# SAN ANTONIO INDEPENDENT SCHOOL DISTRICT ET AL. v. RODRIGUEZ ET AL.

No. 71–1332. Argued October 12, 1972—Decided March 21, 1973

2

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, Blackmun, and Rehnquist, JJ., joined.

STEWART, J., filed a concurring opinion, *post,* p. 59. BRENNAN, J., filed a dissenting opinion, *post,* p. 62. WHITE, J., filed a dissenting opinion, in which DOUGLAS and BRENNAN, JJ., joined, *post,* p. 63. MARSHALL, J., filed a dissenting opinion, in which DOUGLAS, J., joined, *post,* p. 70.

*Charles Alan Wright* argued the cause for appellants. With him on the briefs were *Crawford C. Martin,* Attorney General of Texas, *Nola White,* First Assistant Attorney General, *Alfred Walker,* Executive Assistant Attorney General, *J. C. Davis* and *Pat Bailey,* Assistant Attorneys General, and *Samuel D. McDaniel.*

*Arthur Gochman* argued the cause for appellees. With him on the brief was *Mario Obledo.**

---

*Briefs of *amici curiae* urging reversal were filed by *George F. Kugler, Jr.,* Attorney General, *pro se,* and *Stephen Skillman,* Assistant Attorney General, for the Attorney General of New Jersey; by *George W. Liebmann* and *Shale D. Stiller* for Montgomery County, Maryland, joined by *Francis B. Burch,* Attorney General of Maryland, *Henry R. Lord,* Deputy Attorney General, *E. Stephen Derby,* Assistant Attorney General; *William J. Baxley,* Attorney General of Alabama; *Gary K. Nelson,* Attorney General of Arizona, *James G. Bond,* Assistant Attorney General; *Evelle J. Younger,* Attorney General of California, *Elizabeth Palmer,* Assistant Attorney General, *Edward M. Belasco,* Deputy Attorney General; *Duke W. Dunbar,* Attorney General of Colorado; *Robert K. Killian,* Attorney General of Connecticut, *F. Michael Ahern,* Assistant Attorney General; *W. Anthony Park,* Attorney General of Idaho, *James R. Hargis,* Deputy Attorney General; *Theodore L. Sendak,* Attorney General of Indiana; *Charles M. Wells, Harry T. Ice, Richard C. Turner,* Attorney General of Iowa, *George W. Murray,* Assistant Attorney General; *Vern Miller,* Attorney General of Kansas, *Matthew J. Dowd* and *John C. Johnson,* Assistant Attorneys General; *Ed W. Hancock,* Attorney General of Kentucky, *Carl T. Miller,* Assistant Attorney General; *William J. Guste, Jr.,* Attorney General of Louisiana; *James S. Erwin,* Attorney General of Maine, *George West,* Assistant Attorney General; *Robert H. Quinn,* Attorney General of Massachusetts, *Lawrence T. Bench,* Assistant Attorney General, *Charles F. Clippert,*

Mr. Justice Powell delivered the opinion of the Court.

This suit attacking the Texas system of financing public education was initiated by Mexican-American parents whose children attend the elementary and sec-

*William M. Saxton, Robert B. Webster; A. F. Summer,* Attorney General of Mississippi, *Martin R. McLendon,* Assistant Attorney General; *John Danforth,* Attorney General of Missouri, *D. Brook Bartlett,* Assistant Attorney General; *Clarence A. H. Meyer,* Attorney General of Nebraska, *Harold Mosher,* Assistant Attorney General; *Warren B. Rudman,* Attorney General of New Hampshire; *Louis J. Lefkowitz,* Attorney General of New York; *Robert B. Morgan,* Attorney General of North Carolina, *Burley B. Mitchell, Jr.,* Assistant Attorney General; *Helgi Johanneson,* Attorney General of North Dakota, *Gerald Vandewalle,* Assistant Attorney General; *Lee Johnson,* Attorney General of Oregon; *Daniel R. McLeod,* Attorney General of South Carolina, *G. Lewis Argoe, Jr.,* Assistant Attorney General; *Gordon Mydland,* Attorney General of South Dakota, *C. J. Kelly,* Assistant Attorney General; *David M. Pack,* Attorney General of Tennessee, *Milton P. Rice,* Deputy Attorney General; *Vernon B. Romney,* Attorney General of Utah, *Robert B. Hansen,* Deputy Attorney General; *James M. Jeffords,* Attorney General of Vermont; *Chauncey H. Browning, Jr.,* Attorney General of West Virginia, *Victor A. Barone,* Assistant Attorney General; *Robert W. Warren,* Attorney General of Wisconsin, and *Betty R. Brown,* Assistant Attorney General; and by *John D. Maharg* and *James W. Briggs* for Richard M. Clowes, Superintendent of Schools of the County of Los Angeles, et al.

Briefs of *amici curiae* urging affirmance were filed by *David Bonderman* and *Peter Van N. Lockwood* for Wendell Anderson, Governor of Minnesota, et al.; by *Robert R. Coffman* for Wilson Riles, Superintendent of Public Instruction of California, et al.; by *Roderick M. Hills* for Houston I. Flournoy, Controller of California; by *Ramsey Clark, John Silard, David C. Long, George L. Russell, Jr., Harold J. Ruvoldt, Jr., J. Albert Woll, Thomas E. Harris, John Ligtenberg, A. L. Zwerdling,* and *Stephen I. Schlossberg* for the Mayor and City Council of Baltimore et al.; by *George H. Spencer* for San Antonio Independent School District; by *Norman Dorsen, Marvin M. Karpatkin, Melvin L. Wulf, Paul S. Berger, Joseph B.*

ondary schools in the Edgewood Independent School District, an urban school district in San Antonio, Texas.[1] They brought a class action on behalf of schoolchildren throughout the State who are members of minority groups or who are poor and reside in school districts having a low property tax base. Named as defendants[2] were the State Board of Education, the Commissioner of Education, the State Attorney General, and the Bexar County (San Antonio) Board of Trustees. The com-

*Robison, Arnold Forster,* and *Stanley P. Hebert* for the American Civil Liberties Union et al.; by *Jack Greenberg, James M. Nabrit III, Norman J. Chachkin,* and *Abraham Sofaer* for the NAACP Legal Defense and Educational Fund, Inc.; by *Stephen J. Pollak, Ralph J. Moore, Jr., Richard M. Sharp,* and *David Rubin* for the National Education Assn. et al.; and by *John E. Coons* for John Serrano, Jr., et al.

Briefs of *amici curiae* were filed by *Lawrence E. Walsh, Victor W. Bouldin, Richard B. Smith,* and *Guy M. Struve* for the Republic National Bank of Dallas et al., and by *Joseph R. Cortese, Joseph Guandolo, Bryce Huguenin, Manly W. Mumford, Joseph H. Johnson, Jr., Joseph Rudd, Fred H. Rosenfeld, Herschel H. Friday, George Herrington, Harry T. Ice, Cornelius W. Grafton, Fred G. Benton, Jr., Eugene E. Huppenbauer, Jr., Harold B. Judell, Robert B. Fizzell, John B. Dawson, George J. Fagin, Howard A. Rankin, Huger Sinkler, Robert W. Spence, Hobby H. McCall, James R. Ellis,* and *William J. Kiernan, Jr.,* Bond Counsel.

[1] Not all of the children of these complainants attend public school. One family's children are enrolled in private school "because of the condition of the schools in the Edgewood Independent School District." Third Amended Complaint, App. 14.

[2] The San Antonio Independent School District, whose name this case still bears, was one of seven school districts in the San Antonio metropolitan area that were originally named as defendants. After a pretrial conference, the District Court issued an order dismissing the school districts from the case. Subsequently, the San Antonio Independent School District joined in the plaintiffs' challenge to the State's school finance system and filed an *amicus curiae* brief in support of that position in this Court.

plaint was filed in the summer of 1968 and a three-judge court was impaneled in January 1969.[3] In December 1971[4] the panel rendered its judgment in a *per curiam* opinion holding the Texas school finance system unconstitutional under the Equal Protection Clause of the Fourteenth Amendment.[5] The State appealed, and we noted probable jurisdiction to consider the far-reaching constitutional questions presented. 406 U. S. 966 (1972). For the reasons stated in this opinion, we reverse the decision of the District Court.

I

The first Texas State Constitution, promulgated upon Texas' entry into the Union in 1845, provided for the establishment of a system of free schools.[6] Early in its history, Texas adopted a dual approach to the financing of its schools, relying on mutual participation by the local school districts and the State. As early as 1883, the state

---

[3] A three-judge court was properly convened and there are no questions as to the District Court's jurisdiction or the direct appealability of its judgment. 28 U. S. C. §§ 1253, 2281.

[4] The trial was delayed for two years to permit extensive pretrial discovery and to allow completion of a pending Texas legislative investigation concerning the need for reform of its public school finance system. 337 F. Supp. 280, 285 n. 11 (WD Tex. 1971).

[5] 337 F. Supp. 280. The District Court stayed its mandate for two years to provide Texas an opportunity to remedy the inequities found in its financing program. The court, however, retained jurisdiction to fashion its own remedial order if the State failed to offer an acceptable plan. *Id.*, at 286.

[6] Tex. Const., Art. X, § 1 (1845):

"A general diffusion of knowledge being essential to the preservation of the rights and liberties of the people, it shall be the duty of the Legislature of this State to make suitable provision for the support and maintenance of public schools."

*Id.*, § 2:

"The Legislature shall as early as practicable establish free schools throughout the State, and shall furnish means for their support, by taxation on property . . . ."

constitution was amended to provide for the creation of local school districts empowered to levy ad valorem taxes with the consent of local taxpayers for the "erection . . . of school buildings" and for the "further maintenance of public free schools." [7] Such local funds as were raised were supplemented by funds distributed to each district from the State's Permanent and Available School Funds.[8] The Permanent School Fund, its predecessor established in 1854 with $2,000,000 realized from an annexation settlement,[9] was thereafter endowed with millions of acres of public land set aside to assure a continued source of income for school support.[10] The Available School Fund, which received income from the Permanent School Fund as well as from a state ad valorem property tax and other designated taxes,[11] served as the disbursing arm for most state educational funds throughout the late 1800's and first half of this century. Additionally, in 1918 an increase in state property taxes was used to finance a program providing free textbooks throughout the State.[12]

Until recent times, Texas was a predominantly rural State and its population and property wealth were spread

---

[7] Tex. Const. of 1876, Art. 7, § 3, as amended, Aug. 14, 1883.

[8] *Id.*, Art. 7, §§ 3, 4, 5.

[9] 3 Gammel's Laws of Texas 1847–1854, p. 1461. See Tex. Const., Art. 7, §§ 1, 2, 5 (interpretive commentaries) ; 1 Report of Governor's Committee on Public School Education, The Challenge and the Chance 27 (1969) (hereinafter Governor's Committee Report).

[10] Tex. Const., Art. 7, § 5 (see also the interpretive commentary) ; 5 Governor's Committee Report 11–12.

[11] The various sources of revenue for the Available School Fund are cataloged in A Report of the Adequacy of Texas Schools, prepared by Texas State Board of Education, 7–15 (1938) (hereinafter Texas State Bd. of Educ.).

[12] Tex. Const., Art. 7, § 3, as amended, Nov. 5, 1918 (see interpretive commentary).

8

relatively evenly across the State.[13] Sizable differences in the value of assessable property between local school districts became increasingly evident as the State became more industrialized and as rural-to-urban population shifts became more pronounced.[14] The location of commercial and industrial property began to play a significant role in determining the amount of tax resources available to each school district. These growing disparities in population and taxable property between districts were responsible in part for increasingly notable differences in levels of local expenditure for education.[15]

In due time it became apparent to those concerned with financing public education that contributions from the Available School Fund were not sufficient to ameliorate these disparities.[16] Prior to 1939, the Available School Fund contributed money to every school district at a rate of $17.50 per school-age child.[17] Although the amount was increased several times in the early 1940's,[18]

---

[13] 1 Governor's Committee Report 35; Texas State Bd. of Educ., *supra*, n. 11, at 5–7; J. Coons, W. Clune, & S. Sugarman, Private Wealth and Public Education 48–49 (1970); E. Cubberley, School Funds and Their Apportionment 21–27 (1905).

[14] By 1940, one-half of the State's population was clustered in its metropolitan centers. 1 Governor's Committee Report 35.

[15] Gilmer-Aikin Committee, To Have What We Must 13 (1948).

[16] R. Still, The Gilmer-Aikin Bills 11–13 (1950); Texas State Bd. of Educ., *supra*, n. 11.

[17] Still, *supra*, n. 16, at 12. It should be noted that during this period the median per-pupil expenditure for all schools with an enrollment of more than 200 was approximately $50 per year. During this same period, a survey conducted by the State Board of Education concluded that "in Texas the best educational advantages offered by the State at present may be had for the median cost of $52.67 per year per pupil in average daily attendance." Texas State Bd. of Educ., *supra*, n. 11, at 56.

[18] General Laws of Texas, 46th Legis., Reg. Sess. 1939, c. 7, pp. 274–275 ($22.50 per student); General & Spec. Laws of Texas, 48th Legis., Reg. Sess. 1943, c. 161, pp. 262–263 ($25 per student).

the Fund was providing only $46 per student by 1945.[19]

Recognizing the need for increased state funding to help offset disparities in local spending and to meet Texas' changing educational requirements, the state legislature in the late 1940's undertook a thorough evaluation of public education with an eye toward major reform. In 1947, an 18-member committee, composed of educators and legislators, was appointed to explore alternative systems in other States and to propose a funding scheme that would guarantee a minimum or basic educational offering to each child and that would help overcome interdistrict disparities in taxable resources. The Committee's efforts led to the passage of the Gilmer-Aikin bills, named for the Committee's co-chairmen, establishing the Texas Minimum Foundation School Program.[20] Today, this Program accounts for approximately half of the total educational expenditures in Texas.[21]

The Program calls for state and local contributions to a fund earmarked specifically for teacher salaries, operating expenses, and transportation costs. The State, supplying funds from its general revenues, finances approximately 80% of the Program, and the school districts are responsible—as a unit—for providing the remaining 20%. The districts' share, known as the Local Fund Assignment, is apportioned among the school districts

[19] General & Spec. Laws of Texas, 49th Legis., Reg. Sess. 1945, c. 52, pp. 74–75; Still, supra, n. 16, at 12.

[20] For a complete history of the adoption in Texas of a foundation program, see Still, supra, n. 16. See also 5 Governor's Committee Report 14; Texas Research League, Public School Finance Problems in Texas 9 (Interim Report 1972).

[21] For the 1970–1971 school year this state aid program accounted for 48% of all public school funds. Local taxation contributed 41.1% and 10.9% was provided in federal funds. Texas Research League, supra, n. 20, at 9.

10

under a formula designed to reflect each district's relative taxpaying ability. The Assignment is first divided among Texas' 254 counties pursuant to a complicated economic index that takes into account the relative value of each county's contribution to the State's total income from manufacturing, mining, and agricultural activities. It also considers each county's relative share of all payrolls paid within the State and, to a lesser extent, considers each county's share of all property in the State.[22] Each county's assignment is then divided among its school districts on the basis of each district's share of assessable property within the county.[23] The district, in turn, finances its share of the Assignment out of revenues from local property taxation.

The design of this complex system was twofold. First, it was an attempt to assure that the Foundation Program would have an equalizing influence on expenditure levels between school districts by placing the heaviest burden on the school districts most capable of paying. Second, the Program's architects sought to establish a Local Fund Assignment that would force every school district to contribute to the education of its children[24] but that would not by itself exhaust any district's resources.[25] Today every school district does impose a property tax from which it derives locally expendable

---

[22] 5 Governor's Committee Report 44–48.

[23] At present, there are 1,161 school districts in Texas. Texas Research League, supra, n. 20, at 12.

[24] In 1948, the Gilmer-Aikin Committee found that some school districts were not levying any local tax to support education. Gilmer-Aikin Committee, supra, n. 15, at 16. The Texas State Board of Education Survey found that over 400 common and independent school districts were levying no local property tax in 1935–1936. Texas State Bd. of Educ., supra n. 11, at 39–42.

[25] Gilmer-Aikin Committee, supra, n. 15, at 15.

funds in excess of the amount necessary to satisfy its Local Fund Assignment under the Foundation Program.

In the years since this program went into operation in 1949, expenditures for education—from state as well as local sources—have increased steadily. Between 1949 and 1967, expenditures increased approximately 500%.[26] In the last decade alone the total public school budget rose from $750 million to $2.1 billion [27] and these increases have been reflected in consistently rising per-pupil expenditures throughout the State.[28] Teacher salaries, by far the largest item in any school's budget, have increased dramatically—the state-supported minimum salary for teachers possessing college degrees has risen from $2,400 to $6,000 over the last 20 years.[29]

The school district in which appellees reside, the Edgewood Independent School District, has been compared throughout this litigation with the Alamo Heights Independent School District. This comparison between the least and most affluent districts in the San Antonio area serves to illustrate the manner in which the dual system of finance operates and to indicate the extent to which substantial disparities exist despite the State's impressive progress in recent years. Edgewood is one of seven public school districts in the metropolitan area. Approximately 22,000 students are enrolled in its 25 elementary

---

[26] 1 Governor's Committee Report 51–53.

[27] Texas Research League, *supra*, n. 20, at 2.

[28] In the years between 1949 and 1967, the average per-pupil expenditure for all current operating expenses increased from $206 to $493. In that same period, capital expenditures increased from $44 to $102 per pupil. 1 Governor's Committee Report 53–54.

[29] Acts 1949, 51st Legis., p. 625, c. 334, Art. 4, Tex. Educ. Code Ann. § 16.302 (1972); see generally 3 Governor's Committee Report 113–146; Berke, Carnevale, Morgan & White, The Texas School Finance Case: A Wrong in Search of a Remedy, 1 J. of L. & Educ. 659, 681–682 (1972).

and secondary schools. The district is situated in the core-city sector of San Antonio in a residential neighborhood that has little commercial or industrial property. The residents are predominantly of Mexican-American descent: approximately 90% of the student population is Mexican-American and over 6% is Negro. The average assessed property value per pupil is $5,960—the lowest in the metropolitan area—and the median family income ($4,686) is also the lowest.[30] At an equalized tax rate of $1.05 per $100 of assessed property—the highest in the metropolitan area—the district contributed $26 to the education of each child for the 1967–1968 school year above its Local Fund Assignment for the Minimum Foundation Program. The Foundation Program contributed $222 per pupil for a state-local total of $248.[31] Federal funds added another $108 for a total of $356 per pupil.[32]

Alamo Heights is the most affluent school district in San Antonio. Its six schools, housing approximately 5,000 students, are situated in a residential community quite unlike the Edgewood District. The school population is predominantly "Anglo," having only 18% Mexican-Amer-

---

[30] The family income figures are based on 1960 census statistics.

[31] The Available School Fund, technically, provides a second source of state money. That Fund has continued as in years past (see text accompanying nn. 16–19, *supra*) to distribute uniform per-pupil grants to every district in the State. In 1968, this Fund allotted $98 per pupil. However, because the Available School Fund contribution is always subtracted from a district's entitlement under the Foundation Program, it plays no significant role in educational finance today.

[32] While federal assistance has an ameliorating effect on the difference in school budgets between wealthy and poor districts, the District Court rejected an argument made by the State in that court that it should consider the effect of the federal grant in assessing the discrimination claim. 337 F. Supp., at 284. The State has not renewed that contention here.

icans and less than 1% Negroes. The assessed property value per pupil exceeds $49,000,[33] and the median family income is $8,001. In 1967–1968 the local tax rate of $.85 per $100 of valuation yielded $333 per pupil over and above its contribution to the Foundation Program. Coupled with the $225 provided from that Program, the district was able to supply $558 per student. Supplemented by a $36 per-pupil grant from federal sources, Alamo Heights spent $594 per pupil.

Although the 1967–1968 school year figures provide the only complete statistical breakdown for each category of aid,[34] more recent partial statistics indicate that the previously noted trend of increasing state aid has been significant. For the 1970–1971 school year, the Foundation School Program allotment for Edgewood was $356 per pupil, a 62% increase over the 1967–1968 school year. Indeed, state aid alone in 1970–1971 equaled Edgewood's entire 1967–1968 school budget from local, state, and federal sources. Alamo Heights enjoyed a similar increase under the Foundation Program, netting $491 per pupil in 1970–1971.[35] These recent figures

---

[33] A map of Bexar County included in the record shows that Edgewood and Alamo Heights are among the smallest districts in the county and are of approximately equal size. Yet, as the figures above indicate, Edgewood's student population is more than four times that of Alamo Heights. This factor obviously accounts for a significant percentage of the differences between the two districts in per-pupil property values and expenditures. If Alamo Heights had as many students to educate as Edgewood does (22,000) its per pupil assessed property value would be approximately $11,100 rather than $49,000, and its per-pupil expenditures would therefore have been considerably lower.

[34] The figures quoted above vary slightly from those utilized in the District Court opinion. 337 F. Supp., at 282. These trivial differences are apparently a product of that court's reliance on slightly different statistical data than we have relied upon.

[35] Although the Foundation Program has made significantly greater contributions to both school districts over the last several years, it

14

also reveal the extent to which these two districts' allotments were funded from their own required contributions to the Local Fund Assignment. Alamo Heights, because of its relative wealth, was required to contribute out of its local property tax collections approximately $100 per pupil, or about 20% of its Foundation grant. Edgewood, on the other hand, paid only $8.46 per pupil, which is about 2.4% of its grant.[36] It appears then that, at least as to these two districts, the Local Fund Assignment does reflect a rough approximation of the relative taxpaying potential of each.[37]

---

is apparent that Alamo Heights has enjoyed a larger gain. The sizable difference between the Alamo Heights and Edgewood grants is due to the emphasis in the State's allocation formula on the guaranteed minimum salaries for teachers. Higher salaries are guaranteed to teachers having more years of experience and possessing more advanced degrees. Therefore, Alamo Heights, which has a greater percentage of experienced personnel with advanced degrees, receives more state support. In this regard, the Texas Program is not unlike that presently in existence in a number of other States. Coons, Clune & Sugarman, *supra*, n. 13, at 63–125. Because more dollars have been given to districts that already spend more per pupil, such Foundation formulas have been described as "anti-equalizing." *Ibid.* The formula, however, is anti-equalizing only if viewed in absolute terms. The percentage disparity between the two Texas districts is diminished substantially by state aid. Alamo Heights derived in 1967–1968 almost 13 times as much money from local taxes as Edgewood did. The state aid grants to each district in 1970–1971 lowered the ratio to approximately two to one, *i. e.*, Alamo Heights had a little more than twice as much money to spend per pupil from its combined state and local resources.

[36] Texas Research League, *supra*, n. 20, at 13.

[37] The Economic Index, which determines each county's share of the total Local Fund Assignment, is based on a complex formula conceived in 1949 when the Foundation Program was instituted. See text, *supra*, at 9–10. It has frequently been suggested by Texas researchers that the formula be altered in several respects

Despite these recent increases, substantial interdistrict disparities in school expenditures found by the District Court to prevail in San Antonio and in varying degrees throughout the State [38] still exist. And it was

to provide a more accurate reflection of local taxpaying ability, especially of urban school districts. 5 Governor's Committee Report 48; Texas Research League, Texas Public School Finance: A Majority of Exceptions 31–32 (2d Interim Report 1972); Berke, Carnevale, Morgan & White, *supra,* n. 29, at 680–681.

[38] The District Court relied on the findings presented in an affidavit submitted by Professor Berke of Syracuse University. His sampling of 110 Texas school districts demonstrated a direct correlation between the amount of a district's taxable property and its level of per-pupil expenditures. But his study found only a partial correlation between a district's median family income and per-pupil expenditures. The study also shows, in the relatively few districts at the extremes, an inverse correlation between percentage of minorities and expenditures.

Categorized by Equalized Property Values,
Median Family Income, and State-Local Revenue

| *Market Value of Taxable Property Per Pupil* | *Median Family Income From 1960* | *Per Cent Minority Pupils* | *State & Local Revenues Per Pupil* |
|---|---|---|---|
| Above $100,000 (10 districts) | $5,900 | 8% | $815 |
| $100,000–$50,000 (26 districts) | $4,425 | 32% | $544 |
| $50,000–$30,000 (30 districts) | $4,900 | 23% | $483 |
| $30,000–$10,000 (40 districts) | $5,050 | 31% | $462 |
| Below $10,000 (4 districts) | $3,325 | 79% | $305 |

Although the correlations with respect to family income and race appear only to exist at the extremes, and although the affiant's methodology has been questioned (see Goldstein, Interdistrict Inequalities in School Financing: A Critical Analysis of *Serrano* v. *Priest* and its Progeny, 120 U. Pa. L. Rev. 504, 523–525, nn. 67, 71 (1972)), insofar as any of these correlations is relevant to the

these disparities, largely attributable to differences in the amounts of money collected through local property taxation, that led the District Court to conclude that Texas' dual system of public school financing violated the Equal Protection Clause. The District Court held that the Texas system discriminates on the basis of wealth in the manner in which education is provided for its people. 337 F. Supp., at 282. Finding that wealth is a "suspect" classification and that education is a "fundamental" interest, the District Court held that the Texas system could be sustained only if the State could show that it was premised upon some compelling state interest. *Id.,* at 282–284. On this issue the court concluded that "[n]ot only are defendants unable to demonstrate compelling state interests . . . they fail even to establish a reasonable basis for these classifications." *Id.,* at 284.

Texas virtually concedes that its historically rooted dual system of financing education could not withstand the strict judicial scrutiny that this Court has found appropriate in reviewing legislative judgments that interfere with fundamental constitutional rights [39] or that involve suspect classifications.[40] If, as previous decisions have indicated, strict scrutiny means that the State's system is not entitled to the usual presumption of validity, that the State rather than the complainants must carry a "heavy burden of justification," that the State must

---

constitutional thesis presented in this case we may accept its basic thrust. But see *infra,* at 25–27. For a defense of the reliability of the affidavit, see Berke, Carnevale, Morgan & White, *supra,* n. 29.

[39] *E. g., Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92 (1972); *Dunn* v. *Blumstein,* 405 U. S. 330 (1972); *Shapiro* v. *Thompson,* 394 U. S. 618 (1969).

[40] *E. g., Graham* v. *Richardson,* 403 U. S. 365 (1971); *Loving* v. *Virginia,* 388 U. S. 1 (1967); *McLaughlin* v. *Florida,* 379 U. S. 184 (1964).

demonstrate that its educational system has been structured with "precision," and is "tailored" narrowly to serve legitimate objectives and that it has selected the "less drastic means" for effectuating its objectives,[41] the Texas financing system and its counterpart in virtually every other State will not pass muster. The State candidly admits that "[n]o one familiar with the Texas system would contend that it has yet achieved perfection." [42] Apart from its concession that educational financing in Texas has "defects" [43] and "imperfections," [44] the State defends the system's rationality with vigor and disputes the District Court's finding that it lacks a "reasonable basis."

This, then, establishes the framework for our analysis. We must decide, first, whether the Texas system of financing public education operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny. If so, the judgment of the District Court should be affirmed. If not, the Texas scheme must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.

## II

The District Court's opinion does not reflect the novelty and complexity of the constitutional questions posed by appellees' challenge to Texas' system of school financing. In concluding that strict judicial scrutiny was required,

---

[41] See *Dunn* v. *Blumstein, supra,* at 343, and the cases collected therein.

[42] Brief for Appellants 11.

[43] *Ibid.*

[44] Tr. of Oral Arg. 3; Reply Brief for Appellants 2.

18

that court relied on decisions dealing with the rights of indigents to equal treatment in the criminal trial and appellate processes,[45] and on cases disapproving wealth restrictions on the right to vote.[46] Those cases, the District Court concluded, established wealth as a suspect classification. Finding that the local property tax system discriminated on the basis of wealth, it regarded those precedents as controlling. It then reasoned, based on decisions of this Court affirming the undeniable importance of education,[47] that there is a fundamental right to education and that, absent some compelling state justification, the Texas system could not stand.

We are unable to agree that this case, which in significant aspects is *sui generis,* may be so neatly fitted into the conventional mosaic of constitutional analysis under the Equal Protection Clause. Indeed, for the several reasons that follow, we find neither the suspect-classification nor the fundamental-interest analysis persuasive.

A

The wealth discrimination discovered by the District Court in this case, and by several other courts that have recently struck down school-financing laws in other States,[48] is quite unlike any of the forms of wealth dis-

---

[45] *E. g., Griffin* v. *Illinois,* 351 U. S. 12 (1956); *Douglas* v. *California,* 372 U. S. 353 (1963).

[46] *Harper* v. *Virginia Bd. of Elections,* 383 U. S. 663 (1966); *McDonald* v. *Board of Election Comm'rs,* 394 U. S. 802 (1969); *Bullock* v. *Carter,* 405 U. S. 134 (1972); *Goosby* v. *Osser,* 409 U. S. 512 (1973).

[47] See cases cited in text, *infra,* at 29–30.

[48] *Serrano* v. *Priest,* 5 Cal. 3d 584, 487 P. 2d 1241 (1971); *Van Dusartz* v. *Hatfield,* 334 F. Supp. 870 (Minn. 1971); *Robinson* v. *Cahill,* 118 N. J. Super. 223, 287 A. 2d 187 (1972); *Milliken* v. *Green,* 389 Mich. 1, 203 N. W. 2d 457 (1972), rehearing granted, Jan. 1973.

crimination heretofore reviewed by this Court. Rather than focusing on the unique features of the alleged discrimination, the courts in these cases have virtually assumed their findings of a suspect classification through a simplistic process of analysis: since, under the traditional systems of financing public schools, some poorer people receive less expensive educations than other more affluent people, these systems discriminate on the basis of wealth. This approach largely ignores the hard threshold questions, including whether it makes a difference for purposes of consideration under the Constitution that the class of disadvantaged "poor" cannot be identified or defined in customary equal protection terms, and whether the relative—rather than absolute—nature of the asserted deprivation is of significant consequence. Before a State's laws and the justifications for the classifications they create are subjected to strict judicial scrutiny, we think these threshold considerations must be analyzed more closely than they were in the court below.

The case comes to us with no definitive description of the classifying facts or delineation of the disfavored class. Examination of the District Court's opinion and of appellees' complaint, briefs, and contentions at oral argument suggests, however, at least three ways in which the discrimination claimed here might be described. The Texas system of school financing might be regarded as discriminating (1) against "poor" persons whose incomes fall below some identifiable level of poverty or who might be characterized as functionally "indigent," [49] or

---

[49] In their complaint, appellees purported to represent a class composed of persons who are "poor" and who reside in school districts having a "low value of . . . property." Third Amended Complaint, App. 15. Yet appellees have not defined the term "poor" with reference to any absolute or functional level of impecunity. See

(2) against those who are relatively poorer than others,[50] or (3) against all those who, irrespective of their personal incomes, happen to reside in relatively poorer school districts.[51] Our task must be to ascertain whether, in fact, the Texas system has been shown to discriminate on any of these possible bases and, if so, whether the resulting classification may be regarded as suspect.

The precedents of this Court provide the proper starting point. The individuals, or groups of individuals, who constituted the class discriminated against in our prior cases shared two distinguishing characteristics: because of their impecunity they were completely unable to pay for some desired benefit, and as a consequence, they sustained an absolute deprivation of a meaningful opportunity to enjoy that benefit. In *Griffin* v. *Illinois*,

---

text, *infra*, at 22–23. See also Brief for Appellees 1, 3; Tr. of Oral Arg. 20–21.

[50] Appellees' proof at trial focused on comparative differences in family incomes between residents of wealthy and poor districts. They endeavored, apparently, to show that there exists a direct correlation between personal family income and educational expenditures. See text, *infra*, at 25–27. The District Court may have been relying on this notion of relative discrimination based on family wealth. Citing appellees' statistical proof, the court emphasized that "those districts most rich in property also have the highest median family income . . . while the poor property districts are poor in income . . . ." 337 F. Supp., at 282.

[51] At oral argument and in their brief, appellees suggest that description of the personal status of the residents in districts that spend less on education is not critical to their case. In their view, the Texas system is impermissibly discriminatory even if relatively poor districts do not contain poor people. Brief for Appellees 43–44; Tr. of Oral Arg. 20–21. There are indications in the District Court opinion that it adopted this theory of district discrimination. The opinion repeatedly emphasizes the comparative financial status of districts and early in the opinion it describes appellees' class as being composed of "all . . . children throughout Texas who live in school districts with low property valuations." 337 F. Supp., at 281.

351 U. S. 12 (1956), and its progeny,[52] the Court invalidated state laws that prevented an indigent criminal defendant from acquiring a transcript, or an adequate substitute for a transcript, for use at several stages of the trial and appeal process. The payment requirements in each case were found to occasion *de facto* discrimination against those who, because of their indigency, were totally unable to pay for transcripts. And the Court in each case emphasized that no constitutional violation would have been shown if the State had provided some "adequate substitute" for a full stenographic transcript. *Britt* v. *North Carolina,* 404 U. S. 226, 228 (1971); *Gardner* v. *California,* 393 U. S. 367 (1969); *Draper* v. *Washington,* 372 U. S. 487 (1963); *Eskridge* v. *Washington Prison Board,* 357 U. S. 214 (1958).

Likewise, in *Douglas* v. *California,* 372 U. S. 353 (1963), a decision establishing an indigent defendant's right to court-appointed counsel on direct appeal, the Court dealt only with defendants who could not pay for counsel from their own resources and who had no other way of gaining representation. *Douglas* provides no relief for those on whom the burdens of paying for a criminal defense are, relatively speaking, great but not insurmountable. Nor does it deal with relative differences in the quality of counsel acquired by the less wealthy.

*Williams* v. *Illinois,* 399 U. S. 235 (1970), and *Tate* v. *Short,* 401 U. S. 395 (1971), struck down criminal penalties that subjected indigents to incarceration simply be-

---

[52] *Mayer* v. *City of Chicago,* 404 U. S. 189 (1971); *Williams* v. *Oklahoma City,* 395 U. S. 458 (1969); *Gardner* v. *California,* 393 U. S. 367 (1969); *Roberts* v. *LaVallee,* 389 U. S. 40 (1967); *Long* v. *District Court of Iowa,* 385 U. S. 192 (1966); *Draper* v. *Washington,* 372 U. S. 487 (1963); *Eskridge* v. *Washington Prison Board,* 357 U. S. 214 (1958).

22

cause of their inability to pay a fine. Again, the disadvantaged class was composed only of persons who were totally unable to pay the demanded sum. Those cases do not touch on the question whether equal protection is denied to persons with relatively less money on whom designated fines impose heavier burdens. The Court has not held that fines must be structured to reflect each person's ability to pay in order to avoid disproportionate burdens. Sentencing judges may, and often do, consider the defendant's ability to pay, but in such circumstances they are guided by sound judicial discretion rather than by constitutional mandate.

Finally, in *Bullock* v. *Carter,* 405 U. S. 134 (1972), the Court invalidated the Texas filing-fee requirement for primary elections. Both of the relevant classifying facts found in the previous cases were present there. The size of the fee, often running into the thousands of dollars and, in at least one case, as high as $8,900, effectively barred all potential candidates who were unable to pay the required fee. As the system provided "no reasonable alternative means of access to the ballot" (*id.,* at 149), inability to pay occasioned an absolute denial of a position on the primary ballot.

Only appellees' first possible basis for describing the class disadvantaged by the Texas school-financing system—discrimination against a class of definably "poor" persons—might arguably meet the criteria established in these prior cases. Even a cursory examination, however, demonstrates that neither of the two distinguishing characteristics of wealth classifications can be found here. First, in support of their charge that the system discriminates against the "poor," appellees have made no effort to demonstrate that it operates to the peculiar disadvantage of any class fairly definable as indigent, or as composed of persons whose incomes are beneath any

designated poverty level. Indeed, there is reason to believe that the poorest families are not necessarily clustered in the poorest property districts. A recent and exhaustive study of school districts in Connecticut concluded that "[i]t is clearly incorrect . . . to contend that the 'poor' live in 'poor' districts . . . . Thus, the major factual assumption of *Serrano*—that the educational financing system discriminates against the 'poor'—is simply false in Connecticut." [53] Defining "poor" families as those below the Bureau of the Census "poverty level," [54] the Connecticut study found, not surprisingly, that the poor were clustered around commercial and industrial areas—those same areas that provide the most attractive sources of property tax income for school districts. [55] Whether a similar pattern would be discovered in Texas is not known, but there is no basis on the record in this case for assuming that the poorest people—defined by reference to any level of absolute impecunity—are concentrated in the poorest districts.

Second, neither appellees nor the District Court addressed the fact that, unlike each of the foregoing cases, lack of personal resources has not occasioned an absolute deprivation of the desired benefit. The argument here is not that the children in districts having relatively low assessable property values are receiving no public education; rather, it is that they are receiving a poorer quality education than that available to children in districts having more assessable wealth. Apart from the unsettled and disputed question whether the quality of education may be determined by the amount of money

---

[53] Note, A Statistical Analysis of the School Finance Decisions: On Winning Battles and Losing Wars, 81 Yale L. J. 1303, 1328–1329 (1972).

[54] *Id.*, at 1324 and n. 102

[55] *Id.*, at 1328.

expended for it,[56] a sufficient answer to appellees' argument is that, at least where wealth is involved, the Equal Protection Clause does not require absolute equality or precisely equal advantages.[57] Nor, indeed, in view of the infinite variables affecting the educational process, can any system assure equal quality of education except in the most relative sense. Texas asserts that the Minimum Foundation Program provides an "adequate" education for all children in the State. By providing 12 years of free public-school education, and by assuring teachers, books, transportation, and operating funds, the Texas Legislature has endeavored to "guarantee, for the welfare of the state as a whole, that all people shall have at least an adequate program of education. This is what is meant by 'A Minimum Foundation Program of Education.' "[58] The State repeatedly asserted in its briefs in this Court that it has fulfilled this desire and that it now assures "every child in every school district an adequate education."[59] No proof was offered at trial persuasively discrediting or refuting the State's assertion.

---

[56] Each of appellees' possible theories of wealth discrimination is founded on the assumption that the quality of education varies directly with the amount of funds expended on it and that, therefore, the difference in quality between two schools can be determined simplistically by looking at the difference in per-pupil expenditures. This is a matter of considerable dispute among educators and commentators. See nn. 86 and 101, *infra.*

[57] *E. g., Bullock* v. *Carter,* 405 U. S., at 137, 149; *Mayer* v. *City of Chicago,* 404 U. S., at 194; *Draper* v. *Washington,* 372 U. S., at 495–496; *Douglas* v. *California,* 372 U. S., at 357.

[58] Gilmer-Aikin Committee, *supra,* n. 15, at 13. Indeed, even though local funding has long been a significant aspect of educational funding, the State has always viewed providing an acceptable education as one of its primary functions. See Texas State Bd. of Educ., *supra,* n. 11, at 1, 7.

[59] Brief for Appellants 35; Reply Brief for Appellants 1.

For these two reasons—the absence of any evidence that the financing system discriminates against any definable category of "poor" people or that it results in the absolute deprivation of education—the disadvantaged class is not susceptible of identification in traditional terms.[60]

As suggested above, appellees and the District Court may have embraced a second or third approach, the second of which might be characterized as a theory of relative or comparative discrimination based on family income. Appellees sought to prove that a direct correlation exists between the wealth of families within each district and the expenditures therein for education. That is, along a continuum, the poorer the family the lower the dollar amount of education received by the family's children.

The principal evidence adduced in support of this comparative-discrimination claim is an affidavit submitted by Professor Joel S. Berke of Syracuse University's Educational Finance Policy Institute. The District Court, relying in major part upon this affidavit and apparently accepting the substance of appellees' theory,

---

[60] An educational financing system might be hypothesized, however, in which the analogy to the wealth discrimination cases would be considerably closer. If elementary and secondary education were made available by the State only to those able to pay a tuition assessed against each pupil, there would be a clearly defined class of "poor" people—definable in terms of their inability to pay the prescribed sum—who would be absolutely precluded from receiving an education. That case would present a far more compelling set of circumstances for judicial assistance than the case before us today. After all, Texas has undertaken to do a good deal more than provide an education to those who can afford it. It has provided what it considers to be an adequate base education for all children and has attempted, though imperfectly, to ameliorate by state funding and by the local assessment program the disparities in local tax resources.

noted, first, a positive correlation between the wealth of school districts, measured in terms of assessable property per pupil, and their levels of per-pupil expenditures. Second, the court found a similar correlation between district wealth and the personal wealth of its residents, measured in terms of median family income. 337 F. Supp., at 282 n. 3.

If, in fact, these correlations could be sustained, then it might be argued that expenditures on education—equated by appellees to the quality of education—are dependent on personal wealth. Appellees' comparative-discrimination theory would still face serious unanswered questions, including whether a bare positive correlation or some higher degree of correlation[61] is necessary to provide a basis for concluding that the financing system is designed to operate to the peculiar disadvantage of the comparatively poor,[62] and whether a class of this size and diversity could ever claim the special protection accorded "suspect" classes. These questions need not be addressed in this case, however, since appellees' proof fails to support their allegations or the District Court's conclusions.

Professor Berke's affidavit is based on a survey of approximately 10% of the school districts in Texas. His findings, previously set out in the margin,[63] show only

---

[61] Also, it should be recognized that median income statistics may not define with any precision the status of individual families within any given district. A more dependable showing of comparative wealth discrimination would also examine factors such as the average income, the mode, and the concentration of poor families in any district.

[62] Cf. *Jefferson* v. *Hackney*, 406 U. S. 535, 547–549 (1972); Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L. J. 1205, 1258–1259 (1970); Simon, The School Finance Decisions: Collective Bargaining and Future Finance Systems, 82 Yale L. J. 409, 439–440 (1973).

[63] *Supra,* at 15 n. 38.

that the wealthiest few districts in the sample have the highest median family incomes and spend the most on education, and that the several poorest districts have the lowest family incomes and devote the least amount of money to education. For the remainder of the districts— 96 districts composing almost 90% of the sample—the correlation is inverted, *i. e.*, the districts that spend next to the most money on education are populated by families having next to the lowest median family incomes while the districts spending the least have the highest median family incomes. It is evident that, even if the conceptual questions were answered favorably to appellees, no factual basis exists upon which to found a claim of comparative wealth discrimination.[64]

This brings us, then, to the third way in which the classification scheme might be defined—*district* wealth discrimination. Since the only correlation indicated by the evidence is between district property wealth and expenditures, it may be argued that discrimination might be found without regard to the individual income characteristics of district residents. Assuming a perfect correlation between district property wealth and expenditures from top to bottom, the disadvantaged class might be

---

[64] Studies in other States have also questioned the existence of any dependable correlation between a district's wealth measured in terms of assessable property and the collective wealth of families residing in the district measured in terms of median family income. Ridenour & Ridenour, Serrano v. Priest: Wealth and Kansas School Finance, 20 Kan. L. Rev. 213, 225 (1972) ("it can be argued that there exists in Kansas almost an inverse correlation: districts with highest income per pupil have low assessed value per pupil, and districts with high assessed value per pupil have low income per pupil"); Davis, Taxpaying Ability: A Study of the Relationship Between Wealth and Income in California Counties, in The Challenge of Change in School Finance, 10th Nat. Educational Assn. Conf. on School Finance 199 (1967). Note, 81 Yale L. J., *supra*, n. 53. See also Goldstein, *supra*, n. 38, at 522–527.

viewed as encompassing every child in every district except the district that has the most assessable wealth and spends the most on education.[65] Alternatively, as suggested in Mr. Justice Marshall's dissenting opinion, *post*, at 96, the class might be defined more restrictively to include children in districts with assessable property which falls below the statewide average, or median, or below some other artificially defined level.

However described, it is clear that appellees' suit asks this Court to extend its most exacting scrutiny to review a system that allegedly discriminates against a large, diverse, and amorphous class, unified only by the common factor of residence in districts that happen to have less taxable wealth than other districts.[66] The system of alleged discrimination and the class it defines have none of the traditional indicia of suspectness: the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.

We thus conclude that the Texas system does not operate to the peculiar disadvantage of any suspect class.

---

[65] Indeed, this is precisely how the plaintiffs in *Serrano* v. *Priest* defined the class they purported to represent: "Plaintiff children claim to represent a class consisting of all public school pupils in California, 'except children in that school district . . . which . . . affords the greatest educational opportunity of all school districts within California.'" 5 Cal. 3d, at 589, 487 P. 2d, at 1244. See also *Van Dusartz* v. *Hatfield,* 334 F. Supp., at 873.

[66] Appellees, however, have avoided describing the Texas system as one resulting merely in discrimination between districts *per se* since this Court has never questioned the State's power to draw reasonable distinctions between political subdivisions within its borders. *Griffin* v. *County School Board of Prince Edward County,* 377 U. S. 218, 230–231 (1964); *McGowan* v. *Maryland,* 366 U. S. 420, 427 (1961); *Salsburg* v. *Maryland,* 346 U. S. 545, 552 (1954).

But in recognition of the fact that this Court has never heretofore held that wealth discrimination alone provides an adequate basis for invoking strict scrutiny, appellees have not relied solely on this contention.[67] They also assert that the State's system impermissibly interferes with the exercise of a "fundamental" right and that accordingly the prior decisions of this Court require the application of the strict standard of judicial review. *Graham* v. *Richardson*, 403 U. S. 365, 375–376 (1971); *Kramer* v. *Union School District*, 395 U. S. 621 (1969); *Shapiro* v. *Thompson*, 394 U. S. 618 (1969). It is this question—whether education is a fundamental right, in the sense that it is among the rights and liberties protected by the Constitution—which has so consumed the attention of courts and commentators in recent years.[68]

## B

In *Brown* v. *Board of Education*, 347 U. S. 483 (1954), a unanimous Court recognized that "education is perhaps the most important function of state and local governments." *Id.*, at 493. What was said there in the context of racial discrimination has lost none of its vitality with the passage of time:

"Compulsory school attendance laws and the great expenditures for education both demonstrate our

[67] *E. g., Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663 (1966); *United States* v. *Kras*, 409 U. S. 434 (1973). See MR. JUSTICE MARSHALL's dissenting opinion, *post*, at 121.

[68] See *Serrano* v. *Priest, supra; Van Dusartz* v. *Hatfield, supra; Robinson* v. *Cahill*, 118 N. J. Super. 223, 287 A. 2d 187 (1972); Coons, Clune & Sugarman, *supra*, n. 13, at 339–393; Goldstein, *supra*, n. 38, at 534–541; Vieira, Unequal Educational Expenditures: Some Minority Views on *Serrano* v. *Priest*, 37 Mo. L. Rev. 617, 618–624 (1972); Comment, Educational Financing, Equal Protection of the Laws, and the Supreme Court, 70 Mich. L. Rev. 1324, 1335–1342 (1972); Note, The Public School Financing Cases: Interdistrict Inequalities and Wealth Discrimination, 14 Ariz. L. Rev. 88, 120–124 (1972).

recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *Ibid.*

This theme, expressing an abiding respect for the vital role of education in a free society, may be found in numerous opinions of Justices of this Court writing both before and after *Brown* was decided. *Wisconsin* v. *Yoder,* 406 U. S. 205, 213 (BURGER, C. J.), 237, 238–239 (WHITE, J.), (1972); *Abington School Dist.* v. *Schempp,* 374 U. S. 203, 230 (1963) (BRENNAN, J.); *McCollum* v. *Board of Education,* 333 U. S. 203, 212 (1948) (Frankfurter, J.); *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925); *Meyer* v. *Nebraska,* 262 U. S. 390 (1923); *Interstate Consolidated Street R. Co.* v. *Massachusetts,* 207 U. S. 79 (1907).

Nothing this Court holds today in any way detracts from our historic dedication to public education. We are in complete agreement with the conclusion of the three-judge panel below that "the grave significance of education both to the individual and to our society" cannot be doubted.[69] But the importance of a service performed by the State does not determine whether it must be regarded as fundamental for purposes of examination under the Equal Protection Clause. Mr. Justice

---

[69] 337 F. Supp., at 283.

Harlan, dissenting from the Court's application of strict scrutiny to a law impinging upon the right of interstate travel, admonished that "[v]irtually every state statute affects important rights." *Shapiro* v. *Thompson*, 394 U. S., at 655, 661. In his view, if the degree of judicial scrutiny of state legislation fluctuated, depending on a majority's view of the importance of the interest affected, we would have gone "far toward making this Court a 'super-legislature.'" *Ibid.* We would, indeed, then be assuming a legislative role and one for which the Court lacks both authority and competence. But MR. JUSTICE STEWART's response in *Shapiro* to Mr. Justice Harlan's concern correctly articulates the limits of the fundamental-rights rationale employed in the Court's equal protection decisions:

> "The Court today does *not* 'pick out particular human activities, characterize them as "fundamental," and give them added protection . . . .' To the contrary, the Court simply recognizes, as it must, an established constitutional right, and gives to that right no less protection than the Constitution itself demands." *Id.,* at 642. (Emphasis in original.)

MR. JUSTICE STEWART's statement serves to underline what the opinion of the Court in *Shapiro* makes clear. In subjecting to strict judicial scrutiny state welfare eligibility statutes that imposed a one-year durational residency requirement as a precondition to receiving AFDC benefits, the Court explained:

> "[I]n moving from State to State . . . appellees were exercising a constitutional right, and any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional." *Id.,* at 634. (Emphasis in original.)

The right to interstate travel had long been recognized as a right of constitutional significance,[70] and the Court's decision, therefore, did not require an ad hoc determination as to the social or economic importance of that right.[71]

*Lindsey* v. *Normet*, 405 U. S. 56 (1972), decided only last Term, firmly reiterates that social importance is not the critical determinant for subjecting state legislation to strict scrutiny. The complainants in that case, involving a challenge to the procedural limitations imposed on tenants in suits brought by landlords under Oregon's Forcible Entry and Wrongful Detainer Law, urged the Court to examine the operation of the statute under "a more stringent standard than mere rationality." *Id.*, at 73. The tenants argued that the statutory limitations implicated "fundamental interests which are particularly important to the poor," such as the " 'need for decent shelter' " and the " 'right to retain peaceful possession of one's home.' " *Ibid.* Mr. Justice White's analysis, in his opinion for the Court, is instructive:

> "We do not denigrate the importance of decent, safe, and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access

---

[70] *E. g., United States* v. *Guest*, 383 U. S. 745, 757–759 (1966); *Oregon* v. *Mitchell*, 400 U. S. 112, 229, 237–238 (1970) (opinion of Brennan, White, and Marshall, JJ.).

[71] After *Dandridge* v. *Williams*, 397 U. S. 471 (1970), there could be no lingering question about the constitutional foundation for the Court's holding in *Shapiro*. In *Dandridge*, the Court applied the rational-basis test in reviewing Maryland's maximum family grant provision under its AFDC program. A federal district court held the provision unconstitutional, applying a stricter standard of review. In the course of reversing the lower court, the Court distinguished *Shapiro* properly on the ground that in that case "the Court found state interference with the constitutionally protected freedom of interstate travel." *Id.*, at 484 n. 16.

to dwellings of a particular quality or any recognition of the right of a tenant to occupy the real property of his landlord beyond the term of his lease, without the payment of rent . . . . *Absent constitutional mandate,* the assurance of adequate housing and the definition of landlord-tenant relationships are legislative, not judicial, functions." *Id.,* at 74. (Emphasis supplied.)

Similarly, in *Dandridge* v. *Williams,* 397 U. S. 471 (1970), the Court's explicit recognition of the fact that the "administration of public welfare assistance . . . involves the most basic economic needs of impoverished human beings," *id.,* at 485,[72] provided no basis for departing from the settled mode of constitutional analysis of legislative classifications involving questions of economic and social policy. As in the case of housing, the central importance of welfare benefits to the poor was not an adequate foundation for requiring the State to justify its law by showing some compelling state interest. See also *Jefferson* v. *Hackney,* 406 U. S. 535 (1972); *Richardson* v. *Belcher,* 404 U. S. 78 (1971).

The lesson of these cases in addressing the question now before the Court is plain. It is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws. Thus, the key to discovering whether education is "fundamental" is not to be found in comparisons of the relative societal significance of education as opposed to subsistence or housing. Nor is it to be found by weighing whether education is as important as the right to travel. Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Con-

---

[72] The Court refused to apply the strict-scrutiny test despite its contemporaneous recognition in *Goldberg* v. *Kelly,* 397 U. S. 254, 264 (1970) that "welfare provides the means to obtain essential food, clothing, housing, and medical care."

34

stitution. *Eisenstadt* v. *Baird,* 405 U. S. 438 (1972); [73]
*Dunn* v. *Blumstein,* 405 U. S. 330 (1972); [74] *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92 (1972); [75] *Skinner* v. *Oklahoma,* 316 U. S. 535 (1942). [76]

[73] In *Eisenstadt,* the Court struck down a Massachusetts statute that prohibited the distribution of contraceptive devices, finding that the law failed "to satisfy even the more lenient equal protection standard." 405 U. S., at 447 n. 7. Nevertheless, in *dictum,* the Court recited the correct form of equal protection analysis: "[I]f we were to conclude that the Massachusetts statute impinges upon fundamental freedoms under *Griswold* [v. *Connecticut,* 381 U. S. 479 (1965)], the statutory classification would have to be not merely *rationally related* to a valid public purpose but *necessary* to the achievement of a *compelling* state interest." *Ibid.* (emphasis in original).

[74] *Dunn* fully canvasses this Court's voting rights cases and explains that "this Court has made clear that a citizen has a *constitutionally protected right* to participate in elections on an equal basis with other citizens in the jurisdiction." 405 U. S., at 336 (emphasis supplied). The constitutional underpinnings of the right to equal treatment in the voting process can no longer be doubted even though, as the Court noted in *Harper* v. *Virginia Bd. of Elections,* 383 U. S., at 665, "the right to vote in state elections is nowhere expressly mentioned." See *Oregon* v. *Mitchell,* 400 U. S., at 135, 138–144 (DOUGLAS, J.), 229, 241–242 (BRENNAN, WHITE, and MARSHALL, JJ.); *Bullock* v. *Carter,* 405 U. S., at 140–144; *Kramer* v. *Union School District,* 395 U. S. 621, 625–630 (1969); *Williams* v. *Rhodes,* 393 U. S. 23, 29, 30–31 (1968); *Reynolds* v. *Sims,* 377 U. S. 533, 554–562 (1964); *Gray* v. *Sanders,* 372 U. S. 368, 379–381 (1963).

[75] In *Mosley,* the Court struck down a Chicago antipicketing ordinance that exempted labor picketing from its prohibitions. The ordinance was held invalid under the Equal Protection Clause after subjecting it to careful scrutiny and finding that the ordinance was not narrowly drawn. The stricter standard of review was appropriately applied since the ordinance was one "affecting First Amendment interests." 408 U. S., at 101.

[76] *Skinner* applied the standard of close scrutiny to a state law permitting forced sterilization of "habitual criminals." Implicit in the Court's opinion is the recognition that the right of procreation is among the rights of personal privacy protected under the Constitution. See *Roe* v. *Wade,* 410 U. S. 113, 152 (1973).

Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected. As we have said, the undisputed importance of education will not alone cause this Court to depart from the usual standard for reviewing a State's social and economic legislation. It is appellees' contention, however, that education is distinguishable from other services and benefits provided by the State because it bears a peculiarly close relationship to other rights and liberties accorded protection under the Constitution. Specifically, they insist that education is itself a fundamental personal right because it is essential to the effective exercise of First Amendment freedoms and to intelligent utilization of the right to vote. In asserting a nexus between speech and education, appellees urge that the right to speak is meaningless unless the speaker is capable of articulating his thoughts intelligently and persuasively. The "marketplace of ideas" is an empty forum for those lacking basic communicative tools. Likewise, they argue that the corollary right to receive information [77] becomes little more than a hollow privilege when the recipient has not been taught to read, assimilate, and utilize available knowledge.

A similar line of reasoning is pursued with respect to the right to vote.[78] Exercise of the franchise, it is contended, cannot be divorced from the educational foun-

---

[77] See, e. g., Red Lion Broadcasting Co. v. FCC, 395 U. S. 367, 389–390 (1969); Stanley v. Georgia, 394 U. S. 557, 564 (1969); Lamont v. Postmaster General, 381 U. S. 301, 306–307 (1965).

[78] Since the right to vote, per se, is not a constitutionally protected right, we assume that appellees' references to that right are simply shorthand references to the protected right, implicit in our constitutional system, to participate in state elections on an equal basis with other qualified voters whenever the State has adopted an elective process for determining who will represent any segment of the State's population. See n. 74, supra.

dation of the voter. The electoral process, if reality is to conform to the democratic ideal, depends on an informed electorate: a voter cannot cast his ballot intelligently unless his reading skills and thought processes have been adequately developed.

We need not dispute any of these propositions. The Court has long afforded zealous protection against unjustifiable governmental interference with the individual's rights to speak and to vote. Yet we have never presumed to possess either the ability or the authority to guarantee to the citizenry the most *effective* speech or the most *informed* electoral choice. That these may be desirable goals of a system of freedom of expression and of a representative form of government is not to be doubted.[79] These are indeed goals to be pursued by a people whose thoughts and beliefs are freed from governmental interference. But they are not values to be implemented by judicial intrusion into otherwise legitimate state activities.

Even if it were conceded that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either right, we have no indication that the present levels of educational expendi-

---

[79] The States have often pursued their entirely legitimate interest in assuring "intelligent exercise of the franchise," *Katzenbach* v. *Morgan,* 384 U. S. 641, 655 (1966), through such devices as literacy tests and age restrictions on the right to vote. See *ibid.; Oregon* v. *Mitchell,* 400 U. S. 112 (1970). And, where those restrictions have been found to promote intelligent use of the ballot without discriminating against those racial and ethnic minorities previously deprived of an equal educational opportunity, this Court has upheld their use. Compare *Lassiter* v. *Northampton County Bd. of Elections,* 360 U. S. 45 (1959), with *Oregon* v. *Mitchell, supra,* at 133 (Black, J.), 135, 144–147 (Douglas, J.), 152, 216–217 (Harlan, J.), 229, 231–236 (Brennan, White, and Marshall, JJ.), 281, 282–284 (Stewart, J.), and *Gaston County* v. *United States,* 395 U. S. 285 (1969).

tures in Texas provide an education that falls short. Whatever merit appellees' argument might have if a State's financing system occasioned an absolute denial of educational opportunities to any of its children, that argument provides no basis for finding an interference with fundamental rights where only relative differences in spending levels are involved and where—as is true in the present case—no charge fairly could be made that the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process.

Furthermore, the logical limitations on appellees' nexus theory are difficult to perceive. How, for instance, is education to be distinguished from the significant personal interests in the basics of decent food and shelter? Empirical examination might well buttress an assumption that the ill-fed, ill-clothed, and ill-housed are among the most ineffective participants in the political process, and that they derive the least enjoyment from the benefits of the First Amendment.[80] If so, appellees' thesis would cast serious doubt on the authority of *Dandridge* v. *Williams, supra,* and *Lindsey* v. *Normet, supra.*

We have carefully considered each of the arguments supportive of the District Court's finding that education is a fundamental right or liberty and have found those arguments unpersuasive. In one further respect we find this a particularly inappropriate case in which to subject state action to strict judicial scrutiny. The present case, in another basic sense, is significantly different from any of the cases in which the Court has

[80] See Schoettle, The Equal Protection Clause in Public Education, 71 Col. L. Rev. 1355, 1389–1390 (1971); Vieira, *supra,* n. 68, at 622–623; Comment, Tenant Interest Representation: Proposal for a National Tenants' Association, 47 Tex. L. Rev. 1160, 1172–1173, n. 61 (1969).

applied strict scrutiny to state or federal legislation touching upon constitutionally protected rights. Each of our prior cases involved legislation which "deprived," "infringed," or "interfered" with the free exercise of some such fundamental personal right or liberty. See *Skinner* v. *Oklahoma, supra,* at 536; *Shapiro* v. *Thompson, supra,* at 634; *Dunn* v. *Blumstein, supra,* at 338–343. A critical distinction between those cases and the one now before us lies in what Texas is endeavoring to do with respect to education. MR. JUSTICE BRENNAN, writing for the Court in *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966), expresses well the salient point: [81]

> "This is not a complaint that Congress . . . has unconstitutionally denied or diluted anyone's right to vote but rather that Congress violated the Constitution by not extending the relief effected [to others similarly situated] . . . .
>
> "[The federal law in question] does not restrict or deny the franchise but in effect extends the franchise to persons who otherwise would be denied it by state law. . . . We need only decide whether the challenged limitation on the relief effected . . . was permissible. In deciding that question, the principle that calls for the closest scrutiny of distinctions in laws *denying* fundamental rights . . . is

---

[81] *Katzenbach* v. *Morgan* involved a challenge by registered voters in New York City to a provision of the Voting Rights Act of 1965 that prohibited enforcement of a state law calling for English literacy tests for voting. The law was suspended as to residents from Puerto Rico who had completed at least six years of education at an "American-flag" school in that country even though the language of instruction was other than English. This Court upheld the questioned provision of the 1965 Act over the claim that it discriminated against those with a sixth-grade education obtained in non-English-speaking schools other than the ones designated by the federal legislation.

inapplicable; for the distinction challenged by appellees is presented only as a limitation on a reform measure aimed at eliminating an existing barrier to the exercise of the franchise. Rather, in deciding the constitutional propriety of the limitations in such a reform measure we are guided by the familiar principles that a 'statute is not invalid under the Constitution because it might have gone farther than it did,' . . . that a legislature need not 'strike at all evils at the same time,' . . . and that 'reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind . . . .' " *Id.*, at 656–657. (Emphasis in original.)

The Texas system of school financing is not unlike the federal legislation involved in *Katzenbach* in this regard. Every step leading to the establishment of the system Texas utilizes today—including the decisions permitting localities to tax and expend locally, and creating and continuously expanding state aid—was implemented in an effort to *extend* public education and to improve its quality.[82] Of course, every reform that benefits some more than others may be criticized for what it fails to accomplish. But we think it plain that, in substance, the thrust of the Texas system is affirmative and reformatory and, therefore, should be scrutinized under judicial principles sensitive to the nature of the State's efforts and to the rights reserved to the States under the Constitution.[83]

---

[82] Cf. *Meyer* v. *Nebraska*, 262 U. S. 390 (1923); *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925); *Hargrave* v. *Kirk*, 313 F. Supp. 944 (MD Fla. 1970), vacated, 401 U. S. 476 (1971).

[83] See *Schilb* v. *Kuebel*, 404 U. S. 357 (1971); *McDonald* v. *Board of Election Comm'rs*, 394 U. S. 802 (1969).

## C

It should be clear, for the reasons stated above and in accord with the prior decisions of this Court, that this is not a case in which the challenged state action must be subjected to the searching judicial scrutiny reserved for laws that create suspect classifications or impinge upon constitutionally protected rights.

We need not rest our decision, however, solely on the inappropriateness of the strict-scrutiny test. A century of Supreme Court adjudication under the Equal Protection Clause affirmatively supports the application of the traditional standard of review, which requires only that the State's system be shown to bear some rational relationship to legitimate state purposes. This case represents far more than a challenge to the manner in which Texas provides for the education of its children. We have here nothing less than a direct attack on the way in which Texas has chosen to raise and disburse state and local tax revenues. We are asked to condemn the State's judgment in conferring on political subdivisions the power to tax local property to supply revenues for local interests. In so doing, appellees would have the Court intrude in an area in which it has traditionally deferred to state legislatures.[84] This Court has often admonished against such interferences with the State's fiscal policies under the Equal Protection Clause:

"The broad discretion as to classification possessed by a legislature in the field of taxation has long been recognized. . . . [T]he passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax poli-

[84] See, e. g., Bell's Gap R. Co. v. Pennsylvania, 134 U. S. 232 (1890); Carmichael v. Southern Coal & Coke Co., 301 U. S. 495, 508–509 (1937); Allied Stores of Ohio v. Bowers, 358 U. S. 522 (1959).

cies. . . . It has . . . been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. . . ." *Madden* v. *Kentucky,* 309 U. S. 83, 87–88 (1940).

See also *Lehnhausen* v. *Lake Shore Auto Parts Co.,* 410 U. S. 356 (1973); *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435, 445 (1940).

Thus, we stand on familiar ground when we continue to acknowledge that the Justices of this Court lack both the expertise and the familiarity with local problems so necessary to the making of wise decisions with respect to the raising and disposition of public revenues. Yet, we are urged to direct the States either to alter drastically the present system or to throw out the property tax altogether in favor of some other form of taxation. No scheme of taxation, whether the tax is imposed on property, income, or purchases of goods and services, has yet been devised which is free of all discriminatory impact. In such a complex arena in which no perfect alternatives exist, the Court does well not to impose too rigorous a standard of scrutiny lest all local fiscal schemes become subjects of criticism under the Equal Protection Clause.[85]

---

[85] Those who urge that the present system be invalidated offer little guidance as to what type of school financing should replace it. The most likely result of rejection of the existing system would be statewide financing of all public education with funds derived from taxation of property or from the adoption or expansion of sales and income taxes. See Simon, *supra,* n. 62. The authors of *Private Wealth and Public Education, supra,* n. 13, at 201–242, suggest an

In addition to matters of fiscal policy, this case also involves the most persistent and difficult questions of educational policy, another area in which this Court's lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels. Education, perhaps even more than welfare assistance, presents a myriad of "intractable economic, social, and even philosophical problems." *Dandridge* v. *Williams,* 397 U. S., at 487. The very complexity of the problems of financing and managing a statewide public school system suggests that "there will be more than one constitutionally permissible method of solving them," and that, within the limits of rationality, "the legislature's efforts to tackle the problems" should be entitled to respect. *Jefferson* v. *Hackney,* 406 U. S., at 546–547. On even the most basic questions in this area the scholars and educational experts are divided. Indeed, one of the major

---

alternative scheme, known as "district power equalizing." In simplest terms, the State would guarantee that at any particular rate of property taxation the district would receive a stated number of dollars regardless of the district's tax base. To finance the subsidies to "poorer" districts, funds would be taken away from the "wealthier" districts that, because of their higher property values, collect more than the stated amount at any given rate. This is not the place to weigh the arguments for and against "district power equalizing," beyond noting that commentators are in disagreement as to whether it is feasible, how it would work, and indeed whether it would violate the equal protection theory underlying appellees' case. President's Commission on School Finance, Schools, People, & Money 32–33 (1972); Bateman & Brown, Some Reflections on *Serrano* v. *Priest,* 49 J. Urban L. 701, 706–708 (1972); Brest, Book Review, 23 Stan. L. Rev. 591, 594–596 (1971); Goldstein, *supra,* n. 38, at 542–543; Wise, School Finance Equalization Lawsuits: A Model Legislative Response, 2 Yale Rev. of L. & Soc. Action 123, 125 (1971); Silard & White, Intrastate Inequalities in Public Education: The Case for Judicial Relief Under the Equal Protection Clause, 1970 Wis. L. Rev. 7, 29–30.

sources of controversy concerns the extent to which there is a demonstrable correlation between educational expenditures and the quality of education [86]— an assumed correlation underlying virtually every legal conclusion drawn by the District Court in this case. Related to the questioned relationship between cost and quality is the equally unsettled controversy as to the proper goals of a system of public education.[87] And the question regarding the most effective relationship beween state boards of education and local school boards, in terms of their respective responsibilities and degrees of control, is now undergoing searching re-examination. The ultimate wisdom as to these and related problems of education is not likely to be divined for all time even by the scholars who now so earnestly debate the issues. In such circumstances, the judiciary is well advised to refrain from imposing on the States inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions.

---

[86] The quality-cost controversy has received considerable attention. Among the notable authorities on both sides are the following: C. Jencks, Inequality (1972); C. Silberman, Crisis in the Classroom (1970); U. S. Office of Education, Equality of Educational Opportunity (1966) (the Coleman Report); On Equality of Educational Opportunity (F. Mosteller & D. Moynihan eds. 1972); J. Guthrie, G. Kleindorfer, H. Levin & R. Stout, Schools and Inequality (1971); President's Commission on School Finance, *supra,* n. 85; Swanson, The Cost-Quality Relationship, in The Challenge of Change in School Finance, 10th Nat. Educational Assn. Conf. on School Finance 151 (1967).

[87] See the results of the Texas Governor's Committee's statewide survey on the goals of education in that State. 1 Governor's Committee Report 59–68. See also Goldstein, *supra,* n. 38, at 519–522; Schoettle, *supra,* n. 80; authorities cited in n. 86, *supra.*

It must be remembered, also, that every claim arising under the Equal Protection Clause has implications for the relationship between national and state power under our federal system. Questions of federalism are always inherent in the process of determining whether a State's laws are to be accorded the traditional presumption of constitutionality, or are to be subjected instead to rigorous judicial scrutiny. While "[t]he maintenance of the principles of federalism is a foremost consideration in interpreting any of the pertinent constitutional provisions under which this Court examines state action," [88] it would be difficult to imagine a case having a greater potential impact on our federal system than the one now before us, in which we are urged to abrogate systems of financing public education presently in existence in virtually every State.

The foregoing considerations buttress our conclusion that Texas' system of public school finance is an inappropriate candidate for strict judicial scrutiny. These same considerations are relevant to the determination whether that system, with its conceded imperfections, nevertheless bears some rational relationship to a legitimate state purpose. It is to this question that we next turn our attention.

## III

The basic contours of the Texas school finance system have been traced at the outset of this opinion. We will now describe in more detail that system and how it operates, as these facts bear directly upon the demands of the Equal Protection Clause.

Apart from federal assistance, each Texas school receives its funds from the State and from its local school

---

[88] *Allied Stores of Ohio* v. *Bowers,* 358 U. S. 522, 530, 532 (1959) (BRENNAN, J., concurring); *Katzenbach* v. *Morgan,* 384 U. S., at 659, 661 (Harlan, J., dissenting).

district. On a statewide average, a roughly comparable amount of funds is derived from each source.[89] The State's contribution, under the Minimum Foundation Program, was designed to provide an adequate minimum educational offering in every school in the State. Funds are distributed to assure that there will be one teacher— compensated at the state-supported minimum salary— for every 25 students.[90] Each school district's other supportive personnel are provided for: one principal for every 30 teachers;[91] one "special service" teacher— librarian, nurse, doctor, etc.—for every 20 teachers;[92] superintendents, vocational instructors, counselors, and educators for exceptional children are also provided.[93] Additional funds are earmarked for current operating expenses, for student transportation,[94] and for free textbooks.[95]

The program is administered by the State Board of Education and by the Central Education Agency, which also have responsibility for school accreditation[96] and for monitoring the statutory teacher-qualification standards.[97] As reflected by the 62% increase in funds allotted to the Edgewood School District over the last three years,[98] the State's financial contribution to education is steadily increasing. None of Texas' school districts, how-

---

[89] In 1970 Texas expended approximately $2.1 billion for education and a little over $1 billion came from the Minimum Foundation Program. Texas Research League, *supra*, n. 20, at 2.

[90] Tex. Educ. Code Ann. § 16.13 (1972).

[91] *Id.*, § 16.18.

[92] *Id.*, § 16.15.

[93] *Id.*, §§ 16.16, 16.17, 16.19

[94] *Id.*, §§ 16.45, 16.51–16.63.

[95] *Id.*, §§ 12.01–12.04.

[96] *Id.*, § 11.26 (5).

[97] *Id.*, § 16.301 *et seq.*

[98] See *supra*, at 13–14.

ever, has been content to rely alone on funds from the Foundation Program.

By virtue of the obligation to fulfill its Local Fund Assignment, every district must impose an ad valorem tax on property located within its borders. The Fund Assignment was designed to remain sufficiently low to assure that each district would have some ability to provide a more enriched educational program.[99] Every district supplements its Foundation grant in this manner. In some districts, the local property tax contribution is insubstantial, as in Edgewood where the supplement was only $26 per pupil in 1967. In other districts, the local share may far exceed even the total Foundation grant. In part, local differences are attributable to differences in the rates of taxation or in the degree to which the market value for any category of property varies from its assessed value.[100] The greatest interdistrict disparities, however, are attributable to differences in the amount of assessable property available within any district. Those districts that have more property, or more valuable property, have a greater capability for supplementing state funds. In large measure, these additional local revenues are devoted to paying higher salaries to more teachers. Therefore, the primary distinguishing attributes of schools in property-affluent districts are lower pupil-teacher ratios and higher salary schedules.[101]

---

[99] Gilmer-Aikin Committee, supra, n. 15, at 15.

[100] There is no uniform statewide assessment practice in Texas. Commercial property, for example, might be assessed at 30% of market value in one county and at 50% in another. 5 Governor's Committee Report 25–26; Berke, Carnevale, Morgan & White, supra, n. 29, at 666–667, n. 16.

[101] Texas Research League, supra, n. 20, at 18. Texas, in this regard, is not unlike most other States. One commentator has observed that "disparities in expenditures appear to be largely ex-

This, then, is the basic outline of the Texas school financing structure. Because of differences in expenditure levels occasioned by disparities in property tax income, appellees claim that children in less affluent districts have been made the subject of invidious discrimination. The District Court found that the State had failed even "to establish a reasonable basis" for a system that results in different levels of per-pupil expenditure. 337 F. Supp., at 284. We disagree.

In its reliance on state as well as local resources, the Texas system is comparable to the systems employed

plained by variations in teacher salaries." Simon, *supra,* n. 62, at 413.

As previously noted, see text accompanying n. 86, *supra,* the extent to which the quality of education varies with expenditure per pupil is debated inconclusively by the most thoughtful students of public education. While all would agree that there is a correlation up to the point of providing the recognized essentials in facilities and academic opportunities, the issues of greatest disagreement include the effect on the quality of education of pupil-teacher ratios and of higher teacher salary schedules. *E. g.,* Office of Education, *supra,* n. 86, at 316–319. The state funding in Texas is designed to assure, on the average, one teacher for every 25 students, which is considered to be a favorable ratio by most standards. Whether the minimum salary of $6,000 per year is sufficient in Texas to attract qualified teachers may be more debatable, depending in major part upon the location of the school district. But there appear to be few empirical data that support the advantage of any particular pupil-teacher ratio or that document the existence of a dependable correlation between the level of public school teachers' salaries and the quality of their classroom instruction. An intractable problem in dealing with teachers' salaries is the absence, up to this time, of satisfactory techniques for judging their ability or performance. Relatively few school systems have merit plans of any kind, with the result that teachers' salaries are usually increased across the board in a way which tends to reward the least deserving on the same basis as the most deserving. Salaries are usually raised automatically on the basis of length of service and according to predetermined "steps," extending over 10- to 12-year periods.

48

in virtually every other State.[102] The power to tax local property for educational purposes has been recognized in Texas at least since 1883.[103] When the growth of commercial and industrial centers and accompanying shifts in population began to create disparities in local resources, Texas undertook a program calling for a considerable investment of state funds.

The "foundation grant" theory upon which Texas legislators and educators based the Gilmer-Aikin bills, was a product of the pioneering work of two New York educational reformers in the 1920's, George D. Strayer and Robert M. Haig.[104] Their efforts were devoted to establishing a means of guaranteeing a minimum statewide educational program without sacrificing the vital element of local participation. The Strayer-Haig thesis

---

[102] President's Commission on School Finance, *supra*, n. 85, at 9. Until recently, Hawaii was the only State that maintained a purely state-funded educational program. In 1968, however, that State amended its educational finance statute to permit counties to collect additional funds locally and spend those amounts on its schools. The rationale for that recent legislative choice is instructive on the question before the Court today:

"Under existing law, counties are precluded from doing anything in this area, even to spend their own funds if they so desire. This corrective legislation is urgently needed in order to allow counties to go above and beyond the State's standards and provide educational facilities as good as the people of the counties want and are willing to pay for. Allowing local communities to go above and beyond established minimums to provide for their people encourages the best features of democratic government." Haw. Sess. Laws 1968, Act 38, § 1.

[103] See text accompanying n. 7, *supra*.

[104] G. Strayer & R. Haig, The Financing of Education in the State of New York (1923). For a thorough analysis of the contribution of these reformers and of the prior and subsequent history of educational finance, see Coons, Clune & Sugarman, *supra*, n. 13, at 39–95.

represented an accommodation between these two competing forces. As articulated by Professor Coleman:

> "The history of education since the industrial revolution shows a continual struggle between two forces: the desire by members of society to have educational opportunity for all children, and the desire of each family to provide the best education it can afford for its own children." [105]

The Texas system of school finance is responsive to these two forces. While assuring a basic education for every child in the State, it permits and encourages a large measure of participation in and control of each district's schools at the local level. In an era that has witnessed a consistent trend toward centralization of the functions of government, local sharing of responsibility for public education has survived. The merit of local control was recognized last Term in both the majority and dissenting opinions in *Wright* v. *Council of the City of Emporia,* 407 U. S. 451 (1972). MR. JUSTICE STEWART stated there that "[d]irect control over decisions vitally affecting the education of one's children is a need that is strongly felt in our society." *Id.,* at 469. THE CHIEF JUSTICE, in his dissent, agreed that "[l]ocal control is not only vital to continued public support of the schools, but it is of overriding importance from an educational standpoint as well." *Id.,* at 478.

The persistence of attachment to government at the lowest level where education is concerned reflects the depth of commitment of its supporters. In part, local control means, as Professor Coleman suggests, the freedom to devote more money to the education of one's children. Equally important, however, is the opportunity

---

[105] J. Coleman, Foreword to Strayer & Haig, *supra,* at vii.

it offers for participation in the decisionmaking process that determines how those local tax dollars will be spent. Each locality is free to tailor local programs to local needs. Pluralism also affords some opportunity for experimentation, innovation, and a healthy competition for educational excellence. An analogy to the Nation-State relationship in our federal system seems uniquely appropriate. Mr. Justice Brandeis identified as one of the peculiar strengths of our form of government each State's freedom to "serve as a laboratory; and try novel social and economic experiments." [106] No area of social concern stands to profit more from a multiplicity of viewpoints and from a diversity of approaches than does public education.

Appellees do not question the propriety of Texas' dedication to local control of education. To the contrary, they attack the school-financing system precisely because, in their view, it does not provide the same level of local control and fiscal flexibility in all districts. Appellees suggest that local control could be preserved and promoted under other financing systems that resulted in more equality in educational expenditures. While it is no doubt true that reliance on local property taxation for school revenues provides less freedom of choice with respect to expenditures for some districts than for others,[107]

---

[106] *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 280, 311 (1932) (Brandeis, J., dissenting).

[107] MR. JUSTICE WHITE suggests in his dissent that the Texas system violates the Equal Protection Clause because the means it has selected to effectuate its interest in local autonomy fail to guarantee complete freedom of choice to every district. He places special emphasis on the statutory provision that establishes a maximum rate of $1.50 per $100 valuation at which a local school district may tax for school maintenance. Tex. Educ. Code Ann. § 20.04 (d) (1972). The maintenance rate in Edgewood when this case was litigated in the District Court was $.55 per $100, barely one-third of the allowable rate. (The tax rate of $1.05 per $100, see *supra,* at 12, is the equalized

the existence of "some inequality" in the manner in which the State's rationale is achieved is not alone a sufficient basis for striking down the entire system. *McGowan* v. *Maryland,* 366 U. S. 420, 425–426 (1961). It may not be condemned simply because it imperfectly effectuates the State's goals. *Dandridge* v. *Williams,* 397 U. S., at 485. Nor must the financing system fail because, as appellees suggest, other methods of satisfying the State's interest, which occasion "less drastic" disparities in expenditures, might be conceived. Only where state action impinges on the exercise of fundamental constitutional rights or liberties must it be found to have chosen the least restrictive alternative. Cf. *Dunn* v. *Blumstein,* 405 U. S., at 343; *Shelton* v. *Tucker,* 364 U. S. 479, 488 (1960). It is also well to remember that even those districts that have reduced ability to make free decisions with respect to how much they spend on education still retain under the present system a large measure of authority as to how available funds will be allocated. They further enjoy the power to make numerous other decisions with respect to the operation of the schools.[108] The people of Texas may be

---

rate for maintenance and for the retirement of bonds.) Appellees do not claim that the ceiling presently bars desired tax increases in Edgewood or in any other Texas district. Therefore, the constitutionality of that statutory provision is not before us and must await litigation in a case in which it is properly presented. Cf. *Hargrave* v. *Kirk,* 313 F. Supp. 944 (MD Fla. 1970), vacated, 401 U. S. 476 (1971).

[108] MR. JUSTICE MARSHALL states in his dissenting opinion that the State's asserted interest in local control is a "mere sham," *post,* at 130, and that it has been offered, not as a legitimate justification, but "as an excuse . . . for interdistrict inequality." *Id.,* at 126. In addition to asserting that local control would be preserved and possibly better served under other systems—a consideration that we find irrelevant for the purpose of deciding whether the system may be said to be supported by a legitimate and reasonable basis—the dissent suggests that Texas' lack of good faith may be demonstrated

justified in believing that other systems of school financing, which place more of the financial responsibility in the hands of the State, will result in a comparable lessening of desired local autonomy. That is, they may believe

by examining the extent to which the State already maintains considerable control. The State, we are told, regulates "the most minute details of local public education," *ibid.*, including textbook selection, teacher qualifications, and the length of the school day. This assertion, that genuine local control does not exist in Texas, simply cannot be supported. It is abundantly refuted by the elaborate statutory division of responsibilities set out in the Texas Education Code. Although policy decisionmaking and supervision in certain areas are reserved to the State, the day-to-day authority over the "management and control" of all public elementary and secondary schools is squarely placed on the local school boards. Tex. Educ. Code Ann. §§ 17.01, 23.26 (1972). Among the innumerable specific powers of the local school authorities are the following: the power of eminent domain to acquire land for the construction of school facilities, *id.*, §§ 17.26, 23.26; the power to hire and terminate teachers and other personnel, *id.*, §§ 13.101–13.103; the power to designate conditions of teacher employment and to establish certain standards of educational policy, *id.*, § 13.901; the power to maintain order and discipline, *id.*, § 21.305, including the prerogative to suspend students for disciplinary reasons, *id.*, § 21.301; the power to decide whether to offer a kindergarten program, *id.*, §§ 21.131–21.135, or a vocational training program, *id.*, § 21.111, or a program of special education for the handicapped, *id.*, § 11.16; the power to control the assignment and transfer of students, *id.*, §§ 21.074–21.080; and the power to operate and maintain a school bus program, *id.*, § 16.52. See also *Pervis* v. *LaMarque Ind. School Dist.*, 328 F. Supp. 638, 642–643 (SD Tex. 1971), reversed, 466 F. 2d 1054 (CA5 1972); *Nichols* v. *Aldine Ind. School Dist.*, 356 S. W. 2d 182 (Tex. Civ. App. 1962). Local school boards also determine attendance zones, location of new schools, closing of old ones, school attendance hours (within limits), grading and promotion policies subject to general guidelines, recreational and athletic policies, and a myriad of other matters in the routine of school administration. It cannot be seriously doubted that in Texas education remains largely a local function, and that the preponderating bulk of all decisions affecting the schools is made and executed at the local level, guaranteeing the greatest participation by those most directly concerned.

that along with increased control of the purse strings at the state level will go increased control over local policies.[109]

Appellees further urge that the Texas system is unconstitutionally arbitrary because it allows the availability of local taxable resources to turn on "happenstance." They see no justification for a system that allows, as they contend, the quality of education to fluctuate on the basis of the fortuitous positioning of the boundary lines of political subdivisions and the location of valuable commercial and industrial property. But any scheme of

---

[109] This theme—that greater state control over funding will lead to greater state power with respect to local educational programs and policies—is a recurrent one in the literature on financing public education. Professor Simon, in his thoughtful analysis of the political ramifications of this case, states that one of the most likely consequences of the District Court's decision would be an increase in the centralization of school finance and an increase in the extent of collective bargaining by teacher unions at the state level. He suggests that the subjects for bargaining may include many "non-salary" items, such as teaching loads, class size, curricular and program choices, questions of student discipline, and selection of administrative personnel—matters traditionally decided heretofore at the local level. Simon, *supra*, n. 62, at 434–436. See, *e. g.*, Coleman, The Struggle for Control of Education, in Education and Social Policy: Local Control of Education 64, 77–79 (C. Bowers, I. Housego & D. Dyke eds. 1970); J. Conant, The Child, The Parent, and The State 27 (1959) ("Unless a local community, through its school board, has some control over the purse, there can be little real feeling in the community that the schools are in fact local schools . . ."); Howe, Anatomy of a Revolution, in Saturday Review 84, 88 (Nov. 20, 1971) ("It is an axiom of American politics that control and power follow money . . ."); R. Hutchinson, State-Administered Locally-Shared Taxes 21 (1931) ("[S]tate administration of taxation is the first step toward state control of the functions supported by these taxes . . ."). Irrespective of whether one regards such prospects as detrimental, or whether he agrees that the consequence is inevitable, it certainly cannot be doubted that there is a rational basis for this concern on the part of parents, educators, and legislators.

local taxation—indeed the very existence of identifiable local governmental units—requires the establishment of jurisdictional boundaries that are inevitably arbitrary. It is equally inevitable that some localities are going to be blessed with more taxable assets than others.[110] Nor is local wealth a static quantity. Changes in the level of taxable wealth within any district may result from any number of events, some of which local residents can and do influence. For instance, commercial and industrial enterprises may be encouraged to locate within a district by various actions—public and private.

Moreover, if local taxation for local expenditures were an unconstitutional method of providing for education then it might be an equally impermissible means of providing other necessary services customarily financed largely from local property taxes, including local police and fire protection, public health and hospitals, and public utility facilities of various kinds. We perceive no justification for such a severe denigration of local property taxation and control as would follow from appellees' contentions. It has simply never been within the constitutional prerogative of this Court to nullify statewide measures for financing public services merely because the burdens or benefits thereof fall unevenly depending upon the relative wealth of the political subdivisions in which citizens live.

In sum, to the extent that the Texas system of school financing results in unequal expenditures between chil-

---

[110] This Court has never doubted the propriety of maintaining political subdivisions within the States and has never found in the Equal Protection Clause any *per se* rule of "territorial uniformity." *McGowan* v. *Maryland*, 366 U. S., at 427. See also *Griffin* v. *County School Board of Prince Edward County*, 377 U. S., at 230–231; *Salsburg* v. *Maryland*, 346 U. S. 545 (1954). Cf. *Board of Education of Muskogee* v. *Oklahoma*, 409 F. 2d 665, 668 (CA10 1969).

dren who happen to reside in different districts, we cannot say that such disparities are the product of a system that is so irrational as to be invidiously discriminatory. Texas has acknowledged its shortcomings and has persistently endeavored—not without some success—to ameliorate the differences in levels of expenditures without sacrificing the benefits of local participation. The Texas plan is not the result of hurried, ill-conceived legislation. It certainly is not the product of purposeful discrimination against any group or class. On the contrary, it is rooted in decades of experience in Texas and elsewhere, and in major part is the product of responsible studies by qualified people. In giving substance to the presumption of validity to which the Texas system is entitled, *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61, 78 (1911), it is important to remember that at every stage of its development it has constituted a "rough accommodation" of interests in an effort to arrive at practical and workable solutions. *Metropolis Theatre Co.* v. *City of Chicago*, 228 U. S. 61, 69–70 (1913). One also must remember that the system here challenged is not peculiar to Texas or to any other State. In its essential characteristics, the Texas plan for financing public education reflects what many educators for a half century have thought was an enlightened approach to a problem for which there is no perfect solution. We are unwilling to assume for ourselves a level of wisdom superior to that of legislators, scholars, and educational authorities in 50 States, especially where the alternatives proposed are only recently conceived and nowhere yet tested. The constitutional standard under the Equal Protection Clause is whether the challenged state action rationally furthers a legitimate state purpose or interest. *McGinnis* v. *Royster,* 410 U. S. 263, 270 (1973). We hold that the Texas plan abundantly satisfies this standard.

## IV

In light of the considerable attention that has focused on the District Court opinion in this case and on its California predecessor, *Serrano* v. *Priest,* 5 Cal. 3d 584, 487 P. 2d 1241 (1971), a cautionary postscript seems appropriate. It cannot be questioned that the constitutional judgment reached by the District Court and approved by our dissenting Brothers today would occasion in Texas and elsewhere an unprecedented upheaval in public education. Some commentators have concluded that, whatever the contours of the alternative financing programs that might be devised and approved, the result could not avoid being a beneficial one. But, just as there is nothing simple about the constitutional issues involved in these cases, there is nothing simple or certain about predicting the consequences of massive change in the financing and control of public education. Those who have devoted the most thoughtful attention to the practical ramifications of these cases have found no clear or dependable answers and their scholarship reflects no such unqualified confidence in the desirability of completely uprooting the existing system.

The complexity of these problems is demonstrated by the lack of consensus with respect to whether it may be said with any assurance that the poor, the racial minorities, or the children in overburdened core-city school districts would be benefited by abrogation of traditional modes of financing education. Unless there is to be a substantial increase in state expenditures on education across the board—an event the likelihood of which is open to considerable question [111]—these groups stand to

---

[111] Any alternative that calls for significant increases in expenditures for education, whether financed through increases in property taxation or through other sources of tax dollars, such as income and

realize gains in terms of increased per-pupil expenditures only if they reside in districts that presently spend at relatively low levels, *i. e.*, in those districts that would benefit from the redistribution of existing resources. Yet, recent studies have indicated that the poorest families are not invariably clustered in the most impecunious school districts.[112] Nor does it now appear that there is any more than a random chance that racial minorities are concentrated in property-poor districts.[113] Additionally,

sales taxes, is certain to encounter political barriers. At a time when nearly every State and locality is suffering from fiscal undernourishment, and with demands for services of all kinds burgeoning and with weary taxpayers already resisting tax increases, there is considerable reason to question whether a decision of this Court nullifying present state taxing systems would result in a marked increase in the financial commitment to education. See Senate Select Committee on Equal Educational Opportunity, 92d Cong., 2d Sess., Toward Equal Educational Opportunity 339–345 (Comm. Print 1972); Berke & Callahan, *Serrano* v. *Priest:* Milestone or Millstone for School Finance, 21 J. Pub. L. 23, 25–26 (1972); Simon, *supra,* n. 62, at 420–421. In Texas, it has been calculated that $2.4 billion of additional school funds would be required to bring all schools in that State up to the present level of expenditure of all but the wealthiest districts—an amount more than double that currently being spent on education. Texas Research League, *supra,* n. 20, at 16–18. An *amicus curiae* brief filed·on behalf of almost 30 States, focusing on these practical consequences, claims with some justification that "each of the undersigned states . . . would suffer severe financial stringency." Brief of *Amici Curiae* in Support of Appellants 2 (filed by Montgomery County, Md., et al.).

[112] See Note, *supra,* n. 53. See also authorities cited n. 114, *infra.*

[113] See Goldstein, *supra,* n. 38, at 526; Jencks, *supra,* n. 86, at 27; U. S. Comm'n on Civil Rights, Inequality in School Financing: The Role of the Law 37 (1972). Coons, Clune & Sugarman, *supra,* n. 13, at 356–357, n. 47, have noted that in California, for example, "[f]ifty-nine percent . . . of minority students live in districts above the median [average valuation per pupil.]" In Bexar County, the largest district by far—the San Antonio Independent School District—is above the local average in both the amount of

58

several research projects have concluded that any financing alternative designed to achieve a greater equality of expenditures is likely to lead to higher taxation and lower educational expenditures in the major urban centers,[114] a result that would exacerbate rather than ameliorate existing conditions in those areas.

These practical considerations, of course, play no role in the adjudication of the constitutional issues presented here. But they serve to highlight the wisdom of the traditional limitations on this Court's function. The consideration and initiation of fundamental reforms with respect to state taxation and education are matters reserved for the legislative processes of the various States, and we do no violence to the values of federalism and separation of powers by staying our hand. We hardly need add that this Court's action today is not to be viewed as placing its judicial imprimatur on the status quo. The need is apparent for reform in tax systems which may well have relied too long and too heavily on the local property tax. And certainly innovative thinking as to public education, its methods, and its funding is necessary to assure both a higher level of quality and greater uniformity of opportunity. These matters merit the continued attention of the scholars who already

taxable wealth per pupil and in median family income. Yet 72% of its students are Mexican-Americans. And, in 1967–1968 it spent only a very few dollars less per pupil than the North East and North Side Independent School Districts, which have only 7% and 18% Mexican-American enrollment respectively. Berke, Carnevale, Morgan & White, *supra,* n. 29, at 673.

[114] See Senate Select Committee on Equal Educational Opportunity, 92d Cong., 2d Sess., Issues in School Finance 129 (Comm. Print 1972) (monograph entitled Inequities in School. Finance prepared by Professors Berke and Callahan); U. S. Office of Education, Finances of Large-City School Systems: A Comparative Analysis (1972) (HEW publication); U. S. Comm'n on Civil Rights, *supra,* n. 113, at 33–36; Simon, *supra,* n. 62, at 410–411, 418.

have contributed much by their challenges. But the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them.

*Reversed.*

MR. JUSTICE STEWART, concurring.

The method of financing public schools in Texas, as in almost every other State, has resulted in a system of public education that can fairly be described as chaotic and unjust.[1] It does not follow, however, and I cannot find, that this system violates the Constitution of the United States. I join the opinion and judgment of the Court because I am convinced that any other course would mark an extraordinary departure from principled adjudication under the Equal Protection Clause of the Fourteenth Amendment. The uncharted directions of such a departure are suggested, I think, by the imaginative dissenting opinion my Brother MARSHALL has filed today.

Unlike other provisions of the Constitution, the Equal Protection Clause confers no substantive rights and creates no substantive liberties.[2] The function of the Equal Protection Clause, rather,, is simply to measure the validity of *classifications* created by state laws.

---

[1] See New York Times, Mar. 11, 1973, p. 1, col. 1.

[2] There is one notable exception to the above statement: It has been established in recent years that the Equal Protection Clause confers the substantive right to participate on an equal basis with other qualified voters whenever the State has adopted an electoral process for determining who will represent any segment of the State's population. See, *e. g., Reynolds* v. *Sims,* 377 U. S. 533; *Kramer* v. *Union School District,* 395 U. S. 621; *Dunn* v. *Blumstein,* 405 U. S. 330, 336. But there is no constitutional right to vote, as such. *Minor* v. *Happersett,* 21 Wall. 162. If there were such a right, both the Fifteenth Amendment and the Nineteenth Amendment would have been wholly unnecessary.

There is hardly a law on the books that does not affect some people differently from others. But the basic concern of the Equal Protection Clause is with state legislation whose purpose or effect is to create discrete and objectively identifiable classes.[3] And with respect to such legislation, it has long been settled that the Equal Protection Clause is offended only by laws that are invidiously discriminatory—only by classifications that are wholly arbitrary or capricious. See, *e. g.*, *Rinaldi* v. *Yeager*, 384 U. S. 305. This settled principle of constitutional law was compendiously stated in Mr. Chief Justice Warren's opinion for the Court in *McGowan* v. *Maryland*, 366 U. S. 420, 425–426, in the following words:

> "Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

This doctrine is no more than a specific application of one of the first principles of constitutional adjudication—the basic presumption of the constitutional validity of a duly enacted state or federal law. See Thayer, The Origin and Scope of the American Doctrine of Constitutional Law, 7 Harv. L. Rev. 129 (1893).

---

[3] But see *Bullock* v. *Carter*, 405 U. S. 134.

Under the Equal Protection Clause, this presumption of constitutional validity disappears when a State has enacted legislation whose purpose or effect is to create classes based upon criteria that, in a constitutional sense, are inherently "suspect." Because of the historic purpose of the Fourteenth Amendment, the prime example of such a "suspect" classification is one that is based upon race. See, e. g., *Brown* v. *Board of Education,* 347 U. S. 483; *McLaughlin* v. *Florida,* 379 U. S. 184. But there are other classifications that, at least in some settings, are also "suspect"—for example, those based upon national origin,[4] alienage,[5] indigency,[6] or illegitimacy.[7]

Moreover, quite apart from the Equal Protection Clause, a state law that impinges upon a substantive right or liberty created or conferred by the Constitution is, of course, presumptively invalid, whether or not the law's purpose or effect is to create any classifications. For example, a law that provided that newspapers could be published only by people who had resided in the State for five years could be superficially viewed as invidiously discriminating against an identifiable class in violation of the Equal Protection Clause. But, more basically, such a law would be invalid simply because it abridged the freedom of the press. Numerous cases in this Court illustrate this principle.[8]

---

[4] See *Oyama* v. *California,* 332 U. S. 633, 644–646.

[5] See *Graham* v. *Richardson,* 403 U. S. 365, 372.

[6] See *Griffin* v. *Illinois,* 351 U. S. 12. "Indigency" means actual or functional indigency; it does not mean comparative poverty *vis-à-vis* comparative affluence. See *James* v. *Valtierra,* 402 U. S. 137.

[7] See *Gomez* v. *Perez,* 409 U. S. 535; *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164.

[8] See, e. g., *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92 (free speech); *Shapiro* v. *Thompson,* 394 U. S. 618 (freedom of interstate travel); *Williams* v. *Rhodes,* 393 U. S. 23 (freedom of association); *Skinner* v. *Oklahoma,* 316 U. S. 535 ("liberty" conditionally protected by Due Process Clause of Fourteenth Amendment).

In refusing to invalidate the Texas system of financing its public schools, the Court today applies with thoughtfulness and understanding the basic principles I have so sketchily summarized. First, as the Court points out, the Texas system has hardly created the kind of objectively identifiable classes that are cognizable under the Equal Protection Clause.[9] Second, even assuming the existence of such discernible categories, the classifications are in no sense based upon constitutionally "suspect" criteria. Third, the Texas system does not rest "on grounds wholly irrelevant to the achievement of the State's objective." Finally, the Texas system impinges upon no substantive constitutional rights or liberties. It follows, therefore, under the established principle reaffirmed in Mr. Chief Justice Warren's opinion for the Court in *McGowan* v. *Maryland, supra,* that the judgment of the District Court must be reversed.

MR. JUSTICE BRENNAN, dissenting.

Although I agree with my Brother WHITE that the Texas statutory scheme is devoid of any rational basis, and for that reason is violative of the Equal Protection Clause, I also record my disagreement with the Court's rather distressing assertion that a right may be deemed "fundamental" for the purposes of equal protection analysis only if it is "explicitly or implicitly guaranteed by the Constitution." *Ante,* at 33–34. As my Brother MARSHALL convincingly demonstrates, our prior cases stand for the proposition that "fundamentality" is, in large measure, a function of the right's importance in terms of the effectuation of those rights which are in fact constitutionally guaranteed. Thus, "[a]s the nexus between the specific constitutional guarantee and the non-

---

[9] See *Katzenbach* v. *Morgan,* 384 U. S. 641, 660 (Harlan, J., dissenting).

constitutional interest draws closer, the nonconstitutional interest becomes more fundamental and the degree of judicial scrutiny applied when the interest is infringed on a discriminatory basis must be adjusted accordingly." *Post,* at 102–103.

Here, there can be no doubt that education is inextricably linked to the right to participate in the electoral process and to the rights of free speech and association guaranteed by the First Amendment. See *post,* at 111–115. This being so, any classification affecting education must be subjected to strict judicial scrutiny, and since even the State concedes that the statutory scheme now before us cannot pass constitutional muster under this stricter standard of review, I can only conclude that the Texas school-financing scheme is constitutionally invalid.

MR. JUSTICE WHITE, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN join, dissenting.

The Texas public schools are financed through a combination of state funding, local property tax revenue, and some federal funds.[1] Concededly, the system yields wide disparity in per-pupil revenue among the various districts. In a typical year, for example, the Alamo Heights district had total revenues of $594 per pupil, while the Edgewood district had only $356 per pupil.[2] The majority and the State concede, as they must, the exist-

---

[1] The heart of the Texas system is embodied in an intricate series of statutory provisions which make up Chapter 16 of the Texas Education Code, Tex. Educ. Code Ann. § 16.01 *et seq.* See also Tex. Educ. Code Ann. § 15.01 *et seq.,* and § 20.10 *et seq.*

[2] The figures discussed are from Plaintiffs' Exhibits 7, 8, and 12. The figures are from the 1967–1968 school year. Because the various exhibits relied upon different attendance totals, the per-pupil results do not precisely correspond to the gross figures quoted. The disparity between districts, rather than the actual figures, is the important factor.

ence of major disparities in spendable funds. But the State contends that the disparities do not invidiously discriminate against children and families in districts such as Edgewood, because the Texas scheme is designed "to provide an adequate education for all, with local autonomy to go beyond that as individual school districts desire and are able . . . . It leaves to the people of each district the choice whether to go beyond the minimum and, if so, by how much." [3] The majority advances this rationalization: "While assuring a basic education for every child in the State, it permits and encourages a large measure of participation in and control of each district's schools at the local level."

I cannot disagree with the proposition that local control and local decisionmaking play an important part in our democratic system of government. Cf. *James* v. *Valtierra,* 402 U. S. 137 (1971). Much may be left to local option, and this case would be quite different if it were true that the Texas system, while insuring minimum educational expenditures in every district through state funding, extended a meaningful option to all local districts to increase their per-pupil expenditures and so to improve their children's education to the extent that increased funding would achieve that goal. The system would then arguably provide a rational and sensible method of achieving the stated aim of preserving an area for local initiative and decision.

The difficulty with the Texas system, however, is that it provides a meaningful option to Alamo Heights and like school districts but almost none to Edgewood and those other districts with a low per-pupil real estate tax base. In these latter districts, no matter how desirous parents are of supporting their schools with greater revenues, it is impossible to do so through the use of the

---

[3] Brief for Appellants 11–13, 35.

real estate property tax. In these districts, the Texas system utterly fails to extend a realistic choice to parents because the property tax, which is the only revenue-raising mechanism extended to school districts, is practically and legally unavailable. That this is the situation may be readily demonstrated.

Local school districts in Texas raise their portion of the Foundation School Program—the Local Fund Assignment—by levying ad valorem taxes on the property located within their boundaries. In addition, the districts are authorized, by the state constitution and by statute, to levy ad valorem property taxes in order to raise revenues to support educational spending over and above the expenditure of Foundation School Program funds.

Both the Edgewood and Alamo Heights districts are located in Bexar County, Texas. Student enrollment in Alamo Heights is 5,432, in Edgewood 22,862. The per-pupil market value of the taxable property in Alamo Heights is $49,078, in Edgewood $5,960. In a typical, relevant year, Alamo Heights had a maintenance tax rate of $1.20 and a debt service (bond) tax rate of 20¢ per $100 assessed evaluation, while Edgewood had a maintenance rate of 52¢ and a bond rate of 67¢. These rates, when applied to the respective tax bases, yielded Alamo Heights $1,433,473 in maintenance dollars and $236,074 in bond dollars, and Edgewood $223,034 in maintenance dollars and $279,023 in bond dollars. As is readily apparent, because of the variance in tax bases between the districts, results, in terms of revenues, do not correlate with effort, in terms of tax rate. Thus, Alamo Heights, with a tax base approximately twice the size of Edgewood's base, realized approximately six times as many maintenance dollars as Edgewood by using a tax rate only approximately two and one-half times larger. Similarly, Alamo Heights realized slightly fewer bond

dollars by using a bond tax rate less than one-third of that used by Edgewood.

Nor is Edgewood's revenue-raising potential only deficient when compared with Alamo Heights. North East District has taxable property with a per-pupil market value of approximately $31,000, but total taxable property approximately four and one-half times that of Edgewood. Applying a maintenance rate of $1, North East yielded $2,818,148. Thus, because of its superior tax base, North East was able to apply a tax rate slightly less than twice that applied by Edgewood and yield more than 10 times the maintenance dollars. Similarly, North East, with a bond rate of 45¢, yielded $1,249,159—more than four times Edgewood's yield with two-thirds the rate.

Plainly, were Alamo Heights or North East to apply the Edgewood tax rate to its tax base, it would yield far greater revenues than Edgewood is able to yield applying those same rates to its base. Conversely, were Edgewood to apply the Alamo Heights or North East rates to its base, the yield would be far smaller than the Alamo Heights or North East yields. The disparity is, therefore, currently operative and its impact on Edgewood is undeniably serious. It is evident from statistics in the record that show that, applying an equalized tax rate of 85¢ per $100 assessed valuation, Alamo Heights was able to provide approximately $330 per pupil in local revenues over and above the Local Fund Assignment. In Edgewood, on the other hand, with an equalized tax rate of $1.05 per $100 of assessed valuation, $26 per pupil was raised beyond the Local Fund Assignment.[4] As previously noted, in Alamo Heights,

---

[4] Variable assessment practices are also revealed in this record. Appellants do not, however, contend that this factor accounts, even to a small extent, for the interdistrict disparities.

total per-pupil revenues from local, state, and federal funds was $594 per pupil, in Edgewood $356.[5]

In order to equal the highest yield in any other Bexar County district, Alamo Heights would be required to tax at the rate of 68¢ per $100 of assessed valuation. Edgewood would be required to tax at the prohibitive rate of $5.76 per $100. But state law places a $1.50 per $100 ceiling on the maintenance tax rate, a limit that would surely be reached long before Edgewood attained an equal yield. Edgewood is thus precluded in law, as well as in fact, from achieving a yield even close to that of some other districts.

The Equal Protection Clause permits discriminations between classes but requires that the classification bear some rational relationship to a permissible object sought to be attained by the statute. It is not enough that the Texas system before us seeks to achieve the valid, rational purpose of maximizing local initiative; the means chosen by the State must also be rationally related to the end sought to be achieved. As the Court stated just last Term in *Weber* v. *Aetna Casualty & Surety Co.*, 406 U. S. 164, 172 (1972):

> "The tests to determine the validity of state statutes under the Equal Protection Clause have been variously expressed, but this Court requires, at a minimum, that a statutory classification bear some rational relationship to a legitimate state purpose. *Morey* v. *Doud*, 354 U. S. 457 (1957); *Williamson* v. *Lee Optical Co.*, 348 U. S. 483 (1955); *Gulf, Colorado & Santa Fé R. Co.* v. *Ellis*, 165 U. S. 150 (1897); *Yick Wo* v. *Hopkins*, 118 U. S. 356 (1886)."

---

[5] The per-pupil funds received from state, federal, and other sources, while not precisely equal, do not account for the large differential and are not directly attacked in the present case.

Neither Texas nor the majority heeds this rule. If the State aims at maximizing local initiative and local choice, by permitting school districts to resort to the real property tax if they choose to do so, it utterly fails in achieving its purpose in districts with property tax bases so low that there is little if any opportunity for interested parents, rich or poor, to augment school district revenues. Requiring the State to establish only that unequal treatment is in furtherance of a permissible goal, without also requiring the State to show that the means chosen to effectuate that goal are rationally related to its achievement, makes equal protection analysis no more than an empty gesture.[6] In my view, the parents and children in Edgewood, and in like districts, suffer from an invidious discrimination violative of the Equal Protection Clause.

This does not, of course, mean that local control may not be a legitimate goal of a school-financing system. Nor does it mean that the State must guarantee each district an equal per-pupil revenue from the state school-financing system. Nor does it mean, as the majority appears to believe, that, by affirming the decision below,

_____

[6] The State of Texas appears to concede that the choice of whether or not to go beyond the state-provided minimum "is easier for some districts than for others. Those districts with large amounts of taxable property can produce more revenue at a lower tax rate and will provide their children with a more expensive education." Brief for Appellants 35. The State nevertheless insists that districts have a choice and that the people in each district have exercised that choice by providing some real property tax money over and above the minimum funds guaranteed by the State. Like the majority, however, the State fails to explain why the Equal Protection Clause is not violated, or how its goal of providing local government with realistic choices as to how much money should be expended on education is implemented, where the system makes it much more difficult for some than for others to provide additional educational funds and where, as a practical and legal matter, it is impossible for some districts to provide the educational budgets that other districts can make available from real property tax revenues.

this Court would be "imposing on the States inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions." On the contrary, it would merely mean that the State must fashion a financing scheme which provides a rational basis for the maximization of local control, if local control is to remain a goal of the system, and not a scheme with "different treatment be[ing] accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute." *Reed v. Reed,* 404 U. S. 71, 75–76 (1971).

Perhaps the majority believes that the major disparity in revenues provided and permitted by the Texas system is inconsequential. I cannot agree, however, that the difference of the magnitude appearing in this case can sensibly be ignored, particularly since the State itself considers it so important to provide opportunities to exceed the minimum state educational expenditures.

There is no difficulty in identifying the class that is subject to the alleged discrimination and that is entitled to the benefits of the Equal Protection Clause. I need go no farther than the parents and children in the Edgewood district, who are plaintiffs here and who assert that they are entitled to the same choice as Alamo Heights to augment local expenditures for schools but are denied that choice by state law. This group constitutes a class sufficiently definite to invoke the protection of the Constitution. They are as entitled to the protection of the Equal Protection Clause as were the voters in allegedly underrepresented counties in the reapportionment cases. See, *e. g., Baker* v. *Carr,* 369 U. S. 186, 204–208 (1962); *Gray* v. *Sanders,* 372 U. S. 368, 375 (1963); *Reynolds* v. *Sims,* 377 U. S. 533, 554–556 (1964). And in *Bullock* v. *Carter,* 405 U. S. 134 (1972), where a challenge to the

Texas candidate filing fee on equal protection grounds was upheld, we noted that the victims of alleged discrimination wrought by the filing fee "cannot be described by reference to discrete and precisely defined segments of the community as is typical of inequities challenged under the Equal Protection Clause," but concluded that "we would ignore reality were we not to recognize that this system falls with unequal weight on voters, as well as candidates, according to their economic status." *Id.,* at 144. Similarly, in the present case we would blink reality to ignore the fact that school districts, and students in the end, are differentially affected by the Texas school-financing scheme with respect to their capability to supplement the Minimum Foundation School Program. At the very least, the law discriminates against those children and their parents who live in districts where the per-pupil tax base is sufficiently low to make impossible the provision of comparable school revenues by resort to the real property tax which is the only device the State extends for this purpose.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE DOUGLAS concurs, dissenting.

The Court today decides, in effect, that a State may constitutionally vary the quality of education which it offers its children in accordance with the amount of taxable wealth located in the school districts within which they reside. The majority's decision represents an abrupt departure from the mainstream of recent state and federal court decisions concerning the unconstitutionality of state educational financing schemes dependent upon taxable local wealth.[1] More unfortunately, though, the

---

[1] See *Van Dusartz* v. *Hatfield,* 334 F. Supp. 870 (Minn. 1971); *Milliken* v. *Green,* 389 Mich. 1, 203 N. W. 2d 457 (1972), rehearing granted, Jan. 1973; *Serrano* v. *Priest,* 5 Cal. 3d 584, 487 P. 2d 1241 (1971); *Robinson* v. *Cahill,* 118 N. J. Super. 223, 287 A. 2d 187, 119

majority's holding can only be seen as a retreat from our historic commitment to equality of educational opportunity and as unsupportable acquiescence in a system which deprives children in their earliest years of the chance to reach their full potential as citizens. The Court does this despite the absence of any substantial justification for a scheme which arbitrarily channels educational resources in accordance with the fortuity of the amount of taxable wealth within each district.

In my judgment, the right of every American to an equal start in life, so far as the provision of a state service as important as education is concerned, is far too vital to permit state discrimination on grounds as tenuous as those presented by this record. Nor can I accept the notion that it is sufficient to remit these appellees to the vagaries of the political process which, contrary to the majority's suggestion, has proved singularly unsuited to the task of providing a remedy for this discrimination.[2] I, for one, am unsatisfied with the hope of an ultimate "political" solution sometime in the indefinite future while, in the meantime, countless children unjustifiably receive inferior educations that "may affect their hearts

---

N. J. Super. 40, 289 A. 2d 569 (1972); *Hollins* v. *Shofstall*, Civil No. C–253652 (Super. Ct. Maricopa County, Ariz., July 7, 1972). See also *Sweetwater County Planning Com. for the Organization of School Districts* v. *Hinkle*, 491 P. 2d 1234 (Wyo. 1971), juris. relinquished, 493 P. 2d 1050 (Wyo. 1972).

[2] The District Court in this case postponed decision for some two years in the hope that the Texas Legislature would remedy the gross disparities in treatment inherent in the Texas financing scheme. It was only after the legislature failed to act in its 1971 Regular Session that the District Court, apparently recognizing the lack of hope for self-initiated legislative reform, rendered its decision. See Texas Research League, Public School Finance Problems in Texas 13 (Interim Report 1972). The strong vested interest of property-rich districts in the existing property tax scheme poses a substantial barrier to self-initiated legislative reform in educational financing. See N. Y. Times, Dec. 19, 1972, p. 1, col. 1.

and minds in a way unlikely ever to be undone." *Brown*
v. *Board of Education,* 347 U. S. 483, 494 (1954). I must
therefore respectfully dissent.

## I

The Court acknowledges that "substantial interdis-
trict disparities in school expenditures" exist in Texas,
*ante,* at 15, and that these disparities are "largely at-
tributable to differences in the amounts of money col-
lected through local property taxation," *ante,* at 16.
But instead of closely examining the seriousness of these
disparities and the invidiousness of the Texas financing
scheme, the Court undertakes an elaborate exploration
of the efforts Texas has purportedly made to close the
gaps between its districts in terms of levels of district
wealth and resulting educational funding. Yet, how-
ever praiseworthy Texas' equalizing efforts, the issue in
this case is not whether Texas is doing its best to amelio-
rate the worst features of a discriminatory scheme but,
rather, whether the scheme itself is in fact unconstitu-
tionally discriminatory in the face of the Fourteenth
Amendment's guarantee of equal protection of the laws.
When the Texas financing scheme is taken as a whole, I
do not think it can be doubted that it produces a dis-
criminatory impact on substantial numbers of the school-
age children of the State of Texas.

## A

Funds to support public education in Texas are de-
rived from three sources: local ad valorem property taxes;
the Federal Government; and the state government.[3]
It is enlightening to consider these in order.

---

[3] Texas provides its school districts with extensive bonding au-
thority to obtain capital both for the acquisition of school sites and
"the construction and equipment of school buildings," Tex. Educ.
Code Ann. § 20.01 (1972), and for the acquisition, construction, and

Under Texas law, the only mechanism provided the local school district for raising new, unencumbered revenues is the power to tax property located within its boundaries.[4] At the same time, the Texas financing scheme effectively restricts the use of monies raised by local property taxation to the support of public education within the boundaries of the district in which they are raised, since any such taxes must be approved by a majority of the property-taxpaying voters of the district.[5]

The significance of the local property tax element of the Texas financing scheme is apparent from the fact that it provides the funds to meet some 40% of the cost of public education for Texas as a whole.[6] Yet the amount of revenue that any particular Texas district can raise is dependent on two factors—its tax rate and its amount of taxable property. The first factor is determined by the property-taxpaying voters of the district.[7] But, regardless of the enthusiasm of the local voters for public

---

maintenance of "gymnasia, stadia, or other recreational facilities," *id.*, §§ 20.21–20.22. While such private capital provides a fourth source of revenue, it is, of course, only temporary in nature since the principal and interest of all bonds must ultimately be paid out of the receipts of the local ad valorem property tax, see *id.*, §§ 20.01, 20.04, except to the extent that outside revenues derived from the operation of certain facilities, such as gymnasia, are employed to repay the bonds issued thereon, see *id.*, §§ 20.22, 20.25.

[4] See Tex. Const., Art. 7, § 3; Tex. Educ. Code Ann. §§ 20.01–20.02. As a part of the property tax scheme, bonding authority is conferred upon the local school districts, see n. 3, *supra.*

[5] See Tex. Educ. Code Ann. § 20.04.

[6] For the 1970–1971 school year, the precise figure was 41.1%. See Texas Research League, *supra*, n. 2, at 9.

[7] See Tex. Educ. Code Ann. § 20.04.

Theoretically, Texas law limits the tax rate for public school maintenance, see *id.*, § 20.02, to $1.50 per $100 valuation, see *id.*, § 20.04 (d). However, it does not appear that any Texas district presently taxes itself at the highest rate allowable, although some poor districts are approaching it, see App. 174.

education, the second factor—the taxable property wealth of the district—necessarily restricts the district's ability to raise funds to support public education.[8] Thus, even though the voters of two Texas districts may be willing to make the same tax effort, the results for the districts will be substantially different if one is property rich while the other is property poor. The necessary effect of the Texas local property tax is, in short, to favor property-rich districts and to disfavor property-poor ones.

The seriously disparate consequences of the Texas local property tax, when that tax is considered alone, are amply illustrated by data presented to the District Court by appellees. These data included a detailed study of a sample of 110 Texas school districts [9] for the 1967–1968 school year conducted by Professor Joel S. Berke of Syracuse University's Educational Finance Policy Institute. Among other things, this study revealed that the 10 richest districts examined, each of which had more than $100,000 in taxable property per pupil, raised through local effort an average of $610 per pupil, whereas the four poorest districts studied, each of which had less than $10,000 in taxable property per pupil, were able

---

[8] Under Texas law local districts are allowed to employ differing bases of assessment—a fact that introduces a third variable into the local funding. See Tex. Educ. Code Ann. § 20.03. But neither party has suggested that this factor is responsible for the disparities in revenues available to the various districts. Consequently, I believe we must deal with this case on the assumption that differences in local methods of assessment do not meaningfully affect the revenue-raising power of local districts relative to one another. The Court apparently admits as much. See ante, at 46. It should be noted, moreover, that the main set of data introduced before the District Court to establish the disparities at issue here was based upon "equalized taxable property" values which had been adjusted to correct for differing methods of assessment. See App. C to Affidavit of Professor Joel S. Berke.

[9] Texas has approximately 1,200 school districts.

to raise only an average of $63 per pupil.[10] And, as the Court effectively recognizes, *ante,* at 27, this correlation between the amount of taxable property per pupil and the amount of local revenues per pupil holds true for the 96 districts in between the richest and poorest districts.[11]

It is clear, moreover, that the disparity of per-pupil revenues cannot be dismissed as the result of lack of local effort—that is, lower tax rates—by property-poor districts. To the contrary, the data presented below indicate that the poorest districts tend to have the highest tax rates and the richest districts tend to have the lowest tax rates.[12] Yet, despite the apparent *extra* effort being made by the poorest districts, they are unable even to begin to match the richest districts in terms of the production of local revenues. For example, the 10 richest districts studied by Professor Berke were able to produce $585 per pupil with an equalized tax rate of 31¢

[10] See Appendix I, *post,* p. 134.

[11] See *ibid.* Indeed, appellants acknowledge that the relevant data from Professor Berke's affidavit show "a very positive correlation, 0.973, between market value of taxable property per pupil and state and local revenues per pupil." Reply Brief for Appellants 6 n. 9.

While the Court takes issue with much of Professor Berke's data and conclusions, *ante,* at 15–16, n. 38, and 25–27, I do not understand its criticism to run to the basic finding of a correlation between taxable district property per pupil and local revenues per pupil. The critique of Professor Berke's methodology upon which the Court relies, see Goldstein, Interdistrict Inequalities in School Financing: A Critical Analysis of *Serrano* v. *Priest* and its Progeny, 120 U. Pa. L. Rev. 504, 523–525, nn. 67, 71 (1972), is directed only at the suggested correlations between family income and taxable district wealth and between race and taxable district wealth. Obviously, the appellants do not question the relationship in Texas between taxable district wealth and per-pupil expenditures; and there is no basis for the Court to do so, whatever the criticisms that may be leveled at other aspects of Professor Berke's study, see *infra,* n. 56.

[12] See Appendix II, *post,* p. 135.

on $100 of equalized valuation, but the four poorest districts studied, with an equalized rate of 70¢ on $100 of equalized valuation, were able to produce only $60 per pupil.[13] Without more, this state-imposed system of educational funding presents a serious picture of widely varying treatment of Texas school districts, and thereby of Texas schoolchildren, in terms of the amount of funds available for public education.

Nor are these funding variations corrected by the other aspects of the Texas financing scheme. The Federal Government provides funds sufficient to cover only some 10% of the total cost of public education in Texas.[14] Furthermore, while these federal funds are not distributed in Texas solely on a per-pupil basis, appellants do not here contend that they are used in such a way as to ameliorate significantly the widely varying consequences for Texas school districts and schoolchildren of the local property tax element of the state financing scheme.[15]

State funds provide the remaining some 50% of the monies spent on public education in Texas.[16] Technically, they are distributed under two programs. The first is the Available School Fund, for which provision is made in the Texas Constitution.[17] The Available

---

[13] See *ibid.*

[14] For the 1970–1971 school year, the precise figure was 10.9%. See Texas Research League, *supra*, n. 2, at 9.

[15] Appellants made such a contention before the District Court but apparently have abandoned it in this Court. Indeed, data introduced in the District Court simply belie the argument that federal funds have a significant equalizing effect. See Appendix I, *post*, p. 134. And, as the District Court observed, it does not follow that remedial action by the Federal Government would excuse any unconstitutional discrimination effected by the state financing scheme. 337 F. Supp. 280, 284.

[16] For the 1970–1971 school year, the precise figure was 48%. See Texas Research League, *supra*, n. 2, at 9.

[17] See Tex. Const., Art. 7, § 5 (Supp. 1972). See also Tex. Educ. Code Ann. § 15.01 (b).

School Fund is composed of revenues obtained from a number of sources, including receipts from the state ad valorem property tax, one-fourth of all monies collected by the occupation tax, annual contributions by the legislature from general revenues, and the revenues derived from the Permanent School Fund.[18] For the 1970–1971 school year the Available School Fund contained $296,000,000. The Texas Constitution requires that this money be distributed annually on a per capita basis [19] to the local school districts. Obviously, such a flat grant could not alone eradicate the funding differentials attributable to the local property tax. Moreover, today the Available School Fund is in reality simply one facet of the second state financing program, the Minimum Foundation School Program,[20] since each district's annual share of the Fund is deducted from the sum to which the district is entitled under the Foundation Program.[21]

The Minimum Foundation School Program provides funds for three specific purposes: professional salaries, current operating expenses, and transportation expenses.[22] The State pays, on an overall basis, for approximately 80% of the cost of the Program; the remaining 20% is distributed among the local school districts under the

---

[18] See Tex. Educ. Code Ann. § 15.01 (b).

The Permanent School Fund is, in essence, a public trust initially endowed with vast quantities of public land, the sale of which has provided an enormous corpus that in turn produces substantial annual revenues which are devoted exclusively to public education. See Tex. Const., Art. 7, § 5 (Supp. 1972). See also 5 Report of Governor's Committee on Public School Education, The Challenge and the Chance 11 (1969) (hereinafter Governor's Committee Report).

[19] This is determined from the average daily attendance within each district for the preceding year. Tex. Educ. Code Ann. § 15.01 (c).

[20] See id., §§ 16.01–16.975.

[21] See id., §§ 16.71 (2), 16.79.

[22] See id., §§ 16.301–16.316, 16.45, 16.51–16.63.

Local Fund Assignment.[23] Each district's share of the
Local Fund Assignment is determined by a complex
"economic index" which is designed to allocate a larger
share of the costs to property-rich districts than to prop-
erty-poor districts.[24] Each district pays its share with
revenues derived from local property taxation.

The stated purpose of the Minimum Foundation School
Program is to provide certain basic funding for each
local Texas school district.[25] At the same time, the Pro-
gram was apparently intended to improve, to some de-
gree, the financial position of property-poor districts
relative to property-rich districts, since—through the use
of the economic index—an effort is made to charge a
disproportionate share of the costs of the Program to
rich districts.[26] It bears noting, however, that substan-
tial criticism has been leveled at the practical effective-
ness of the economic index system of local cost alloca-
tion.[27] In theory, the index is designed to ascertain the
relative ability of each district to contribute to the Local
Fund Assignment from local property taxes. Yet the
index is not developed simply on the basis of each dis-
trict's taxable wealth. It also takes into account the
district's relative income from manufacturing, mining, and
agriculture, its payrolls, and its scholastic population.[28]

---

[23] See, id., §§ 16.72–16.73, 16.76–16.77.

[24] See id., §§ 16.74–16.76. The formula for calculating each dis-
trict's share is described in 5 Governor's Committee Report 44–48.

[25] See Tex. Educ. Code Ann. § 16.01.

[26] See 5 Governor's Committee Report 40–41.

[27] See id., at 45–67; Texas Research League, Texas Public Schools
Under the Minimum Foundation Program—An Evaluation: 1949–
1954, pp. 67–68 (1954).

[28] Technically, the economic index involves a two-step calculation.
First, on the basis of the factors mentioned above, each Texas
county's share of the Local Fund Assignment is determined. Then
each county's share is divided among its school districts on the
basis of their relative shares of the county's assessable wealth. See

It is difficult to discern precisely how these latter factors are predictive of a district's relative ability to raise revenues through local property taxes. Thus, in 1966, one of the consultants who originally participated in the development of the Texas economic index adopted in 1949 told the Governor's Committee on Public School Education: "The Economic Index approach to evaluating local ability offers a little better measure than sheer chance, but not much." [29]

Moreover, even putting aside these criticisms of the economic index as a device for achieving meaningful district wealth equalization through cost allocation, poor districts still do not necessarily *receive* more state aid than property-rich districts. For the standards which currently determine the amount received from the Foundation School Program by any particular district [30] favor property-rich districts.[31] Thus, focusing on the same

Tex. Educ. Code Ann. §§ 16.74–16.76; 5 Governor's Committee Report 43–44; Texas Research League, Texas Public School Finance: A Majority of Exceptions 6–8 (2d Interim Report 1972).

[29] 5 Governor's Committee Report 48, quoting statement of Dr. Edgar Morphet.

[30] The extraordinarily complex standards are summarized in 5 Governor's Committee Report 41–43.

[31] The key element of the Minimum Foundation School Program is the provision of funds for professional salaries—more particularly, for teacher salaries. The Program provides each district with funds to pay its professional payroll as determined by certain state standards. See Tex. Educ. Code Ann. §§ 16.301–16.316. If the district fails to pay its teachers at the levels determined by the state standards it receives nothing from the Program. See *id.*, § 16.301 (c). At the same time, districts are free to pay their teachers salaries in excess of the level set by the state standards, using local revenues— that is, property tax revenue—to make up the difference, see *id.*, § 16.301 (a).

The state salary standards focus upon two factors: the educational level and the experience of the district's teachers. See *id.*, §§ 16.301– 16.316. The higher these two factors are, the more funds the dis-

Edgewood Independent and Alamo Heights School Districts which the majority uses for purposes of illustration, we find that in 1967–1968 property-rich Alamo Heights,[32] which raised $333 per pupil on an equalized tax rate of 85¢ per $100 valuation, received $225 per pupil from the Foundation School Program, while property-poor Edgewood,[33] which raised only $26 per pupil with an equalized tax rate of $1.05 per $100 valuation, received only $222 per pupil from the Foundation School Program.[34] And, more recent data, which indicate that for the 1970–1971 school year Alamo Heights received $491 per pupil from

trict will receive from the Foundation Program for professional salaries.

It should be apparent that the net effect of this scheme is to provide more assistance to property-rich districts than to property-poor ones. For rich districts are able to pay their teachers, out of local funds, salary increments above the state minimum levels. Thus, the rich districts are able to attract the teachers with the best education and the most experience. To complete the circle, this then means, given the state standards, that the rich districts receive more from the Foundation Program for professional salaries than do poor districts. A portion of Professor Berke's study vividly illustrates the impact of the State's standards on districts of varying wealth. See Appendix III, *post*, p. 136.

[32] In 1967–1968, Alamo Heights School District had $49,478 in taxable property per pupil. See Berke Affidavit, Table VII, App. 216.

[33] In 1967–1968, Edgewood Independent School District had $5.960 in taxable property per pupil. *Ibid.*

[34] I fail to understand the relevance for this case of the Court's suggestion that if Alamo Heights School District, which is approximately the same physical size as Edgewood Independent School District but which has only one-fourth as many students, had the same number of students as Edgewood, the former's per-pupil expenditure would be considerably closer to the latter's. *Ante,* at 13 n. 33. Obviously, this is true, but it does not alter the simple fact that Edgewood *does* have four times as many students but not four times as much taxable property wealth. From the perspective of Edgewood's school children then—the perspective that ultimately counts here—Edgewood is clearly a much poorer district than Alamo

the Program while Edgewood received only $356 per pupil, hardly suggest that the wealth gap between the districts is being narrowed by the State Program. To the contrary, whereas in 1967–1968 Alamo Heights received only $3 per pupil, or about 1%, more than Edgewood in state aid, by 1970–1971 the gap had widened to a difference of $135 per pupil, or about 38%.[35] It was data of this character that prompted the District Court to observe that "the current [state aid] system tends to subsidize the rich at the expense of the poor, rather than the other way around." [36] 337 F. Supp. 280, 282. And even the appellants go no further here than to venture that the Minimum Foundation School Program has "a mildly equalizing effect." [37]

Despite these facts, the majority continually emphasizes how much state aid has, in recent years, been given

---

Heights. The question here is not whether districts have equal taxable property wealth in absolute terms, but whether districts have differing taxable wealth given their respective school-age populations.

[35] In the face of these gross disparities in treatment which experience with the Texas financing scheme has revealed, I cannot accept the Court's suggestion that we are dealing here with a remedial scheme to which we should accord substantial deference because of its accomplishments rather than criticize it for its failures. *Ante,* at 38–39. Moreover, Texas' financing scheme is hardly remedial legislation of the type for which we have previously shown substantial tolerance. Such legislation may in fact extend the vote to "persons who otherwise would be denied it by state law," *Katzenbach* v. *Morgan,* 384 U. S. 641, 657 (1966), or it may eliminate the evils of the private bail bondsman, *Schilb* v. *Kuebel,* 404 U. S. 357 (1971). But those are instances in which a legislative body has sought to remedy problems for which it cannot be said to have been directly responsible. By contrast, public education is the function of the State in Texas, and the responsibility for any defect in the financing scheme must ultimately rest with the State. It is the State's own scheme which has caused the funding problem, and, thus viewed, that scheme can hardly be deemed remedial.

[36] Cf. Appendix I, *post,* p. 134.

[37] Brief for Appellants 3.

to property-poor Texas school districts. What the Court fails to emphasize is the cruel irony of how much more state aid is being given to property-rich Texas school districts on top of their already substantial local property tax revenues.[38] Under any view, then, it is apparent that the state aid provided by the Foundation School Program fails to compensate for the large funding variations attributable to the local property tax element of the Texas financing scheme. And it is these stark differences in the treatment of Texas school districts and school children inherent in the Texas financing scheme, not the absolute amount of state aid provided to any particular school district, that are the crux of this case. There can, moreover, be no escaping the conclusion that the local property tax which is dependent upon taxable district property wealth is an essential feature of the Texas scheme for financing public education.[39]

## B

The appellants do not deny the disparities in educational funding caused by variations in taxable district property wealth. They do contend, however, that whatever the differences in per-pupil spending among Texas districts, there are no discriminatory consequences for the children of the disadvantaged districts. They recognize that what is at stake in this case is the quality of the

---

[38] Thus, in 1967–1968, Edgewood had a total of $248 per pupil in state and local funds compared with a total of $558 per pupil for Alamo Heights. See Berke Affidavit, Table X, App. 219. For 1970–1971, the respective totals were $418 and $913. See Texas Research League, *supra*, n. 2, at 14.

[39] Not only does the local property tax provide approximately 40% of the funds expended on public education, but it is the *only* source of funds for such essential aspects of educational financing as the payment of school bonds, see n. 3, *supra*, and the payment of the district's share of the Local Fund Assignment, as well as for nearly all expenditures above the minimums established by the Foundation School Program.

public education provided Texas children in the districts in which they live. But appellants reject the suggestion that the quality of education in any particular district is determined by money—beyond some minimal level of funding which they believe to be assured every Texas district by the Minimum Foundation School Program. In their view, there is simply no denial of equal educational opportunity to any Texas schoolchildren as a result of the widely varying per-pupil spending power provided districts under the current financing scheme.

In my view, though, even an unadorned restatement of this contention is sufficient to reveal its absurdity. Authorities concerned with educational quality no doubt disagree as to the significance of variations in per-pupil spending.[40] Indeed, conflicting expert testimony was presented to the District Court in this case concerning the effect of spending variations on educational achievement.[41] We sit, however, not to resolve disputes over educational theory but to enforce our Constitution. It is an inescapable fact that if one district has more funds available per pupil than another district, the

[40] Compare, e. g., J. Coleman et al., Equality of Educational Opportunity 290–330 (1966); Jencks, The Coleman Report and the Conventional Wisdom, in On Equality of Educational Opportunity 69, 91–104 (F. Mosteller & D. Moynihan eds. 1972), with, e. g., J. Guthrie, G. Kleindorfer, H. Levin, & R. Stout, Schools and Inequality 79–90 (1971); Kiesling, Measuring a Local Government Service: A Study of School Districts in New York State, 49 Rev. Econ. & Statistics 356 (1967).

[41] Compare Berke Answers to Interrogatories 10 ("Dollar expenditures are probably the best way of measuring the quality of education afforded students . . ."), with Graham Deposition 39 ("[I]t is not just necessarily the money, no. It is how wisely you spend it"). It warrants noting that even appellants' witness, Mr. Graham, qualified the importance of money only by the requirement of wise expenditure. Quite obviously, a district which is property poor is powerless to match the education provided by a property-rich district, assuming each district allocates its funds with equal wisdom.

former will have greater choice in educational planning than will the latter. In this regard, I believe the question of discrimination in educational quality must be deemed to be an objective one that looks to what the State provides its children, not to what the children are able to do with what they receive. That a child forced to attend an underfunded school with poorer physical facilities, less experienced teachers, larger classes, and a narrower range of courses than a school with substantially more funds—and thus with greater choice in educational planning—may nevertheless excel is to the credit of the child, not the State, cf. *Missouri ex rel. Gaines* v. *Canada,* 305 U. S. 337, 349 (1938). Indeed, who can ever measure for such a child the opportunities lost and the talents wasted for want of a broader, more enriched education? Discrimination in the opportunity to learn that is afforded a child must be our standard.

Hence, even before this Court recognized its duty to tear down the barriers of state-enforced racial segregation in public education, it acknowledged that inequality in the educational facilities provided to students may be discriminatory state action as contemplated by the Equal Protection Clause. As a basis for striking down state-enforced segregation of a law school, the Court in *Sweatt* v. *Painter,* 339 U. S. 629, 633–634 (1950), stated:

> "[W]e cannot find substantial equality in the educational opportunities offered white and Negro law students by the State. In terms of number of the faculty, variety of courses and opportunity for specialization, size of the student body, scope of the library, availability of law review and similar activities, the [whites-only] Law School is superior. . . . It is difficult to believe that one who had a free choice between these law schools would consider the question close."

See also *McLaurin* v. *Oklahoma State Regents for Higher Education,* 339 U. S. 637 (1950). Likewise, it is difficult to believe that if the children of Texas had a free choice, they would choose to be educated in districts with fewer resources, and hence with more antiquated plants, less experienced teachers, and a less diversified curriculum. In fact, if financing variations are so insignificant to educational quality, it is difficult to understand why a number of our country's wealthiest school districts, which have no legal obligation to argue in support of the constitutionality of the Texas legislation, have nevertheless zealously pursued its cause before this Court.[42]

The consequences, in terms of objective educational input, of the variations in district funding caused by the Texas financing scheme are apparent from the data introduced before the District Court. For example, in 1968–1969, 100% of the teachers in the property-rich Alamo Heights School District had college degrees.[43] By contrast, during the same school year only 80.02% of the teachers had college degrees in the property poor Edgewood Independent School District.[44] Also, in 1968–1969, approximately 47% of the teachers in the Edgewood District were on emergency teaching permits, whereas only 11% of the teachers in Alamo Heights were on such permits.[45] This is undoubtedly a reflection of the fact that the top of Edgewood's teacher salary scale was

---

[42] See Brief of *amici curiae, inter alia,* San Marino Unified School District; Beverly Hills Unified School District; Brief of *amici curiae, inter alia,* Bloomfield Hills, Michigan, School District; Dearborn City, Michigan, School District; Grosse Pointe, Michigan, Public School System.

[43] Answers to Plaintiffs' Interrogatories, App. 115.

[44] *Ibid.* Moreover, during the same period, 37.17% of the teachers in Alamo Heights had advanced degrees, while only 14.98% of Edgewood's faculty had such degrees. See *id.,* at 116.

[45] *Id.,* at 117.

approximately 80% of Alamo Heights'.[46] And, not sur-
prisingly, the teacher-student ratio varies significantly
between the two districts.[47] In other words, as might be
expected, a difference in the funds available to districts
results in a difference in educational inputs available for
a child's public education in Texas. For constitutional
purposes, I believe this situation, which is directly at-
tributable to the Texas financing scheme, raises a grave
question of state-created discrimination in the provision
of public education. Cf. *Gaston County* v. *United States,*
395 U. S. 285, 293–294 (1969).

At the very least, in view of the substantial inter-
district disparities in funding and in resulting educational
inputs shown by appellees to exist under the Texas
financing scheme, the burden of proving that these dis-
parities do not in fact affect the quality of children's
education must fall upon the appellants. Cf. *Hobson*
v. *Hansen,* 327 F. Supp. 844, 860–861 (DC 1971). Yet
appellants made no effort in the District Court to dem-
onstrate that educational quality is not affected by vari-
ations in funding and in resulting inputs. And, in this
Court, they have argued no more than that the relation-
ship is ambiguous. This is hardly sufficient to overcome
appellees' prima facie showing of state-created discrim-
ination between the schoolchildren of Texas with respect
to objective educational opportunity.

Nor can I accept the appellants' apparent suggestion
that the Texas Minimum Foundation School Program
effectively eradicates any discriminatory effects other-
wise resulting from the local property tax element of the

---

[46] *Id.,* at 118.

[47] In the 1967–1968 school year, Edgewood had 22,862 students and
864 teachers, a ratio of 26.5 to 1. See *id.,* at 110, 114. In Alamo
Heights, for the same school year, there were 5,432 students and 265
teachers for a ratio of 20.5 to 1. *Ibid.*

Texas financing scheme. Appellants assert that, despite its imperfections, the Program "does guarantee an adequate education to every child." [48] The majority, in considering the constitutionality of the Texas financing scheme, seems to find substantial merit in this contention, for it tells us that the Foundation Program "was designed to provide an adequate minimum educational offering in every school in the State," *ante*, at 45, and that the Program "assur[es] a basic education for every child," *ante*, at 49. But I fail to understand how the constitutional problems inherent in the financing scheme are eased by the Foundation Program. Indeed, the precise thrust of the appellants' and the Court's remarks are not altogether clear to me.

The suggestion may be that the state aid received via the Foundation Program sufficiently improves the position of property-poor districts *vis-à-vis* property-rich districts—in terms of educational funds—to eliminate any claim of interdistrict discrimination in available educational resources which might otherwise exist if educational funding were dependent solely upon local property taxation. Certainly the Court has recognized that to demand precise equality of treatment is normally unrealistic, and thus minor differences inherent in any practical context usually will not make out a substantial equal protection claim. See, *e. g., Mayer* v. *City of Chicago,* 404 U. S. 189, 194–195 (1971); *Draper* v. *Washington,* 372 U. S. 487, 495–496 (1963); *Bain Peanut Co.* v. *Pinson,* 282 U. S. 499, 501 (1931). But, as has already been seen, we are hardly presented here with some *de minimis* claim of discrimination resulting from the play necessary in any functioning system; to the contrary, it is clear that the Foundation Program utterly fails to

---

[48] Reply Brief for Appellants 17. See also, *id.*, at 5, 15–16.

ameliorate the seriously discriminatory effects of the local property tax.[49]

Alternatively, the appellants and the majority may believe that the Equal Protection Clause cannot be offended by substantially unequal state treatment of persons who are similarly situated so long as the State provides everyone with some unspecified amount of education which evidently is "enough."[50] The basis for such a novel view is far from clear. It is, of course, true that the Constitution does not require precise equality in the treatment of all persons. As Mr. Justice Frankfurter explained:

> "The equality at which the 'equal protection' clause aims is not a disembodied equality. The Fourteenth Amendment enjoins 'the equal protection of the laws,' and laws are not abstract propositions. . . . The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner* v. *Texas,* 310 U. S. 141, 147 (1940).

See also *Douglas* v. *California,* 372 U. S. 353, 357 (1963); *Goesaert* v. *Cleary,* 335 U. S. 464, 466 (1948).

---

[49] Indeed, even apart from the differential treatment inherent in the local property tax, the significant interdistrict disparities in state aid received under the Minimum Foundation School Program would seem to raise substantial equal protection questions.

[50] I find particularly strong intimations of such a view in the majority's efforts to denigrate the constitutional significance of children in property-poor districts "receiving a poorer quality education than that available to children in districts having more assessable wealth" with the assertion "that, at least where wealth is involved, the Equal Protection Clause does not require absolute equality or precisely equal advantages." *Ante,* at 23, 24. The Court, to be sure, restricts its remark to "wealth" discrimination. But the logical basis for such a restriction is not explained by the Court, nor is it otherwise apparent, see *infra,* at 117–120 and n. 77.

But this Court has never suggested that because some "adequate" level of benefits is provided to all, discrimination in the provision of services is therefore constitutionally excusable. The Equal Protection Clause is not addressed to the minimal sufficiency but rather to the unjustifiable inequalities of state action. It mandates nothing less than that "all persons similarly circumstanced shall be treated alike." *F. S. Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415 (1920).

Even if the Equal Protection Clause encompassed some theory of constitutional adequacy, discrimination in the provision of educational opportunity would certainly seem to be a poor candidate for its application. Neither the majority nor appellants inform us how judicially manageable standards are to be derived for determining how much education is "enough" to excuse constitutional discrimination. One would think that the majority would heed its own fervent affirmation of judicial self-restraint before undertaking the complex task of determining at large what level of education is constitutionally sufficient. Indeed, the majority's apparent reliance upon the adequacy of the educational opportunity assured by the Texas Minimum Foundation School Program seems fundamentally inconsistent with its own recognition that educational authorities are unable to agree upon what makes for educational quality, see *ante,* at 42–43 and n. 86 and at 47 n. 101. If, as the majority stresses, such authorities are uncertain as to the impact of various levels of funding on educational quality, I fail to see where it finds the expertise to divine that the particular levels of funding provided by the Program assure an adequate educational opportunity—much less an education substantially equivalent in quality to that which a higher level of funding might provide. Certainly appellants' mere assertion before this Court of the adequacy of the education guaranteed by the Mini-

mum Foundation School Program cannot obscure the constitutional implications of the discrimination in educational funding and objective educational inputs resulting from the local property tax—particularly since the appellees offered substantial uncontroverted evidence before the District Court impugning the now much-touted "adequacy" of the education guaranteed by the Foundation Program.[51]

In my view, then, it is inequality—not some notion of gross inadequacy—of educational opportunity that raises a question of denial of equal protection of the laws. I find any other approach to the issue unintelligible and without directing principle. Here, appellees have made a substantial showing of wide variations in educational funding and the resulting educational opportunity afforded to the schoolchildren of Texas. This discrimination is, in large measure, attributable to significant disparities in the taxable wealth of local Texas school districts. This is a sufficient showing to raise a substantial question of discriminatory state action in violation of the Equal Protection Clause.[52]

---

[51] See Answers to Interrogatories by Dr. Joel S. Berke, Ans. 17, p. 9; Ans. 48–51, pp. 22–24; Ans. 88–89, pp. 41–42; Deposition of Dr. Daniel C. Morgan, Jr., at 52–55; Affidavit of Dr. Daniel C. Morgan, Jr., App. 242–243.

[52] It is true that in two previous cases this Court has summarily affirmed district court dismissals of constitutional attacks upon other state educational financing schemes. See *McInnis* v. *Shapiro,* 293 F. Supp. 327 (ND Ill. 1968), aff'd *per curiam, sub nom. McInnis* v. *Ogilvie,* 394 U. S. 322 (1969); *Burruss* v. *Wilkerson,* 310 F. Supp. 572 (WD Va. 1969), aff'd *per curiam,* 397 U. S. 44 (1970). But those decisions cannot be considered dispositive of this action, for the thrust of those suits differed materially from that of the present case. In *McInnis,* the plaintiffs asserted that *"only* a financing system which apportions public funds according to the educational needs of the students satisfies the Fourteenth Amendment." 293 F. Supp., at 331. The District Court concluded that "(1) the Fourteenth Amendment does not require that public school

## C

Despite the evident discriminatory effect of the Texas financing scheme, both the appellants and the majority raise substantial questions concerning the precise character of the disadvantaged class in this case. The District Court concluded that the Texas financing scheme draws "distinction between groups of citizens depending upon the wealth of the district in which they live" and thus creates a disadvantaged class composed of persons living in property-poor districts. See 337 F. Supp., at 282. See also *id.*, at 281. In light of the data introduced before the District Court, the conclusion that the schoolchildren of property-poor districts constitute a sufficient class for our purposes seems indisputable to me.

Appellants contend, however, that in constitutional terms this case involves nothing more than discrimination against local school districts, not against individuals, since on its face the state scheme is concerned only with the provision of funds to local districts. The result of the Texas financing scheme, appellants suggest, is merely that some local districts have more available revenues for education; others have less. In that re-

---

expenditures be made only on the basis of pupils' educational needs, and (2) the lack of judicially manageable standards makes this controversy nonjusticiable." *Id.*, at 329. The *Burruss* District Court dismissed that suit essentially in reliance on *McInnis* which it found to be "scarcely distinguishable." 310 F. Supp., at 574. This suit involves no effort to obtain an allocation of school funds that considers only educational need. The District Court ruled only that the State must remedy the discrimination resulting from the distribution of taxable local district wealth which has heretofore prevented many districts from truly exercising local fiscal control. Furthermore, the limited holding of the District Court presents none of the problems of judicial management which would exist if the federal courts were to attempt to ensure the distribution of educational funds solely on the basis of educational need, see *infra,* at 130–132.

spect, they point out, the States have broad discretion in drawing reasonable distinctions between their political subdivisions. See *Griffin* v. *County School Board of Prince Edward County,* 377 U. S. 218, 231 (1964); *McGowan* v. *Maryland,* 366 U. S. 420, 427 (1961); *Salsburg* v. *Maryland,* 346 U. S. 545, 550–554 (1954).

But this Court has consistently recognized that where there is in fact discrimination against individual interests, the constitutional guarantee of equal protection of the laws is not inapplicable simply because the discrimination is based upon some group characteristic such as geographic location. See *Gordon* v. *Lance,* 403 U. S. 1, 4 (1971); *Reynolds* v. *Sims,* 377 U. S. 533, 565–566 (1964); *Gray* v. *Sanders* 372 U. S. 368, 379 (1963). Texas has chosen to provide free public education for all its citizens, and it has embodied that decision in its constitution.[53] Yet, having established public education for its citizens, the State, as a direct consequence of the variations in local property wealth endemic to Texas' financing scheme, has provided some Texas schoolchildren with substantially less resources for their education than others. Thus, while on its face the Texas scheme may merely discriminate between local districts, the impact of that discrimination falls directly upon the children whose educational opportunity is dependent upon where they happen to live. Consequently, the District Court correctly concluded that the Texas financing scheme discriminates, from a constitutional perspective, between schoolchildren on the basis of the amount of taxable property located within their local districts.

In my Brother STEWART's view, however, such a description of the discrimination inherent in this case is apparently not sufficient, for it fails to define the "kind of objectively identifiable classes" that he evidently per-

---

[53] Tex. Const., Art. 7, § 1.

ceives to be necessary for a claim to be "cognizable under the Equal Protection Clause," *ante,* at 62. He asserts that this is also the view of the majority, but he is unable to cite, nor have I been able to find, any portion of the Court's opinion which remotely suggests that there is no objectively identifiable or definable class in this case. In any event, if he means to suggest that an essential predicate to equal protection analysis is the precise identification of the particular individuals who compose the disadvantaged class, I fail to find the source from which he derives such a requirement. Certainly such precision is not analytically necessary. So long as the basis of the discrimination is clearly identified, it is possible to test it against the State's purpose for such discrimination—whatever the standard of equal protection analysis employed.[54] This is clear from our decision only last Term in *Bullock* v. *Carter,* 405 U. S. 134 (1972), where the Court, in striking down Texas' primary filing fees as violative of equal protection, found no impediment to equal protection analysis in the fact that the members of the disadvantaged class could not be readily identified. The Court recognized that the filing-fee system tended "to deny some voters the opportunity to vote for a candidate of their choosing; at the same time it gives the affluent the power to place on the ballot their own names or the names of persons they favor." *Id.,* at 144. The

---

[54] Problems of remedy may be another matter. If provision of the relief sought in a particular case required identification of each member of the affected class, as in the case of monetary relief, the need for clarity in defining the class is apparent. But this involves the procedural problems inherent in class action litigation, not the character of the elements essential to equal protection analysis. We are concerned here only with the latter. Moreover, it is evident that in cases such as this, provision of appropriate relief, which takes the injunctive form, is not a serious problem since it is enough to direct the action of appropriate officials. Cf. *Potts* v. *Flax,* 313 F. 2d 284, 288–290 (CA5 1963).

Court also recognized that "[t]his disparity in voting power based on wealth cannot be described by reference to discrete and precisely defined segments of the community as is typical of inequities challenged under the Equal Protection Clause . . . ." *Ibid.* Nevertheless, it concluded that "we would ignore reality were we not to recognize that this system falls with unequal weight on voters . . . according to their economic status." *Ibid.* The nature of the classification in *Bullock* was clear, although the precise membership of the disadvantaged class was not. This was enough in *Bullock* for purposes of equal protection analysis. It is enough here.

It may be, though, that my Brother STEWART is not in fact demanding precise identification of the membership of the disadvantaged class for purposes of equal protection analysis, but is merely unable to discern with sufficient clarity the nature of the discrimination charged in this case. Indeed, the Court itself displays some uncertainty as to the exact nature of the discrimination and the resulting disadvantaged class alleged to exist in this case. See *ante*, at 19–20. It is, of course, essential to equal protection analysis to have a firm grasp upon the nature of the discrimination at issue. In fact, the absence of such a clear, articulable understanding of the nature of alleged discrimination in a particular instance may well suggest the absence of any real discrimination. But such is hardly the case here.

A number of theories of discrimination have, to be sure, been considered in the course of this litigation. Thus, the District Court found that in Texas the poor and minority group members tend to live in property-poor districts, suggesting discrimination on the basis of both personal wealth and race. See 337 F. Supp., at 282 and n. 3. The Court goes to great lengths to discredit the data upon which the District Court relied, and thereby its conclusion that poor people live in property-poor dis-

tricts.[55] Although I have serious doubts as to the correctness of the Court's analysis in rejecting the data submitted below,[56] I have no need to join issue on these factual disputes.

---

[55] I assume the Court would lodge the same criticism against the validity of the finding of a correlation between poor districts and racial minorities.

[56] The Court rejects the District Court's finding of a correlation between poor people and poor districts with the assertion that "there is reason to believe that the poorest families are not necessarily clustered in the poorest property districts" in Texas. *Ante,* at 23. In support of its conclusion the Court offers absolutely no data— which it cannot on this record—concerning the distribution of poor people in Texas to refute the data introduced below by appellees; it relies instead on a recent law review note concerned solely with the State of Connecticut, Note, A Statistical Analysis of the School Finance Decisions: On Winning Battles and Losing Wars, 81 Yale L. J. 1303 (1972). Common sense suggests that the basis for drawing a demographic conclusion with respect to a geographically large, urban-rural, industrial-agricultural State such as Texas from a geographically small, densely populated, highly industrialized State such as Connecticut is doubtful at best.

Furthermore, the article upon which the Court relies to discredit the statistical procedures employed by Professor Berke to establish the correlation between poor people and poor districts, see n. 11, *supra,* based its criticism primarily on the fact that only four of the 110 districts studied were in the lowest of the five categories, which were determined by relative taxable property per pupil, and most districts clustered in the middle three groups. See Goldstein, Interdistrict Inequalities in School Financing: A Critical Analysis of *Serrano* v. *Priest* and its Progeny, 120 U. Pa. L. Rev. 504, 524 n. 67 (1972). See also *ante,* at 26-27. But the Court fails to note that the four poorest districts in the sample had over 50,000 students which constituted 10% of the students in the entire sample. It appears, moreover, that even when the richest and the poorest categories are enlarged to include in each category 20% of the students in the sample, the correlation between district and individual wealth holds true. See Brief for the Governors of Minnesota, Maine, South Dakota, Wisconsin, and Michigan as *amici curiae* 17 n. 21.

Finally, it cannot be ignored that the data introduced by appellees went unchallenged in the District Court. The majority's willingness

I believe it is sufficient that the overarching form of discrimination in this case is between the schoolchildren of Texas on the basis of the taxable property wealth of the districts in which they happen to live. To understand both the precise nature of this discrimination and the parameters of the disadvantaged class it is sufficient to consider the constitutional principle which appellees contend is controlling in the context of educational financing. In their complaint appellees asserted that the Constitution does not permit local district wealth to be determinative of educational opportunity.[57] This is simply another way of saying, as the District Court concluded, that consistent with the guarantee of equal protection of the laws, "the quality of public education may not be a function of wealth, other than the wealth of the state as a whole." 337 F. Supp., at 284. Under such a principle, the children of a district are excessively advantaged if that district has more taxable property per pupil than the average amount of taxable property per pupil considering the State as a whole. By contrast, the children of a district are disadvantaged if that district has less taxable property per pupil than the state average. The majority attempts to disparage such a definition of the disadvantaged class as the product of an "artificially defined level" of district wealth. *Ante,* at 28. But such is clearly not the case, for this is the

___

to permit appellants to litigate the correctness of those data for the first time before this tribunal—where effective response by appellees is impossible—is both unfair and judicially unsound.

[57] Third Amended Complaint App. 23. Consistent with this theory, appellees purported to represent, among others, a class composed of "all . . . school children in independent school districts . . . who . . . have been deprived of the equal protection of the law under the Fourteenth Amendment with regard to public school education because of the low value of the property lying within the independent school districts in which they reside." *Id.,* at 15.

definition unmistakably dictated by the constitutional principle for which appellees have argued throughout the course of this litigation. And I do not believe that a clearer definition of either the disadvantaged class of Texas schoolchildren or the allegedly unconstitutional discrimination suffered by the members of that class under the present Texas financing scheme could be asked for, much less needed.[58] Whether this discrimination, against the schoolchildren of property-poor districts, inherent in the Texas financing scheme, is violative of the Equal Protection Clause is the question to which we must now turn.

## II

To avoid having the Texas financing scheme struck down because of the interdistrict variations in taxable property wealth, the District Court determined that it was insufficient for appellants to show merely that the State's scheme was rationally related to some legitimate state purpose; rather, the discrimination inherent in the scheme had to be shown necessary to promote a "compelling state interest" in order to withstand constitutional scrutiny. The basis for this determination was twofold: first, the financing scheme divides citizens on a wealth basis, a classification which the District Court viewed as highly suspect; and second, the discriminatory scheme directly affects what it considered to be a "fundamental interest," namely, education.

This Court has repeatedly held that state discrimination which either adversely affects a "fundamental interest," see, e. g., Dunn v. Blumstein, 405 U. S. 330, 336–342 (1972); Shapiro v. Thompson, 394 U. S. 618, 629–631 (1969), or is based on a distinction of a suspect character, see, e. g., Graham v. Richardson, 403 U. S. 365, 372

---

[58] The degree of judicial scrutiny that this particular classification demands is a distinct issue which I consider in Part II, C, infra.

(1971); *McLaughlin* v. *Florida,* 379 U. S. 184, 191–192 (1964), must be carefully scrutinized to ensure that the scheme is necessary to promote a substantial, legitimate state interest. See, *e. g., Dunn* v. *Blumstein, supra,* at 342–343; *Shapiro* v. *Thompson, supra,* at 634. The majority today concludes, however, that the Texas scheme is not subject to such a strict standard of review under the Equal Protection Clause. Instead, in its view, the Texas scheme must be tested by nothing more than that lenient standard of rationality which we have traditionally applied to discriminatory state action in the context of economic and commercial matters. See, *e. g., McGowan* v. *Maryland,* 366 U. S., at 425–426; *Morey* v. *Doud,* 354 U. S. 457, 465–466 (1957); *F. S. Royster Guano Co.* v. *Virginia,* 253 U. S., at 415; *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78–79 (1911). By so doing, the Court avoids the telling task of searching for a substantial state interest which the Texas financing scheme, with its variations in taxable district property wealth, is necessary to further. I cannot accept such an emasculation of the Equal Protection Clause in the context of this case.

### A

To begin, I must once more voice my disagreement with the Court's rigidified approach to equal protection analysis. See *Dandridge* v. *Williams,* 397 U. S. 471, 519–521 (1970) (dissenting opinion); *Richardson* v. *Belcher,* 404 U. S. 78, 90 (1971) (dissenting opinion). The Court apparently seeks to establish today that equal protection cases fall into one of two neat categories which dictate the appropriate standard of review—strict scrutiny or mere rationality. But this Court's decisions in the field of equal protection defy such easy categorization. A principled reading of what this Court has done reveals that it has applied a spectrum of standards in reviewing discrimination allegedly violative of the Equal Protec-

tion Clause. This spectrum clearly comprehends variations in the degree of care with which the Court will scrutinize particular classifications, depending, I believe, on the constitutional and societal importance of the interest adversely affected and the recognized invidiousness of the basis upon which the particular classification is drawn. I find in fact that many of the Court's recent decisions embody the very sort of reasoned approach to equal protection analysis for which I previously argued—that is, an approach in which "concentration [is] placed upon the character of the classification in question, the relative importance to individuals in the class discriminated against of the governmental benefits that they do not receive, and the asserted state interests in support of the classification." *Dandridge* v. *Williams, supra,* at 520–521 (dissenting opinion).

I therefore cannot accept the majority's labored efforts to demonstrate that fundamental interests, which call for strict scrutiny of the challenged classification, encompass only established rights which we are somehow bound to recognize from the text of the Constitution itself. To be sure, some interests which the Court has deemed to be fundamental for purposes of equal protection analysis are themselves constitutionally protected rights. Thus, discrimination against the guaranteed right of freedom of speech has called for strict judicial scrutiny. See *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92 (1972). Further, every citizen's right to travel interstate, although nowhere expressly mentioned in the Constitution, has long been recognized as implicit in the premises underlying that document: the right "was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created." *United States* v. *Guest,* 383 U. S. 745, 758 (1966). See also *Crandall* v. *Nevada,* 6 Wall. 35, 48 (1868). Consequently, the Court has required that a state classification affecting the con-

stitutionally protected right to travel must be "shown to be necessary to promote a *compelling* governmental interest." *Shapiro* v. *Thompson,* 394 U. S., at 634. But it will not do to suggest that the "answer" to whether an interest is fundamental for purposes of equal protection analysis is *always* determined by whether that interest "is a right . . . explicitly or implicitly guaranteed by the Constitution," *ante,* at 33–34.[59]

I would like to know where the Constitution guarantees the right to procreate, *Skinner* v. *Oklahoma,* 316 U. S. 535, 541 (1942), or the right to vote in state elections, *e. g., Reynolds* v. *Sims,* 377 U. S. 533 (1964), or the right to an appeal from a criminal conviction, *e. g., Griffin* v. *Illinois,* 351 U. S. 12 (1956). These are instances in which, due to the importance of the interests at stake, the Court has displayed a strong concern with the existence of discriminatory state treatment. But the Court has never said or indicated that these are interests which independently enjoy full-blown constitutional protection.

Thus, in *Buck* v. *Bell,* 274 U. S. 200 (1927), the Court refused to recognize a substantive constitutional guarantee of the right to procreate. Nevertheless, in *Skinner* v. *Oklahoma, supra,* at 541, the Court, without impugning the continuing validity of *Buck* v. *Bell,* held that "strict scrutiny" of state discrimination affecting procreation "is essential," for "[m]arriage and procreation are fundamental to the very existence and survival of the race." Recently, in *Roe* v. *Wade,* 410 U. S. 113, 152–154 (1973),

---

[59] Indeed, the Court's theory would render the established concept of fundamental interests in the context of equal protection analysis superfluous, for the substantive constitutional right itself requires that this Court strictly scrutinize any asserted state interest for restricting or denying access to any particular guaranteed right, see, *e. g., United States* v. *O'Brien,* 391 U. S. 367, 377 (1968); *Cox* v. *Louisiana,* 379 U. S. 536, 545–551 (1965).

the importance of procreation has, indeed, been explained on the basis of its intimate relationship with the constitutional right of privacy which we have recognized. Yet the limited stature thereby accorded any "right" to procreate is evident from the fact that at the same time the Court reaffirmed its initial decision in *Buck* v. *Bell*. See *Roe* v. *Wade, supra,* at 154.

Similarly, the right to vote in state elections has been recognized as a "fundamental political right," because the Court concluded very early that it is "preservative of all rights." *Yick Wo* v. *Hopkins,* 118 U. S. 356, 370 (1886); see, *e. g., Reynolds* v. *Sims, supra,* at 561–562. For this reason, "this Court has made clear that a citizen has a *constitutionally protected right* to participate in elections *on an equal basis with other citizens in the jurisdiction." Dunn* v. *Blumstein,* 405 U. S., at 336 (emphasis added). The final source of such protection from inequality in the provision of the state franchise is, of course, the Equal Protection Clause. Yet it is clear that whatever degree of importance has been attached to the state electoral process when unequally distributed, the right to vote in state elections has itself never been accorded the stature of an independent constitutional guarantee.[60] See *Oregon* v. *Mitchell,* 400 U. S. 112 (1970); *Kramer* v. *Union School District,* 395 U. S. 621, 626–629 (1969); *Harper* v. *Virginia Bd. of Elections,* 383 U. S. 663, 665 (1966).

---

[60] It is interesting that in its effort to reconcile the state voting rights cases with its theory of fundamentality the majority can muster nothing more than the contention that "[t]he constitutional underpinnings of the *right to equal treatment in the voting process* can no longer be doubted . . . ." *Ante,* at 34 n. 74 (emphasis added). If, by this, the Court intends to recognize a substantive constitutional "right to equal treatment in the voting process" independent of the Equal Protection Clause, the source of such a right is certainly a mystery to me.

Finally, it is likewise "true that a State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all." *Griffin* v. *Illinois,* 351 U. S., at 18. Nevertheless, discrimination adversely affecting access to an appellate process which a State has chosen to provide has been considered to require close judicial scrutiny. See, *e. g., Griffin* v. *Illinois, supra; Douglas* v. *California,* 372 U. S. 353 (1963).[61]

The majority is, of course, correct when it suggests that the process of determining which interests are fundamental is a difficult one. But I do not think the problem is insurmountable. And I certainly do not accept the view that the process need necessarily degenerate into an unprincipled, subjective "picking-and-choosing" between various interests or that it must involve this Court in creating "substantive constitutional rights in the name of guaranteeing equal protection of the laws," *ante,* at 33. Although not all fundamental interests are constitutionally guaranteed, the determination of which interests are fundamental should be firmly rooted in the text of the Constitution. The task in every case should be to determine the extent to which constitutionally guaranteed rights are dependent on interests not mentioned in the Constitution. As the nexus between the specific constitutional guarantee and the nonconstitutional interest draws closer, the nonconstitutional interest becomes

---

[61] It is true that *Griffin* and *Douglas* also involved discrimination against indigents, that is, wealth discrimination. But, as the majority points out, *ante,* at 28–29, the Court has never deemed wealth discrimination alone to be sufficient to require strict judicial scrutiny; rather, such review of wealth classifications has been applied only where the discrimination affects an important individual interest, see, *e. g., Harper* v. *Virginia Bd. of Elections,* 383 U. S. 663 (1966). Thus, I believe *Griffin* and *Douglas* can only be understood as premised on a recognition of the fundamental importance of the criminal appellate process.

more fundamental and the degree of judicial scrutiny applied when the interest is infringed on a discriminatory basis must be adjusted accordingly. Thus, it cannot be denied that interests such as procreation, the exercise of the state franchise, and access to criminal appellate processes are not fully guaranteed to the citizen by our Constitution. But these interests have nonetheless been afforded special judicial consideration in the face of discrimination because they are, to some extent, interrelated with constitutional guarantees. Procreation is now understood to be important because of its interaction with the established constitutional right of privacy. The exercise of the state franchise is closely tied to basic civil and political rights inherent in the First Amendment. And access to criminal appellate processes enhances the integrity of the range of rights [62] implicit in the Fourteenth Amendment guarantee of due process of law. Only if we closely protect the related interests from state discrimination do we ultimately ensure the integrity of the constitutional guarantee itself. This is the real lesson that must be taken from our previous decisions involving interests deemed to be fundamental.

The effect of the interaction of individual interests with established constitutional guarantees upon the degree of care exercised by this Court in reviewing state discrimination affecting such interests is amply illustrated by our decision last Term in *Eisenstadt* v. *Baird,* 405 U. S. 438 (1972). In *Baird,* the Court struck down as violative of the Equal Protection Clause a state statute which denied unmarried persons access to contraceptive devices on the same basis as married persons. The Court

---

[62] See, *e. g., Duncan* v. *Louisiana,* 391 U. S. 145 (1968) (right to jury trial); *Washington* v. *Texas,* 388 U. S. 14 (1967) (right to compulsory process); *Pointer* v. *Texas,* 380 U. S. 400 (1965) (right to confront one's accusers).

purported to test the statute under its traditional standard whether there is some rational basis for the discrimination effected. *Id.*, at 446–447. In the context of commercial regulation, the Court has indicated that the Equal Protection Clause "is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective." See, *e. g.*, *McGowan* v. *Maryland*, 366 U. S., at 425; *Kotch* v. *Board of River Port Pilot Comm'rs*, 330 U. S. 552, 557 (1947). And this lenient standard is further weighted in the State's favor by the fact that "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived [by the Court] to justify it." *McGowan* v. *Maryland, supra*, at 426. But in *Baird* the Court clearly did not adhere to these highly tolerant standards of traditional rational review. For although there were conceivable state interests intended to be advanced by the statute—*e. g.*, deterrence of premarital sexual activity and regulation of the dissemination of potentially dangerous articles—the Court was not prepared to accept these interests on their face, but instead proceeded to test their substantiality by independent analysis. See 405 U. S., at 449–454. Such close scrutiny of the State's interests was hardly characteristic of the deference shown state classifications in the context of economic interests. See, *e. g.*, *Goesaert* v. *Cleary*, 335 U. S. 464 (1948); *Kotch* v. *Board of River Port Pilot Comm'rs, supra*. Yet I think the Court's action was entirely appropriate, for access to and use of contraceptives bears a close relationship to the individual's constitutional right of privacy. See 405 U. S., at 453–454; *id.*, at 463–464 (WHITE, J., concurring in result). See also *Roe* v. *Wade*, 410 U. S., at 152–153.

A similar process of analysis with respect to the invidiousness of the basis on which a particular classification is drawn has also influenced the Court as to the

appropriate degree of scrutiny to be accorded any particular case. The highly suspect character of classifications based on race,[63] nationality,[64] or alienage [65] is well established. The reasons why such classifications call for close judicial scrutiny are manifold. Certain racial and ethnic groups have frequently been recognized as "discrete and insular minorities" who are relatively powerless to protect their interests in the political process. See *Graham* v. *Richardson,* 403 U. S., at 372; cf. *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152–153, n. 4 (1938). Moreover, race, nationality, or alienage is " 'in most circumstances irrelevant' to any constitutionally acceptable legislative purpose, *Hirabayashi* v. *United States,* 320 U. S. 81, 100." *McLaughlin* v. *Florida,* 379 U. S., at 192. Instead, lines drawn on such bases are frequently the reflection of historic prejudices rather than legislative rationality. It may be that all of these considerations, which make for particular judicial solicitude in the face of discrimination on the basis of race, nationality, or alienage, do not coalesce—or at least not to the same degree—in other forms of discrimination. Nevertheless, these considerations have undoubtedly influenced the care with which the Court has scrutinized other forms of discrimination.

In *James* v. *Strange,* 407 U. S. 128 (1972), the Court held unconstitutional a state statute which provided for recoupment from indigent convicts of legal defense fees paid by the State. The Court found that the statute impermissibly differentiated between indigent criminals in debt to the State and civil judgment debtors, since criminal debtors were denied various protective exemp-

---

[63] See, *e. g., McLaughlin* v. *Florida,* 379 U. S. 184, 191–192 (1964); *Loving* v. *Virginia,* 388 U. S. 1, 9 (1967).

[64] See *Oyama* v. *California,* 332 U. S. 633, 644–646 (1948); *Korematsu* v. *United States,* 323 U. S. 214, 216 (1944).

[65] See *Graham* v. *Richardson,* 403 U. S. 365, 372 (1971).

tions afforded civil judgment debtors.[66] The Court suggested that in reviewing the statute under the Equal Protection Clause, it was merely applying the traditional requirement that there be " 'some rationality' " in the line drawn between the different types of debtors. *Id.,* at 140. Yet it then proceeded to scrutinize the statute with less than traditional deference and restraint. Thus, the Court recognized "that state recoupment statutes may betoken legitimate state interests" in recovering expenses and discouraging fraud. Nevertheless, MR. JUSTICE POWELL, speaking for the Court, concluded that

> "these interests are not thwarted by requiring more even treatment of indigent criminal defendants with other classes of debtors to whom the statute itself repeatedly makes reference. State recoupment laws, notwithstanding the state interests they may serve, need not blight in such discriminatory fashion the hopes of indigents for self-sufficiency and self-respect." *Id.,* at 141–142.

The Court, in short, clearly did not consider the problems of fraud and collection that the state legislature might have concluded were peculiar to indigent criminal defendants to be either sufficiently important or at least sufficiently substantiated to justify denial of the protective exemptions afforded to all civil judgment debtors, to a class composed exclusively of indigent criminal debtors.

Similarly, in *Reed* v. *Reed,* 404 U. S. 71 (1971), the Court, in striking down a state statute which gave men

---

[66] The Court noted that the challenged "provision strips from indigent defendants the array of protective exemptions Kansas has erected for other civil judgment debtors, including restrictions on the amount of disposable earnings subject to garnishment, protection of the debtor from wage garnishment at times of severe personal or family sickness, and exemption from attachment and execution on a debtor's personal clothing, books, and tools of trade." 407 U. S., at 135.

preference over women when persons of equal entitlement apply for assignment as an administrator of a particular estate, resorted to a more stringent standard of equal protection review than that employed in cases involving commercial matters. The Court indicated that it was testing the claim of sex discrimination by nothing more than whether the line drawn bore "a rational relationship to a state objective," which it recognized as a legitimate effort to reduce the work of probate courts in choosing between competing applications for letters of administration. *Id.*, at 76. Accepting such a purpose, the Idaho Supreme Court had thought the classification to be sustainable on the basis that the legislature might have reasonably concluded that, as a rule, men have more experience than women in business matters relevant to the administration of an estate. 93 Idaho 511, 514, 465 P. 2d 635, 638 (1970). This Court, however, concluded that "[t]o give a mandatory preference to members of either sex over members of the other, merely to accomplish the elimination of hearings on the merits, is to make the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth Amendment . . . ." 404 U. S., at 76. This Court, in other words, was unwilling to consider a theoretical and unsubstantiated basis for distinction—however reasonable it might appear—sufficient to sustain a statute discriminating on the basis of sex.

*James* and *Reed* can only be understood as instances in which the particularly invidious character of the classification caused the Court to pause and scrutinize with more than traditional care the rationality of state discrimination. Discrimination on the basis of past criminality and on the basis of sex posed for the Court the specter of forms of discrimination which it implicitly recognized to have deep social and legal roots without necessarily having any basis in actual differences. Still,

the Court's sensitivity to the invidiousness of the basis for discrimination is perhaps most apparent in its decisions protecting the interests of children born out of wedlock from discriminatory state action. See *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164 (1972); *Levy* v. *Louisiana,* 391 U. S. 68 (1968).

In *Weber,* the Court struck down a portion of a state workmen's compensation statute that relegated unacknowledged illegitimate children of the deceased to a lesser status with respect to benefits than that occupied by legitimate children of the deceased. The Court acknowledged the true nature of its inquiry in cases such as these: "What legitimate state interest does the classification promote? What fundamental personal rights might the classification endanger?" *Id.,* at 173. Embarking upon a determination of the relative substantiality of the State's justifications for the classification, the Court rejected the contention that the classifications reflected what might be presumed to have been the deceased's preference of beneficiaries as "not compelling . . . where dependency on the deceased is a prerequisite to anyone's recovery . . . ." *Ibid.* Likewise, it deemed the relationship between the State's interest in encouraging legitimate family relationships and the burden placed on the illegitimates too tenuous to permit the classification to stand. *Ibid.* A clear insight into the basis of the Court's action is provided by its conclusion:

> "[I]mposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual—as well as an unjust—way of deterring the parent. Courts are powerless to prevent the social opprobrium suffered by these hapless children, but the Equal Protection

Clause does enable us to strike down discriminatory laws relating to status of birth . . . ." *Id.*, at 175–176.

Status of birth, like the color of one's skin, is something which the individual cannot control, and should generally be irrelevant in legislative considerations. Yet illegitimacy has long been stigmatized by our society. Hence, discrimination on the basis of birth—particularly when it affects innocent children—warrants special judicial consideration.

In summary, it seems to me inescapably clear that this Court has consistently adjusted the care with which it will review state discrimination in light of the constitutional significance of the interests affected and the invidiousness of the particular classification. In the context of economic interests, we find that discriminatory state action is almost always sustained, for such interests are generally far removed from constitutional guarantees. Moreover, "[t]he extremes to which the Court has gone in dreaming up rational bases for state regulation in that area may in many instances be ascribed to a healthy revulsion from the Court's earlier excesses in using the Constitution to protect interests that have more than enough power to protect themselves in the legislative halls." *Dandridge* v. *Williams,* 397 U. S., at 520 (dissenting opinon). But the situation differs markedly when discrimination against important individual interests with constitutional implications and against particularly disadvantaged or powerless classes is involved. The majority suggests, however, that a variable standard of review would give this Court the appearance of a "super-legislature." *Ante,* at 31. I cannot agree. Such an approach seems to me a part of the guarantees of our Constitution and of the historic experiences with oppression of and discrimination against discrete, powerless minorities which underlie that document. In truth,

the Court itself will be open to the criticism raised by the majority so long as it continues on its present course of effectively selecting in private which cases will be afforded special consideration without acknowledging the true basis of its action.[67] Opinions such as those in *Reed* and *James* seem drawn more as efforts to shield rather than to reveal the true basis of the Court's decisions. Such obfuscated action may be appropriate to a political body such as a legislature, but it is not appropriate to this Court. Open debate of the bases for the Court's action is essential to the rationality and consistency of our decisionmaking process. Only in this way can we avoid the label of legislature and ensure the integrity of the judicial process.

Nevertheless, the majority today attempts to force this case into the same category for purposes of equal protection analysis as decisions involving discrimination affecting commercial interests. By so doing, the majority singles this case out for analytic treatment at odds with what seems to me to be the clear trend of recent decisions in this Court, and thereby ignores the constitutional importance of the interest at stake and the invidiousness of the particular classification, factors that call for far more than the lenient scrutiny of the Texas financing scheme which the majority pursues. Yet if the discrimination inherent in the Texas scheme is scrutinized with the care demanded by the interest and classification present in this case, the unconstitutionality of that scheme is unmistakable.

## B

Since the Court now suggests that only interests guaranteed by the Constitution are fundamental for purposes of equal protection analysis, and since it rejects

---

[67] See generally Gunther, The Supreme Court, 1971 Term, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L. Rev. 1 (1972).

the contention that public education is fundamental, it follows that the Court concludes that public education is not constitutionally guaranteed. It is true that this Court has never deemed the provision of free public education to be required by the Constitution. Indeed, it has on occasion suggested that state-supported education is a privilege bestowed by a State on its citizens. See *Missouri ex rel. Gaines* v. *Canada,* 305 U. S., at 349. Nevertheless, the fundamental importance of education is amply indicated by the prior decisions of this Court, by the unique status accorded public education by our society, and by the close relationship between education and some of our most basic constitutional values.

The special concern of this Court with the educational process of our country is a matter of common knowledge. Undoubtedly, this Court's most famous statement on the subject is that contained in *Brown* v. *Board of Education,* 347 U. S., at 493:

"Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. . . ."

Only last Term, the Court recognized that "[p]roviding public schools ranks at the very apex of the function of a State." *Wisconsin* v. *Yoder,* 406 U. S. 205, 213 (1972). This is clearly borne out by the fact that in 48

of our 50 States the provision of public education is mandated by the state constitution.[68] No other state function is so uniformly recognized[69] as an essential element of our society's well-being. In large measure, the explanation for the special importance attached to education must rest, as the Court recognized in *Yoder, id.,* at 221, on the facts that "some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system . . . ," and that "education prepares individuals to be self-reliant and self-sufficient participants in society." Both facets of this observation are suggestive of the substantial relationship which education bears to guarantees of our Constitution.

Education directly affects the ability of a child to exercise his First Amendment rights, both as a source and as a receiver of information and ideas, whatever interests he may pursue in life. This Court's decision in *Sweezy* v. *New Hampshire,* 354 U. S. 234, 250 (1957), speaks of the right of students "to inquire, to study and to evaluate, to gain new maturity and understanding . . . ." Thus, we have not casually described the classroom as the " 'marketplace of ideas.' " *Keyishian* v. *Board of Regents,* 385 U. S. 589, 603 (1967). The opportunity for formal education may not necessarily be the essential determinant of an individual's ability to enjoy throughout his life the rights of free speech and asso-

---

[68] See Brief of the National Education Association et al. as *Amici Curiae* App. A. All 48 of the 50 States which mandate public education also have compulsory-attendance laws which require school attendance for eight years or more. *Id.,* at 20–21.

[69] Prior to this Court's decision in *Brown* v. *Board of Education,* 347 U. S. 483 (1954), every State had a constitutional provision directing the establishment of a system of public schools. But after *Brown,* South Carolina repealed its constitutional provision, and Mississippi made its constitutional provision discretionary with the state legislature.

ciation guaranteed to him by the First Amendment. But such an opportunity may enhance the individual's enjoyment of those rights, not only during but also following school attendance. Thus, in the final analysis, "the pivotal position of education to success in American society and its essential role in opening up to the individual the central experiences of our culture lend it an importance that is undeniable." [70]

Of particular importance is the relationship between education and the political process. "Americans regard the public schools as a most vital civic institution for the preservation of a democratic system of government." *Abington School Dist.* v. *Schempp,* 374 U. S. 203, 230 (1963) (BRENNAN, J., concurring). Education serves the essential function of instilling in our young an understanding of and appreciation for the principles and operation of our governmental processes.[71] Education may instill the interest and provide the tools necessary for political discourse and debate. Indeed, it has frequently been suggested that education is the dominant factor affecting political consciousness and participation.[72] A system of "[c]ompetition in ideas and gov-

---

[70] Developments in the Law—Equal Protection, 82 Harv. L. Rev. 1065, 1129 (1969).

[71] The President's Commission on School Finance, Schools, People, & Money: The Need for Educational Reform 11 (1972), concluded that "[l]iterally, we cannot survive as a nation or as individuals without [education]." It further observed that:

"[I]n a democratic society, public understanding of public issues is necessary for public support. Schools generally include in their courses of instruction a wide variety of subjects related to the history, structure and principles of American government at all levels. In so doing, schools provide students with a background of knowledge which is deemed an absolute necessity for responsible citizenship." *Id.,* at 13–14.

[72] See J. Guthrie, G. Kleindorfer, H. Levin, & R. Stout, Schools and Inequality 103–105 (1971); R. Hess & J. Torney, The Develop-

ernmental policies is at the core of our electoral process and of the First Amendment freedoms." *Williams* v. *Rhodes*, 393 U. S. 23, 32 (1968). But of most immediate and direct concern must be the demonstrated effect of education on the exercise of the franchise by the electorate. The right to vote in federal elections is conferred by Art. I, § 2, and the Seventeenth Amendment of the Constitution, and access to the state franchise has been afforded special protection because it is "preservative of other basic civil and political rights," *Reynolds* v. *Sims*, 377 U. S., at 562. Data from the Presidential Election of 1968 clearly demonstrate a direct relationship between participation in the electoral process and level of educational attainment;[73] and, as this Court recognized in *Gaston County* v. *United States*, 395 U. S. 285, 296 (1969), the quality of education offered may

---

ment of Political Attitudes in Children 217–218 (1967); Campbell, The Passive Citizen, in 6 Acta Sociologica, Nos. 1–2, p. 9, at 20–21 (1962).

That education is the dominant factor in influencing political participation and awareness is sufficient, I believe, to dispose of the Court's suggestion that, in all events, there is no indication that Texas is not providing all of its children with a sufficient education to enjoy the right of free speech and to participate fully in the political process. *Ante,* at 36–37. There is, in short, no limit on the amount of free speech or political participation that the Constitution guarantees. Moreover, it should be obvious that the political process, like most other aspects of social intercourse, is to some degree competitive. It is thus of little benefit to an individual from a property-poor district to have "enough" education if those around him have more than "enough." Cf. *Sweatt* v. *Painter*, 339 U. S. 629, 633–634 (1950).

[73] See United States Department of Commerce, Bureau of the Census, Voting and Registration in the Election of November 1968, Current Population Reports, Series P–20, No. 192, Table 4, p. 17. See also Senate Select Committee on Equal Educational Opportunity, 92d Cong., 2d Sess., Levin, The Costs to the Nation of Inadequate Education 46–47 (Comm. Print 1972).

influence a child's decision to "enter or remain in school."
It is this very sort of intimate relationship between
a particular personal interest and specific constitu-
tional guarantees that has heretofore caused the Court
to attach special significance, for purposes of equal pro-
tection analysis, to individual interests such as procrea-
tion and the exercise of the state franchise.[74]

While ultimately disputing little of this, the majority
seeks refuge in the fact that the Court has "never pre-
sumed to possess either the ability or the authority to
guarantee to the citizenry the most *effective* speech or
the most *informed* electoral choice." *Ante,* at 36. This
serves only to blur what is in fact at stake. With due
respect, the issue is neither provision of the most *effec-
tive* speech nor of the most *informed* vote. Appellees

---

[74] I believe that the close nexus between education and our estab-
lished constitutional values with respect to freedom of speech and
participation in the political process makes this a different case
from our prior decisions concerning discrimination affecting public
welfare, see, *e. g., Dandridge* v. *Williams,* 397 U. S. 471 (1970), or
housing, see, *e. g., Lindsey* v. *Normet,* 405 U. S. 56 (1972). There
can be no question that, as the majority suggests, constitutional
rights may be less meaningful for someone without enough to eat or
without decent housing. *Ante,* at 37. But the crucial difference
lies in the closeness of the relationship. Whatever the severity of
the impact of insufficient food or inadequate housing on a person's
life, they have never been considered to bear the same direct and
immediate relationship to constitutional concerns for free speech
and for our political processes as education has long been recognized
to bear. Perhaps, the best evidence of this fact is the unique status
which has been accorded public education as the single public service
nearly unanimously guaranteed in the constitutions of our States, see
*supra,* at 111–112 and n. 68. Education, in terms of constitutional
values, is much more analogous, in my judgment, to the right to vote
in state elections than to public welfare or public housing. Indeed,
it is not without significance that we have long recognized education
as an essential step in providing the disadvantaged with the tools
necessary to achieve economic self-sufficiency.

do not now seek the best education Texas might provide. They do seek, however, an end to state discrimination resulting from the unequal distribution of taxable district property wealth that directly impairs the ability of some districts to provide the same educational opportunity that other districts can provide with the same or even substantially less tax effort. The issue is, in other words, one of discrimination that affects the quality of the education which Texas has chosen to provide its children; and, the precise question here is what importance should attach to education for purposes of equal protection analysis of that discrimination. As this Court held in *Brown* v. *Board of Education,* 347 U. S., at 493, the opportunity of education, "where the state has undertaken to provide it, is a right which must be made available to all on equal terms." The factors just considered, including the relationship between education and the social and political interests enshrined within the Constitution, compel us to recognize the fundamentality of education and to scrutinize with appropriate care the bases for state discrimination affecting equality of educational opportunity in Texas' school districts [75]—a con-

---

[75] The majority's reliance on this Court's traditional deference to legislative bodies in matters of taxation falls wide of the mark in the context of this particular case. See *ante,* at 40–41. The decisions on which the Court relies were simply taxpayer suits challenging the constitutionality of a tax burden in the face of exemptions or differential taxation afforded to others. See, *e. g., Allied Stores of Ohio* v. *Bowers,* 358 U. S. 522 (1959); *Madden* v. *Kentucky,* 309 U. S. 83 (1940); *Carmichael* v. *Southern Coal & Coke Co.,* 301 U. S. 495 (1937); *Bell's Gap R. Co.* v. *Pennsylvania,* 134 U. S. 232 (1890). There is no question that, from the perspective of the taxpayer, the Equal Protection Clause "imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of state taxation. The State may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various

clusion which is only strengthened when we consider the character of the classification in this case.

## C

The District Court found that in discriminating between Texas schoolchildren on the basis of the amount of taxable property wealth located in the district in which they live, the Texas financing scheme created a form of wealth discrimination. This Court has frequently recognized that discrimination on the basis of wealth may create a classification of a suspect character and thereby call for exacting judicial scrutiny. See, *e. g., Griffin* v. *Illinois*, 351 U. S. 12 (1956); *Douglas* v. *California*, 372 U. S. 353 (1963); *McDonald* v. *Board of Election Comm'rs of Chicago*, 394 U. S. 802, 807 (1969). The majority, however, considers any wealth classification in this case to lack certain essential characteristics which it contends are common to the instances of wealth discrimination that this Court has heretofore recognized. We are told that in every prior case involving a wealth classification, the members of the disadvantaged class have "shared two distinguishing characteristics: be-

products." *Allied Stores of Ohio* v. *Bowers, supra*, at 526–527. But in this case we are presented with a claim of discrimination of an entirely different nature—a claim that the revenue-producing mechanism directly discriminates against the interests of some of the intended beneficiaries; and, in contrast to the taxpayer suits, the interest adversely affected is of substantial constitutional and societal importance. Hence, a different standard of equal protection review than has been employed in the taxpayer suits is appropriate here. It is true that affirmance of the District Court decision would to some extent intrude upon the State's taxing power insofar as it would be necessary for the State to at least equalize taxable district wealth. But contrary to the suggestions of the majority, affirmance would not impose a straitjacket upon the revenue-raising powers of the State, and would certainly not spell the end of the local property tax. See *infra*, at 132.

cause of their impecunity they were completely unable to pay for some desired benefit, and as a consequence, they sustained an absolute deprivation of a meaningful opportunity to enjoy that benefit." *Ante,* at 20. I cannot agree. The Court's distinctions may be sufficient to explain the decisions in *Williams* v. *Illinois,* 399 U. S. 235 (1970); *Tate* v. *Short,* 401 U. S. 395 (1971); and even *Bullock* v. *Carter,* 405 U. S. 134 (1972). But they are not in fact consistent with the decisions in *Harper* v. *Virginia Bd. of Elections,* 383 U. S. 663 (1966), or *Griffin* v. *Illinois, supra,* or *Douglas* v. *California, supra.*

In *Harper,* the Court struck down as violative of the Equal Protection Clause an annual Virginia poll tax of $1.50, payment of which by persons over the age of 21 was a prerequisite to voting in Virginia elections. In part, the Court relied on the fact that the poll tax interfered with a fundamental interest—the exercise of the state franchise. In addition, though, the Court emphasized that "[l]ines drawn on the basis of wealth or property . . . are traditionally disfavored." 383 U. S., at 668. Under the first part of the theory announced by the majority, the disadvantaged class in *Harper,* in terms of a wealth analysis, should have consisted only of those too poor to afford the $1.50 necessary to vote. But the *Harper* Court did not see it that way. In its view, the Equal Protection Clause "bars a system which excludes [from the franchise] those unable to pay a fee to vote or who *fail to pay." Ibid.* (Emphasis added.) So far as the Court was concerned, the "degree of the discrimination [was] irrelevant." *Ibid.* Thus, the Court struck down the poll tax *in toto;* it did not order merely that those too poor to pay the tax be exempted; complete impecunity clearly was not determinative of the limits of the disadvantaged class, nor was it essential to make an equal protection claim.

Similarly, *Griffin* and *Douglas* refute the majority's contention that we have in the past required an absolute deprivation before subjecting wealth classifications to strict scrutiny. The Court characterizes *Griffin* as a case concerned simply with the denial of a transcript or an adequate substitute therefor, and *Douglas* as involving the denial of counsel. But in both cases the question was in fact whether "a State that [grants] *appellate review* can do so in a way that discriminates against some convicted defendants on account of their poverty." *Griffin* v. *Illinois, supra,* at 18 (emphasis added). In that regard, the Court concluded that inability to purchase a transcript denies "the poor an adequate *appellate review* accorded to all who have money enough to pay the costs in advance," *ibid.* (emphasis added), and that "the type of an *appeal* a person is afforded . . . hinges upon whether or not he can pay for the assistance of counsel," *Douglas* v. *California, supra,* at 355–356 (emphasis added). The right of appeal itself was not absolutely denied to those too poor to pay; but because of the cost of a transcript and of counsel, the appeal was a substantially less meaningful right for the poor than for the rich.[76] It was on these terms that the Court found a denial of equal protection, and those terms clearly encompassed degrees of discrimination on the

---

[76] This does not mean that the Court has demanded precise equality in the treatment of the indigent and the person of means in the criminal process. We have never suggested, for instance, that the Equal Protection Clause requires the best lawyer money can buy for the indigent. We are hardly equipped with the objective standards which such a judgment would require. But we have pursued the goal of substantial equality of treatment in the face of clear disparities in the nature of the appellate process afforded rich versus poor. See, *e. g., Draper* v. *Washington,* 372 U. S. 487, 495–496 (1963); cf. *Coppedge* v. *United States,* 369 U. S. 438, 447 (1962).

basis of wealth which do not amount to outright denial of the affected right or interest.[77]

This is not to say that the form of wealth classification in this case does not differ significantly from those recognized in the previous decisions of this Court. Our prior cases have dealt essentially with discrimination on the basis of personal wealth.[78] Here, by contrast, the

[77] Even if I put aside the Court's misreading of *Griffin* and *Douglas*, the Court fails to offer any reasoned constitutional basis for restricting cases involving wealth discrimination to instances in which there is an absolute deprivation of the interest affected. As I have already discussed, see *supra*, at 88–89, the Equal Protection Clause guarantees *equality* of treatment of those persons who are similarly situated; it does not merely bar some form of excessive discrimination between such persons. Outside the context of wealth discrimination, the Court's reapportionment decisions clearly indicate that relative discrimination is within the purview of the Equal Protection Clause. Thus, in *Reynolds* v. *Sims*, 377 U. S. 533, 562–563 (1964), the Court recognized:

"It would appear extraordinary to suggest that a State could be constitutionally permitted to enact a law providing that certain of the State's voters could vote two, five, or 10 times for their legislative representatives, while voters living elsewhere could vote only once. . . . Of course, the effect of state legislative districting schemes which give the same number of representatives to unequal numbers of constituents is identical. Overweighting and overvaluation of the votes of those living here has the certain effect of dilution and undervaluation of the votes of those living there. . . . Their right to vote is simply not the same right to vote as that of those living in a favored part of the State. . . . One must be ever aware that the Constitution forbids 'sophisticated as well as simple-minded modes of discrimination.' "

See also *Gray* v. *Sanders*, 372 U. S. 368, 380–381 (1963). The Court gives no explanation why a case involving wealth discrimination should be treated any differently.

[78] But cf. *Bullock* v. *Carter*, 405 U. S. 134, 144 (1972), where prospective candidates' threatened exclusion from a primary ballot because of their inability to pay a filing fee was seen as discrimination against both the impecunious candidates and the "less affluent

children of the disadvantaged Texas school districts are being discriminated against not necessarily because of their personal wealth or the wealth of their families, but because of the taxable property wealth of the residents of the district in which they happen to live. The appropriate question, then, is whether the same degree of judicial solicitude and scrutiny that has previously been afforded wealth classifications is warranted here.

As the Court points out, *ante*, at 28–29, no previous decision has deemed the presence of just a wealth classification to be sufficient basis to call forth rigorous judicial scrutiny of allegedly discriminatory state action. Compare, *e. g., Harper* v. *Virginia Bd. of Elections*, *supra*, with, *e. g., James* v. *Valtierra,* 402 U. S. 137 (1971). That wealth classifications alone have not necessarily been considered to bear the same high degree of suspectness as have classifications based on, for instance, race or alienage may be explainable on a number of grounds. The "poor" may not be seen as politically powerless as certain discrete and insular minority groups.[79] Personal poverty may entail much the same social stigma as historically attached to certain racial or ethnic groups.[80] But personal poverty is not a permanent disability; its shackles may be escaped. Perhaps most importantly, though, personal wealth may not necessarily share the general irrelevance as a basis for legislative action that race or nationality is recognized to have. While the "poor" have frequently been a

segment of the community" that supported such candidates but was also too poor as a group to contribute enough for the filing fees.

[79] But cf. M. Harrington, The Other America 13–17 (Penguin ed. 1963).

[80] See E. Banfield, The Unheavenly City 63, 75–76 (1970); cf. R. Lynd & H. Lynd, Middletown in Transition 450 (1937).

legally disadvantaged group,[81] it cannot be ignored that social legislation must frequently take cognizance of the economic status of our citizens. Thus, we have generally gauged the invidiousness of wealth classifications with an awareness of the importance of the interests being affected and the relevance of personal wealth to those interests. See *Harper* v. *Virginia Bd. of Elections, supra.*

When evaluated with these considerations in mind, it seems to me that discrimination on the basis of group wealth in this case likewise calls for careful judicial scrutiny. First, it must be recognized that while local district wealth may serve other interests,[82] it bears no relationship whatsoever to the interest of Texas schoolchildren in the educational opportunity afforded them by the State of Texas. Given the importance of that interest, we must be particularly sensitive to the invidious characteristics of any form of discrimination that is not clearly intended to serve it, as opposed to some other distinct state interest. Discrimination on the basis of group wealth may not, to be sure, reflect the social stigma frequently attached to personal poverty. Nevertheless, insofar as group wealth discrimination involves wealth over which the disadvantaged individual has no significant control,[83] it represents in fact a more serious basis of discrimination than does personal wealth. For such dis-

---

[81] Cf. *New York* v. *Miln,* 11 Pet. 102, 142 (1837).

[82] Theoretically, at least, it may provide a mechanism for implementing Texas' asserted interest in local educational control, see *infra,* at 126.

[83] True, a family may move to escape a property-poor school district, assuming it has the means to do so. But such a view would itself raise a serious constitutional question concerning an impermissible burdening of the right to travel, or, more precisely, the concomitant right to remain where one is. Cf. *Shapiro* v. *Thompson,* 394 U. S. 618, 629–631 (1969).

crimination is no reflection of the individual's characteristics or his abilities. And thus—particularly in the context of a disadvantaged class composed of children— we have previously treated discrimination on a basis which the individual cannot control as constitutionally disfavored. Cf. *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164 (1972); *Levy* v. *Louisiana,* 391 U. S. 68 (1968).

The disability of the disadvantaged class in this case extends as well into the political processes upon which we ordinarily rely as adequate for the protection and promotion of all interests. Here legislative reallocation of the State's property wealth must be sought in the face of inevitable opposition from significantly advantaged districts that have a strong vested interest in the preservation of the status quo, a problem not completely dissimilar to that faced by underrepresented districts prior to the Court's intervention in the process of reapportionment,[84] see *Baker* v. *Carr,* 369 U. S. 186, 191–192 (1962).

Nor can we ignore the extent to which, in contrast to our prior decisions, the State is responsible for the wealth discrimination in this instance. *Griffin, Douglas, Williams, Tate,* and our other prior cases have dealt with discrimination on the basis of indigency which was attributable to the operation of the private sector. But we have no such simple *de facto* wealth discrimination here. The means for financing public education in Texas are selected and specified by the State. It is the State that has created local school districts, and tied educational funding to the local property tax and thereby to local district wealth. At the same time, governmentally

---

[84] Indeed, the political difficulties that seriously disadvantaged districts face in securing legislative redress are augmented by the fact that little support is likely to be secured from only mildly disadvantaged districts. Cf. *Gray* v. *Sanders,* 372 U. S. 368 (1963). See also n. 2, *supra.*

imposed land use controls have undoubtedly encouraged and rigidified natural trends in the allocation of particular areas for residential or commercial use,[85] and thus determined each district's amount of taxable property wealth. In short, this case, in contrast to the Court's previous wealth discrimination decisions, can only be seen as "unusual in the extent to which governmental action *is* the cause of the wealth classifications." [86]

In the final analysis, then, the invidious characteristics of the group wealth classification present in this case merely serve to emphasize the need for careful judicial scrutiny of the State's justifications for the resulting interdistrict discrimination in the educational opportunity afforded to the schoolchildren of Texas.

## D

The nature of our inquiry into the justifications for state discrimination is essentially the same in all equal protection cases: We must consider the substantiality of the state interests sought to be served, and we must scrutinize the reasonableness of the means by which the State has sought to advance its interests. See *Police Dept. of Chicago* v. *Mosley,* 408 U. S., at 95. Differences in the application of this test are, in my view, a function of the constitutional importance of the interests at stake and the invidiousness of the particular classification. In terms of the asserted state interests, the Court has indicated that it will require, for instance, a "compelling," *Shapiro* v. *Thompson,* 394 U. S., at 634, or a "substantial"

---

[85] See Tex. Cities, Towns and Villages Code, Civ. Stat. Ann. §§ 1011a–1011j (1963 and Supp. 1972–1973). See also, *e. g., Skinner* v. *Reed,* 265 S. W. 2d 850 (Tex. Ct. Civ. App. 1954); *Corpus Christi* v. *Jones,* 144 S. W. 2d 388 (Tex. Ct. Civ. App. 1940).

[86] *Serrano* v. *Priest,* 5 Cal. 3d, at 603, 487 P. 2d, at 1254. See also *Van Dusartz* v. *Hatfield,* 334 F. Supp., at 875–876.

or "important," *Dunn* v. *Blumstein,* 405 U. S., at 343, state interest to justify discrimination affecting individual interests of constitutional significance. Whatever the differences, if any, in these descriptions of the character of the state interest necessary to sustain such discrimination, basic to each is, I believe, a concern with the legitimacy and the reality of the asserted state interests. Thus, when interests of constitutional importance are at stake, the Court does not stand ready to credit the State's classification with any conceivable legitimate purpose,[87] but demands a clear showing that there are legitimate state interests which the classification was in fact intended to serve. Beyond the question of the adequacy of the State's purpose for the classification, the Court traditionally has become increasingly sensitive to the means by which a State chooses to act as its action affects more directly interests of constitutional significance. See, *e. g., United States* v. *Robel,* 389 U. S. 258, 265 (1967); *Shelton* v. *Tucker,* 364 U. S. 479, 488 (1960). Thus, by now, "less restrictive alternatives" analysis is firmly established in equal protection jurisprudence. See *Dunn* v. *Blumstein, supra,* at 343; *Kramer* v. *Union School District,* 395 U. S., at 627. It seems to me that the range of choice we are willing to accord the State in selecting the means by which it will act, and the care with which we scrutinize the effectiveness of the means which the State selects, also must reflect the constitutional importance of the interest affected and the invidiousness of the particular classification. Here, both the nature of the interest and the classification dictate close judicial scrutiny of the purposes which Texas seeks to serve with its present educational financing

---

[87] Cf., *e. g., Two Guys from Harrison-Allentown* v. *McGinley,* 366 U. S. 582 (1961); *McGowan* v. *Maryland,* 366 U. S. 420 (1961); *Goesaert* v. *Cleary,* 335 U. S. 464 (1948).

scheme and of the means it has selected to serve that purpose.

The only justification offered by appellants to sustain the discrimination in educational opportunity caused by the Texas financing scheme is local educational control. Presented with this justification, the District Court concluded that "[n]ot only are defendants unable to demonstrate compelling state interests for their classifications based upon wealth, they fail even to establish a reasonable basis for these classifications." 337 F. Supp., at 284. I must agree with this conclusion.

At the outset, I do not question that local control of public education, as an abstract matter, constitutes a very substantial state interest. We observed only last Term that "[d]irect control over decisions vitally affecting the education of one's children is a need that is strongly felt in our society." Wright v. Council of the City of Emporia, 407 U. S. 451, 469 (1972). See also id., at 477–478 (BURGER, C. J., dissenting). The State's interest in local educational control—which certainly includes questions of educational funding—has deep roots in the inherent benefits of community support for public education. Consequently, true state dedication to local control would present, I think, a substantial justification to weigh against simply interdistrict variations in the treatment of a State's schoolchildren. But I need not now decide how I might ultimately strike the balance were we confronted with a situation where the State's sincere concern for local control inevitably produced educational inequality. For, on this record, it is apparent that the State's purported concern with local control is offered primarily as an excuse rather than as a justification for interdistrict inequality.

In Texas, statewide laws regulate in fact the most minute details of local public education. For example,

the State prescribes required courses.[88] All textbooks must be submitted for state approval,[89] and only approved textbooks may be used.[90] The State has established the qualifications necessary for teaching in Texas public schools and the procedures for obtaining certification.[91] The State has even legislated on the length of the school day.[92] Texas' own courts have said:

> "As a result of the acts of the Legislature our school system is not of mere local concern but it is statewide. While a school district is local in territorial limits, it is an integral part of the vast school system which is coextensive with the confines of the State of Texas." *Treadaway* v. *Whitney Independent School District,* 205 S. W. 2d 97, 99 Tex. Ct. Civ. App. 1947).

See also *El Dorado Independent School District* v. *Tisdale,* 3 S. W. 2d 420, 422 (Tex. Comm'n App. 1928).

Moreover, even if we accept Texas' general dedication to local control in educational matters, it is difficult to find any evidence of such dedication with respect to fiscal matters. It ignores reality to suggest—as the Court does, *ante,* at 49–50—that the local property tax element of the Texas financing scheme reflects a conscious legislative effort to provide school districts with local fiscal control. If Texas had a system truly dedicated to local fiscal control, one would expect the quality of the educational opportunity provided in each district to vary with the decision of the voters in that district as

---

[88] Tex. Educ. Code Ann. §§ 21.101–21.117. Criminal penalties are provided for failure to teach certain required courses. *Id.,* §§ 4.15–4.16.

[89] *Id.,* §§ 12.11–12.35.

[90] *Id.,* § 12.62.

[91] *Id.,* §§ 13.031–13.046.

[92] *Id.,* § 21.004.

128

to the level of sacrifice they wish to make for public education. In fact, the Texas scheme produces precisely the opposite result. Local school districts cannot choose to have the best education in the State by imposing the highest tax rate. Instead, the quality of the educational opportunity offered by any particular district is largely determined by the amount of taxable property located in the district—a factor over which local voters can exercise no control.

The study introduced in the District Court showed a direct inverse relationship between equalized taxable district property wealth and district tax effort with the result that the property-poor districts making the highest tax effort obtained the lowest per-pupil yield.[93] The implications of this situation for local choice are illustrated by again comparing the Edgewood and Alamo Heights School Districts. In 1967–1968, Edgewood, after contributing its share to the Local Fund Assignment, raised only $26 per pupil through its local property tax, whereas Alamo Heights was able to raise $333 per pupil. Since the funds received through the Minimum Foundation School Program are to be used only for minimum professional salaries, transportation costs, and operating expenses, it is not hard to see the lack of local choice— with respect to higher teacher salaries to attract more and better teachers, physical facilities, library books, and facilities, special courses, or participation in special state and federal matching funds programs—under which a property-poor district such as Edgewood is forced to labor.[94] In fact, because of the difference in taxable local property wealth, Edgewood would have to tax itself almost nine times as heavily to obtain the same

---

[93] See Appendix II, *infra.*

[94] See Affidavit of Dr. Jose Cardenas, Superintendent of Schools, Edgewood Independent School District, App. 234–238.

yield as Alamo Heights.[95] At present, then, local control is a myth for many of the local school districts in Texas. As one district court has observed, "rather than reposing in each school district the economic power to fix its own level of per pupil expenditure, the State has so arranged the structure as to guarantee that some districts will spend low (with high taxes) while others will spend high (with low taxes)." *Van Dusartz* v. *Hatfield,* 334 F. Supp. 870, 876 (Minn. 1971).

In my judgment, any substantial degree of scrutiny of the operation of the Texas financing scheme reveals that the State has selected means wholly inappropriate to secure its purported interest in assuring its school districts local fiscal control.[96] At the same time, appellees have pointed out a variety of alternative financing schemes which may serve the State's purported interest in local control as well as, if not better than, the present scheme without the current impairment of the educational opportunity of vast numbers of Texas schoolchildren.[97] I see no need, however, to explore the practical or constitutional merits of those suggested alternatives at this time for, whatever their positive or negative features, experi-

---

[95] See Appendix IV, *infra.*

[96] My Brother WHITE, in concluding that the Texas financing scheme runs afoul of the Equal Protection Clause, likewise finds on analysis that the means chosen by Texas—local property taxation dependent upon local taxable wealth—is completely unsuited in its present form to the achievement of the asserted goal of providing local fiscal control. Although my Brother WHITE purports to reach this result by application of that lenient standard of mere rationality traditionally applied in the context of commercial interests, it seems to me that the care with which he scrutinizes the practical effectiveness of the present local property tax as a device for affording local fiscal control reflects the application of a more stringent standard of review, a standard which at the least is influenced by the constitutional significance of the process of public education.

[97] See n. 98, *infra.*

ence with the present financing scheme impugns any suggestion that it constitutes a serious effort to provide local fiscal control. If, for the sake of local education control, this Court is to sustain interdistrict discrimination in the educational opportunity afforded Texas school children, it should require that the State present something more than the mere sham now before us.

## III

In conclusion, it is essential to recognize that an end to the wide variations in taxable district property wealth inherent in the Texas financing scheme would entail none of the untoward consequences suggested by the Court or by the appellants.

First, affirmance of the District Court's decisions would hardly sound the death knell for local control of education. It would mean neither centralized decisionmaking nor federal court intervention in the operation of public schools. Clearly, this suit has nothing to do with local decisionmaking with respect to educational policy or even educational spending. It involves only a narrow aspect of local control—namely, local control over the raising of educational funds. In fact, in striking down interdistrict disparities in taxable local wealth, the District Court took the course which is most likely to make true local control over educational decisionmaking a reality for *all* Texas school districts.

Nor does the District Court's decision even necessarily eliminate local control of educational funding. The District Court struck down nothing more than the continued interdistrict wealth discrimination inherent in the present property tax. Both centralized and decentralized plans for educational funding not involving such interdistrict discrimination have been put forward.[98] The choice

---

[98] Centralized educational financing is, to be sure, one alternative. On analysis, though, it is clear that even centralized financing would

among these or other alternatives would remain with the State, not with the federal courts. In this regard, it should be evident that the degree of federal intervention

not deprive local school districts of what has been considered to be the essence of local educational control. See *Wright* v. *Council of the City of Emporia*, 407 U. S. 451, 477–478 (BURGER, C. J., dissenting). Central financing would leave in local hands the entire gamut of local educational policymaking—teachers, curriculum, school sites, the whole process of allocating resources among alternative educational objectives.

A second possibility is the much-discussed theory of district power equalization put forth by Professors Coons, Clune, and Sugarman in their seminal work, Private Wealth and Public Education 201–242 (1970). Such a scheme would truly reflect a dedication to local fiscal control. Under their system, each school district would receive a fixed amount of revenue per pupil for any particular level of tax effort regardless of the level of local property tax base. Appellants criticize this scheme on the rather extraordinary ground that it would encourage poorer districts to overtax themselves in order to obtain substantial revenues for education. But under the present discriminatory scheme, it is the poor districts that are already taxing themselves at the highest rates, yet are receiving the lowest returns.

District wealth reapportionment is yet another alternative which would accomplish directly essentially what district power equalization would seek to do artificially. Appellants claim that the calculations concerning state property required by such a scheme would be impossible as a practical matter. Yet Texas is already making far more complex annual calculations—involving not only local property values but also local income and other economic factors—in conjunction with the Local Fund Assignment portion of the Minimum Foundation School Program. See 5 Governor's Committee Report 43–44.

A fourth possibility would be to remove commercial, industrial, and mineral property from local tax rolls, to tax this property on a statewide basis, and to return the resulting revenues to the local districts in a fashion that would compensate for remaining variations in the local tax bases.

None of these particular alternatives are necessarily constitutionally compelled; rather, they indicate the breadth of choice which would remain to the State if the present interdistrict disparities were eliminated.

in matters of local concern would be substantially less in this context than in previous decisions in which we have been asked effectively to impose a particular scheme upon the States under the guise of the Equal Protection Clause. See, *e. g., Dandridge* v. *Williams,* 397 U. S. 471 (1970); cf. *Richardson* v. *Belcher,* 404 U. S. 78 (1971).

Still, we are told that this case requires us "to condemn the State's judgment in conferring on political subdivisions the power to tax local property to supply revenues for local interests." *Ante,* at 40. Yet no one in the course of this entire litigation has ever questioned the constitutionality of the local property tax as a device for raising educational funds. The District Court's decision, at most, restricts the power of the State to make educational funding dependent exclusively upon local property taxation so long as there exists interdistrict disparities in taxable property wealth. But it hardly eliminates the local property tax as a source of educational funding or as a means of providing local fiscal control.[99]

The Court seeks solace for its action today in the possibility of legislative reform. The Court's suggestions of legislative redress and experimentation will doubtless be of great comfort to the schoolchildren of Texas' disadvantaged districts, but considering the vested interests of wealthy school districts in the preservation of the status quo, they are worth little more. The possibility of legislative action is, in all events, no answer to this Court's duty under the Constitution to eliminate unjustified state discrimination. In this case we have been presented with an instance of such discrimination, in a particularly invidious form, against an individual interest of large constitutional and practical importance. To support the demonstrated discrimination in the provision

---

[99] See n. 98, *supra.*

of educational opportunity the State has offered a justification which, on analysis, takes on at best an ephemeral character. Thus, I believe that the wide disparities in taxable district property wealth inherent in the local property tax element of the Texas financing scheme render that scheme violative of the Equal Protection Clause.[100]

I would therefore affirm the judgment of the District Court.

[Appendices I–IV are on the immediately following pages.]

---

[100] Of course, nothing in the Court's decision today should inhibit further review of state educational funding schemes under state constitutional provisions. See *Milliken* v. *Green,* 389 Mich. 1, 203 N. W. 2d 457 (1972), rehearing granted, Jan. 1973; *Robinson* v. *Cahill,* 118 N. J. Super. 223, 287 A. 2d 187, 119 N. J. Super. 40, 289 A. 2d 569 (1972); cf. *Serrano* v. *Priest,* 5 Cal. 3d 584, 487 P. 2d 1241 (1971).

APPENDIX I TO OPINION OF MARSHALL, J., DISSENTING

## REVENUES OF TEXAS SCHOOL DISTRICTS
## CATEGORIZED BY EQUALIZED PROPERTY VALUES AND SOURCE OF FUNDS

| CATEGORIES<br>Market Value of Taxable Property Per Pupil | Local Revenues Per Pupil | State Revenues Per Pupil | State and Local Revenues Per Pupil (Columns 1 and 2) | Federal Revenues Per Pupil | Total Revenues Per Pupil (State-Local-Federal, Columns 1, 2 and 4) |
|---|---|---|---|---|---|
| Above $100,000 (10 districts) | $610 | $205 | $815 | $41 | $856 |
| $100,000–$50,000 (26 districts) | 287 | 257 | 544 | 66 | 610 |
| $50,000–$30,000 (30 districts) | 224 | 260 | 484 | 45 | 529 |
| $30,000–$10,000 (40 districts) | 166 | 295 | 461 | 85 | 546 |
| Below $10,000 (4 districts) | 63 | 243 | 306 | 135 | 441 |

Based on Table V to affidavit of Joel S. Berke, App. 208, which was prepared on the basis of a sample of 110 selected Texas school districts from data for the 1967–1968 school year.

## APPENDIX II TO OPINION OF MARSHALL, J., DISSENTING

### TEXAS SCHOOL DISTRICTS CATEGORIZED BY EQUALIZED PROPERTY VALUES, EQUALIZED TAX RATES, AND YIELD OF RATES

| CATEGORIES Market Value of Taxable Property Per Pupil | EQUALIZED TAX RATES ON $100 | YIELD PER PUPIL (Equalized Rate Applied to District Market Value) |
|---|---|---|
| Above $100,000 (10 districts) | $.31 | $585 |
| $100,000–$50,000 (26 districts) | .38 | 262 |
| $50,000–$30,000 (30 districts) | .55 | 213 |
| $30,000–$10,000 (40 districts) | .72 | 162 |
| Below $10,000 (4 districts) | .70 | 60 |

Based on Table II to affidavit of Joel S. Berke, App. 205, which was prepared on the basis of a sample of 110 selected Texas school districts from data for the 1967–1968 school year.

## APPENDIX III TO OPINION OF MARSHALL, J., DISSENTING

### SELECTED BEXAR COUNTY, TEXAS, SCHOOL DISTRICTS CATEGORIZED BY EQUALIZED PROPERTY VALUATION AND SELECTED INDICATORS OF EDUCATIONAL QUALITY

| Selected Districts From High to Low by Market Valuation Per Pupil | Professional Salaries Per Pupil | Per Cent of Teachers With College Degrees | Per Cent of Teachers With Masters Degrees | Per Cent of Total Staff With Emergency Permits | Student-Counselor Ratios | Professional Personnel Per 100 Pupils |
|---|---|---|---|---|---|---|
| ALAMO HEIGHTS | $372 | 100% | 40% | 11% | 645 | 4.80 |
| NORTH EAST | 288 | 99 | 24 | 7 | 1,516 | 4.50 |
| SAN ANTONIO | 251 | 98 | 29 | 17 | 2,320 | 4.00 |
| NORTH SIDE | 258 | 99 | 20 | 17 | 1,493 | 4.30 |
| HARLANDALE | 243 | 94 | 21 | 22 | 1,800 | 4.00 |
| EDGEWOOD | 209 | 96 | 15 | 47 | 3,098 | 4.06 |

Based on Table XI to affidavit of Joel S. Berke, App. 220, which was prepared on the basis of a sample of six selected school districts located in Bexar County, Texas, from data for the 1967–1968 school year.

## APPENDIX IV TO OPINION OF MARSHALL, J., DISSENTING

### BEXAR COUNTY, TEXAS, SCHOOL DISTRICTS RANKED BY EQUALIZED PROPERTY VALUE AND TAX RATE REQUIRED TO GENERATE HIGHEST YIELD IN ALL DISTRICTS

| Districts Ranked from High to Low Market Valuation Per Pupil | Tax Rate Per $100 Needed to Equal Highest Yield |
|---|---|
| ALAMO HEIGHTS | $0.68 |
| JUDSON | 1.04 |
| EAST CENTRAL | 1.17 |
| NORTH EAST | 1.21 |
| SOMERSET | 1.32 |
| SAN ANTONIO | 1.56 |
| NORTH SIDE | 1.65 |
| SOUTH WEST | 2.10 |
| SOUTH SIDE | 3.03 |
| HARLANDALE | 3.20 |
| SOUTH SAN ANTONIO | 5.77 |
| EDGEWOOD | 5.76 |

Based on Table IX to affidavit of Joel S. Berke, App. 218, which was prepared on the basis of the 12 school districts located in Bexar County, Texas, from data from the 1967–1968 school year.